EXHIBIT 1

# Ground Lease

between

## Commerce Center Development, LLC, Landlord

and

## Matthews 350 E LaSalle LLC, Tenant

dated as of

October 30, 2019

# Ground Lease

This GROUND LEASE (the "**Lease**") dated as of the October 30, 2019 is entered into between Commerce Center Development, LLC, an Indiana Company ("**Landlord**") and Matthews 350 E LaSalle LLC, an Indiana Company ("**Tenant**"), and together with Landlord collectively referred to herein as the "**Parties**").

## WITNESSETH:

In consideration of the rents reserved and covenants made herein, the sufficiency of which is acknowledged, Landlord and Tenant, for themselves, and their legal representatives, and their permitted successors and assigns, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01   Definitions.** The following terms, as used in this Lease, shall have the meanings set forth below:

"**Additional Rent**" shall mean all amounts payable by Tenant under this Lease, other than Base Rent, and whether or not expressly designated as Additional Rent in this Lease.

"**Affiliate**" shall mean a Person which shall Control, be under the Control of, or be under common Control with the Person in question.

"**Alteration**" or "**Alterations**" shall have the meaning set forth in Section 9.02 hereof.

"**Approval Date**" shall mean December 17, 2018.

"**Approvals**" shall mean all approvals of Governmental Authorities required for the construction of the Facility and for any Alteration, as applicable.

"**Assignment**" shall mean the sale, exchange, assignment, or other disposition of all of Tenant's interest in this Lease and the leasehold estate created thereby, whether by operation of Law or otherwise.

"**Base Rent**" shall have the meaning set forth in Section 3.01hereof.

"**Broker**" shall have the meaning set forth in Section 23.01 hereof.

"**Business Day**" shall mean any day that is not a Saturday, Sunday, or a day observed as a holiday by either the State or the Federal government.

"**Certificate of Occupancy**" shall mean a certificate issued by the appropriate Governmental Authority permitting the occupancy of the Facility. For purposes hereof, a temporary Certificate of Occupancy shall be deemed to be a Certificate of Occupancy but shall be replaced with a permanent Certificate of Occupancy before the expiration of such temporary Certificate of Occupancy.

"**CGL**" shall have the meaning set forth in Section 10.04 hereof.

2

"**Change Order**" shall have the meaning set forth in Section 7.06 hereof.

"**Commencement Date**" shall mean October 30, 2019.

"**Commencement of Construction**" shall mean the date on which on-site construction of the Facility shall commence, including any excavation or pile driving but not including test borings, test pilings, surveys, and similar pre-construction activities.

"**Construction Commencement Date**" shall mean ten (10) days following the Approval Date.

"**Completion Date**" shall mean twenty-four (24) months following the Commencement Date.

"**Condemnation**" shall mean the taking or appropriation of all or any part of the Premises, or any interest therein or right accruing thereto including any right of access, by or on behalf of any Governmental Authority or by any entity granted the authority to take property in the exercise of the power or right of eminent domain granted by statute, or any agreement that conveys to the condemning authority all or any part of the Premises as the result of, in lieu of, or in anticipation of, the exercise of a right of condemnation or eminent domain. Such term shall also be deemed to include, to the extent not otherwise defined herein, a temporary taking of the Premises or any part thereof or the Improvements thereon for a period of ten (10) year(s) or more, and the taking of the leasehold interest created herein.

"**Construction Agreement**" shall mean that certain agreement as of October 8, 2018 with Contractor for the construction of the Facility. A copy of the final form of the Construction Agreement is attached hereto and incorporated herein as Exhibit A.

"**Contract Documents**" shall have the meaning set forth in Section 7.04 hereof.

"**Contractor**" shall mean F.A. Wilhelm Construction Co., Inc., who has entered into or will enter into the Construction Agreement with Tenant for the construction and development of the Facility.

"**Control**" shall mean the ownership of more than fifty (50%) of the outstanding voting ownership interests of the Person in question or the power to direct the management of the Person in question.

"**Date of Taking**" shall mean the earlier of the date, pursuant to the provisions of applicable State or Federal Law, on which: (a) actual possession of all or part of the Premises, as the case may be, is acquired by the appropriate Governmental Authority; or (b) title to all or part of the Premises, as the case may be, is vested in the appropriate Governmental Authority.

"**Deficiency**" shall have the meaning set forth in Section 14.02(d) hereof.

"**Depository**" shall mean the Leasehold Mortgagee holding the Leasehold Mortgage having the highest priority. If there is no Leasehold Mortgagee, or if Leasehold Mortgagee declines to act as Depository, then the Depository shall mean a savings bank, savings and loan association, commercial bank, or trust company designated by Tenant and approved by Landlord, which approval shall not be unreasonably withheld, conditioned, or delayed to serve as Depository pursuant to an agreement reasonably acceptable to Landlord and Tenant. If Tenant shall fail to designate a Depository within ten

(10) Business Days after the request of Landlord, Landlord shall have the right to designate such Depository.

"**Due Date**" shall mean with respect to: (a) Base Rent and Additional Rent, the date on which such Base Rent or Additional Rent payment is due as provided in this Lease; and (b) any Imposition, the last date on which such Imposition can be paid without any fine, penalty, interest, or cost being added thereto or imposed by Law for the non-payment thereof.

"**Embargoed Person**" shall have the meaning set forth in Section 30.02(a).

"**Environmental Laws**" shall mean all Laws: (a) relating to the environment, human health, or natural resources; (b) regulating, controlling, or imposing liability or standards of conduct concerning any Hazardous Materials; (c) relating to Remedial Action; and (d) requiring notification or disclosure of releases of Hazardous Materials or of the existence of any environmental conditions on or at the Premises, as any of the foregoing may be amended, supplemented, or supplanted from time to time.

"**Environmental Liabilities**" shall mean any loss, cost, expense, claim, demand, liability, obligation, action, or other responsibility of whatever kind, based upon or required under Environmental Laws or otherwise relating to: (a) any environmental, health, or safety matter or condition (including, but not limited to, on-site or off-site pollution or contamination, the welfare, safety, and health of people at the Premises or elsewhere, and the regulation of chemical substances or products); (b) fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands, responses, and remedial, investigative, or inspection costs and expenses arising under or caused by application of Environmental Laws (including, but not limited to, fees for attorneys, engineers, and other professionals); (c) financial responsibility under Environmental Laws for Remedial Action or for any damages to natural resources; or (d) any other Remedial Actions required under Environmental Laws.

"**Executive Order**" shall have the meaning set forth in Section 30.02(a) hereof.

"**Expiration Date**" shall mean ninety-nine (99) years from the Completion Date, or such earlier date on which the Term shall sooner end pursuant to any of the terms, covenants or conditions of this Lease or pursuant to Law.

"**Event of Default**" shall have the meaning set forth in Section 14.01 hereof.

"**Facility**" shall mean the building to be constructed on the Land by Tenant pursuant to this Lease which is a multi-use building, together with all fixtures now or in the future installed or erected upon the Land or Improvements and containing not less than One hundred thousand (100,000) rentable square feet.

"**Fee Mortgage**" shall mean any financing obtained by Landlord, as evidenced by any mortgage, deed of trust, assignment of leases and rents, or other instruments, and secured by the fee ownership interest of Landlord in the Property, including any extensions, modifications, amendments, replacements, supplements, renewals, refinancings, and consolidations thereof.

"**Fee Mortgagee**" shall mean the holder of a Fee Mortgage.

4

"**Governmental Authority or Governmental Authorities**" shall mean the United States of America, the State of Indiana, the County of St. Joseph, the City of South Bend, any political subdivision of any of the foregoing, and any other governmental or regulatory authority, agency, board, department, or any other public or quasi-public authority, having jurisdiction over the Premises or the matter at issue.

"**Hazardous Materials**" shall mean any and all substances, materials, chemicals, or wastes that now or hereafter are classified or considered to be hazardous or toxic under any Environmental Law, or that are or become regulated by any Governmental Authority because of toxicity, infectiousness, radioactivity, explosiveness, ignitability, corrosiveness, or reactivity under any Environmental Law applicable to the Premises, and shall also include: (a) gasoline, diesel fuel, and any other petroleum hydrocarbons; (b) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (c) polychlorinated biphenyls; (d) radon gas; and (e) flammable liquids and explosives.

"**Impositions**" shall mean any and all: (a) property taxes of every kind and nature; (b) property assessments (whether general, special, business improvement district, or otherwise); (c) personal property taxes; (d) occupancy and rent taxes; (e) water, water meter, sewer rents, rates, and charges; and (f) any and all other governmental levies, fees, rents, assessments, or taxes and charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, and any interest or costs with respect thereto, which at any time during the Term are, or, if the Premises or any part thereof or the owner thereof were not exempt therefrom, would have been assessed, levied, confirmed, imposed upon, or would have become due and payable out of or in respect of, or would have been charged with respect to, the Premises (excluding any capital gains taxes imposed in connection with the execution of this Lease).

"**Improvements**" shall mean all buildings and other improvements now located, or hereafter erected, on the Land (including the Facility), together with all fixtures now or in the future installed or erected in or upon the Land or such improvements owned or leased by Landlord or Tenant.

"**Indemnitees**" shall have the meaning set forth in Section 11.01hereof.

"**Initial Construction**" shall mean the design, development, and construction of the Facility, including all related demolition and excavation.

"**Interest Rate**" shall mean the Prime Rate plus <u>five percent (5%)</u> per annum but, in no event, in excess of the maximum permissible interest rate then in effect in the State.

"**Land**" shall mean all that certain plot, piece, or parcel of land with a street address of <u>350 E LaSalle</u>, located in the City of South Bend, County of St. Joseph, State of Indiana and which land is legally described in <u>Exhibit B</u> attached hereto and incorporated herein and incorporated herein.

"**Land Value**" shall mean, as of any date, the fair market value of the Land, as determined by Landlord. For purposes herein, the term "fair market value" is deemed to be the price that a willing buyer would offer, and a willing seller would accept, for all of seller's right, title, and interest in the Land, considered as encumbered by this Lease with all extension options exercised, unencumbered by any Fee Mortgage, vacant, and unimproved. If Tenant disputes Landlord's determination of fair market value, Tenant shall submit such dispute to Arbitration.

"**Law**" or "**Laws**" shall mean any present or future applicable law, statute, ordinance, regulation (including zoning regulations), code, building code, judgment, injunction, arbitration award, order, rule, directive, common law, codes and ordinances of any Governmental Authorities, easement, covenant, restriction, or other agreement of record affecting the Premises as of the date of this Lease or subsequent thereto.

"**Leasehold Mortgage**" shall mean any loan financing obtained by Tenant, as evidenced by any mortgage, deed of trust, or other instrument and secured by Tenant's interest in this Lease and the leasehold estate created hereby, including any extensions, modifications, amendments, replacements, supplements, renewals, and refinancing, thereof.

"**Leasehold Mortgagee**" shall mean the holder of a Leasehold Mortgage.

"**Legal Requirements**" shall mean all requirements of Law.

"**Liabilities**" shall mean all losses, claims, suits, demand, costs, liabilities, and expenses, including reasonable attorneys' fees, penalties, interest, fines, judgment amounts, fees, and damages, of whatever kind or nature.

"**Major Sublease**" shall mean a Sublease of not less than <u>one percent (1%)</u> of the total rentable square feet of the Facility.

"**Major Subtenant**" shall mean a Subtenant under a Major Sublease.

"**Mortgagee Lease**" shall have the meaning set forth in Section 13.07 hereof.

"**Patriot Act**" shall have the meaning set forth in Section 30.02 hereof.

"**Permitted Use**" shall mean the use of the Premises in accordance with all applicable Laws for any lawful purpose.

"**Person**" shall mean any individual, corporation, partnership, firm, or other legal entity.

"**Personalty**" shall mean all machinery, equipment, appliances, furniture, and any other personal property of any kind or description owned or leased by Landlord or Tenant located on the Premises and used in the operation of the Premises, excluding trucks and cars.

"**Plans**" shall have the meaning set forth in Section 7.07 hereof.

"**Premises**" shall mean the Land, any Improvements thereon (including the Facility, as applicable), and any and all rights, privileges, easements, and appurtenances to the Land and the Improvements and any development rights.

"**Prevailing Party**" shall have the meaning set forth in Section 30.04 hereof.

"**Prime Rate**" shall mean the prime or base rate announced as such from time to time by <u>JP Morgan Chase & Co</u>, and if not available, a comparable rate selected by Landlord. Any interest payable under this Lease with reference to the Prime Rate shall be adjusted on a daily basis, based upon the

Prime Rate in effect at the time in question, and shall be calculated on the basis of a 360-day year with twelve (12) months of thirty (30) days each.

"**Prohibited Person**" shall have the meaning set forth in Section 30.02 hereof.

"**Property Reports**" shall have the meaning set forth in Section 7.14 hereof.

"**Qualified Appraiser**" shall mean an arbitrator that: (a) is duly licensed in the jurisdiction in which the Premises is located; (b) has at least ten (10) years' experience, on a full-time basis, leasing space in the same general geographic area as that in which the Premises is located and at least five (5) of those ten (10) years of experience; and (c) is independent and has no then-pending or past brokerage relationship with any or all of Landlord, Tenant, and any Affiliates of either or both of Landlord and Tenant.

"**Release**" shall mean the release or threatened release of any Hazardous Materials into or upon or under or above any land, water, or air, or otherwise into the environment, including by means of burial, disposal, discharge, emission, spillage, leakage, seepage, leaching, or dumping.

"**Remedial Action**" shall mean the investigation, response, clean up, remediation, prevention, mitigation, or removal of any Hazardous Materials necessary to comply with any Environmental Laws.

"**Rent**" shall mean Base Rent and Additional Rent.

"**Rent Commencement Date**" shall mean the Commencement Date.

"**Restoration**" shall have the meaning set forth in Section 16.01 hereof.

"**Restoration Funds**" shall have the meaning set forth in Section 16.02 hereof.

"**Restore**" shall have the meaning set forth in Section 16.01hereof.

"**Security**" shall mean the amount of <u>one and 00/100 Dollars ($1.00)</u>.

"**Schedule of Performance**" shall have the meaning set forth in Section 7.04 hereof.

"**State**" shall mean the State of Indiana.

"**Sublease**" shall mean any lease, sublease, occupancy, license, or concession agreement for the use or occupancy of space in the Improvements (other than this Lease).

"**Substantial Completion, Substantially Complete, and Substantially Completed**" shall mean, with respect to the Initial Construction and all Alterations, the satisfaction of the following conditions: (a) Tenant shall have obtained and delivered to Landlord all Approvals required by Law to be issued in connection with the Initial Construction or Alteration, as applicable, including any Certificate of Occupancy or amendment of the Certificate of Occupancy; and (b) Tenant delivers to Landlord a final release and waiver of mechanics' liens covering all of the Initial Construction or Alteration, as applicable, in form and substance reasonably satisfactory to Landlord, executed by each of the general contractor, construction manager, design builder, contractors, and subcontractors.

7

"**Substantially all the Premises**" shall mean: (a) that portion of the Premises in excess of seventy-five (75%) of the total rentable area of the Improvements; or (b) if the Improvements include a parking lot or parking facility, more than eighty (80%) of the total number of parking spaces available at the Premises. If there is any dispute as to whether or not "substantially all the Premises" has been taken, such dispute shall be submitted to and determined by Arbitration.

"**Subtenant**" shall mean any tenant, subtenant, licensee, or other occupant of space in the Improvements (other than Tenant).

"**Subtenant NDA Agreement**" shall have the meaning set forth in Section 12.05(b) hereof.

"**Subtenant NDA Criteria**" shall have the meaning set forth in Section 12.05(b) hereof.

"**Subtenant NDA Request Notice**" shall have the meaning set forth in Section 12.05(a) hereof.

"**Term**" shall mean the term of this Lease commencing on the Commencement Date and ending on the Expiration Date.

"**Transfer**" shall mean any transaction or series of transactions (including any assignment, transfer, issuance, or redemption of any ownership interest, or any merger, consolidation, or dissolution) that results in a change of Control of Tenant or any Person or entity which directly or indirectly Controls Tenant. Notwithstanding the foregoing, a Transfer shall not be deemed to include an issuance or a transfer of stock through the "over the counter" market or through any recognized national stock exchange.

"**Transferee**" shall have the meaning set forth in Section 12.01hereof.

"**Unavoidable Delays**" shall mean delays incurred by Tenant due to acts of God, enemy action, acts of terrorism (both domestic and foreign), civil commotion, fire, unavoidable casualty, or other causes beyond the control of Tenant (but not including Tenant's insolvency or financial condition); provided: (a) Tenant shall have notified Landlord not later than ten (10) days after Tenant knows or should have known of the occurrence of same and the effects of which a prudent Person in the position of Tenant could not have reasonably prevented; and (b) Tenant takes the necessary steps to terminate such unavoidable delays as expeditiously as possible under the circumstances.

**ARTICLE II**
**LEASE OF PREMISES; CONDITION OF PREMISES; COMMENCEMENT DATE AGREEMENT; FAILURE TO DELIVER POSSESSION**

**Section 2.01    Lease of Premises.** Subject to the terms and conditions of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises for a Term that shall commence on the Commencement Date and end on the Expiration Date, subject to earlier termination pursuant to any of the terms, covenants, or conditions of this Lease or pursuant to Law. Landlord hereby acknowledges and agrees that (i) the Demised Premises is subject to certain tax abatements for a period of ten (10) years as evidenced by that certain Resolution No. 4612-17 passed by the Common Council of the City of South Bend, Indiana dated January 9, 2017 and that certain Resolution No. 4613-17 passed by the Common Council of the City of South Bend, Indiana dated January 24, 2017 and (i) the foregoing tax abatements

shall accrue to the benefit of Tenant and any leasehold mortgagee or its nominee in the event such leasehold mortgagee exercises its rights and remedies under a leasehold mortgage or accepts a deed or assignment in lieu thereof.

Section 2.02    Condition of Premises. Tenant has inspected the Premises and accepts possession of the Premises in its "**AS IS**" condition on the Commencement Date. Except as otherwise expressly provided in this Lease, Tenant has full responsibility for the repair, alteration, maintenance, and replacement of the Premises. Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant is not relying upon, any warranties or representations regarding the Premises, except to the extent same are expressly set forth in the Lease.

Section 2.03    Commencement Date Agreement. Within thirty (30) days following the Commencement Date, Landlord and Tenant shall enter into an agreement, in the form attached hereto and incorporated herein as Exhibit C, confirming the Commencement Date, the Rent Commencement Date, and the initial Expiration Date, provided, however, the failure of Landlord or Tenant, or both, to execute and deliver such agreement shall not affect the Commencement Date, the Rent Commencement Date, or the initial Expiration Date.

Section 2.04    Failure to Deliver Possession. If Landlord shall fail to deliver vacant possession of the Premises on the Commencement Date, Landlord shall have no liability to Tenant and this Lease shall remain in full force and effect according to its terms, but the Term shall not commence until the date on which Landlord delivers vacant possession of the Premises to Tenant. Notwithstanding the foregoing, if Landlord fails to deliver vacant possession of the Premises on or before the Outside Delivery Date, Tenant may at its option, upon sixty (60) days' prior written notice to Landlord, elect to terminate this Lease by giving Landlord notice of termination. Upon the date that is ninety (90) days following receipt of such notice by Landlord, this Lease shall terminate and be of no further force and effect, the parties shall have no further liability to the other (except for those Liabilities that expressly survive the termination of the Lease) and Landlord shall return to Tenant the Security. Notwithstanding the foregoing, if Landlord delivers vacant possession of the Premises within such ninety (90)-day period following its receipt of Tenant's notice of termination, Tenant's notice shall be void and of no further force and effect and this Lease shall not terminate.

ARTICLE III
BASE RENT; RENT PAYABLE TO LANDLORD; NET LEASE

Section 3.01    Base Rent.

(a)    Tenant covenants and agrees to pay base rent to Landlord throughout the Term of this Lease as follows ("**Base Rent**") for the period commencing on the Commencement Date and ending on the Expiration Date an amount equal to One and 00/100 Dollars ($1.00) per annum, which Landlord agrees has been paid in full with the execution of this Lease.

Section 3.02    Rent Payable to Landlord.

(a)    Tenant has paid Base Rent for the entire Term in full.

9

(b)      Notwithstanding the foregoing and, provided no Event of Default has occurred and is continuing, Tenant shall not be required to pay Base Rent for the period commencing on the Commencement Date and ending on the Rent Commencement Date.

(c)      Tenant shall pay to Landlord all Additional Rent that is payable to Landlord pursuant to the terms and conditions of this Lease within thirty (30) days after written demand therefore from Landlord, unless a different time is specified in this Lease.

(d)      All Base Rent and Additional Rent (such Additional Rent that is due and owing to Landlord pursuant to the terms and conditions of this Lease) shall be paid: (i) by good check drawn on an account at a bank in currency that at the time of payment is legal tender for public and private debts in the United States of America, made payable to Landlord at Landlord's address set forth in Section 19.01herein or to such other parties and at such other addresses as Landlord shall direct by notice to Tenant from time to time; (ii) if Landlord shall so direct (at any time upon not less than thirty (30) days' prior notice), by wire transfer of immediately available funds to an account at a bank designated in writing by Landlord; or (iii) by any other method reasonably designated in writing by Landlord.

(e)      If any installment of Additional Rent (such Additional Rent that is due and owing to Landlord) is not paid within thirty (30) days of the applicable Due Date, Tenant shall pay to Landlord, as Additional Rent:

(i)      a late charge equal to eight (8%) of the overdue amount to Landlord in order to defray the expenses incident to handling such delinquent payments. Such payment shall be in addition to, and not in lieu of, any other remedy Landlord may have; and

(ii)      interest on the overdue amount to Landlord at the Interest Rate. Such overdue Rent shall bear interest from the Due Date, without regard to any grace period, until the date such Rent is paid. Such payment shall be in addition to, and not in lieu of, any other remedy Landlord may have.

**Section 3.03   Net Lease.** This Lease is an absolute net lease. Tenant shall pay as Additional Rent all expenses of every kind and nature whatsoever relating to or arising from the Premises, including Impositions, and all expenses arising from the leasing, operation, management, construction, maintenance, repair, use, and occupancy of the Premises, except as otherwise expressly provided in this Lease. Notwithstanding the foregoing, Landlord agrees to pay the following expenses: (a) any expenses expressly agreed to be paid by Landlord in this Lease; (b) debt service and other payments with respect to any Fee Mortgage; (c) expenses incurred by Landlord to monitor and administer this Lease; (d) expenses incurred by Landlord prior to the Commencement Date; and (e) expenses that are personal to the Landlord.

## ARTICLE IV
## PAYMENT OF IMPOSITIONS; REDUCTION OF ASSESSED VALUATION; UTILITIES

**Section 4.01   Payment of Impositions.**

(a)     During the Term of this Lease, Tenant shall pay or shall cause to be paid all Impositions directly to the Governmental Authority charged with the collection thereof. Each Imposition, or installment thereof, during the Term shall be paid not later than ten (10) days prior to the Due Date thereof. However, if, by Law, any Imposition may at the option of the taxpayer be paid in installments (whether or not interest shall accrue on the unpaid balance of such Imposition), Tenant may exercise the option to pay the same in such installments and shall be responsible for the payment of such installments only, together with applicable interest, if any, provided that all such installment payments together with applicable interest, if any, relating to periods prior to the Expiration Date shall be made prior to the Expiration Date. Tenant shall promptly notify Landlord if Tenant shall have elected to pay any such Imposition in installments.

(b)     Tenant shall, within ten (10) days following each Due Date, furnish to Landlord official receipts of the appropriate Governmental Authority, or other evidence reasonably satisfactory to Landlord, evidencing the payment of such Impositions.

(c)     Tenant shall not be required to pay municipal, state, or federal income, gross receipts, inheritance, estate, succession, profit, capital, or transfer gains taxes of Landlord, or any corporate franchise tax imposed upon Landlord or any transfer or gains tax imposed on Landlord.

(d)     Any Imposition relating to a period, a part of which is included within the Term and a part of which is included in a period of time before the Commencement Date or after the Expiration Date shall be apportioned between Landlord and Tenant as of the Commencement Date or Expiration Date (other than an Expiration Date arising by reason of Tenant's default), as the case may be, so that Tenant shall pay only that portion of such Imposition which that part of such fiscal period included in the period of time after the Commencement Date or before the Expiration Date bears to such fiscal period, and Landlord shall pay the remainder thereof.

(e)     Tenant shall have the right to contest the amount or validity, in whole or in part, of any Imposition by appropriate proceedings diligently conducted in good faith, in which event, notwithstanding the provisions of this Article IV, payment of such Imposition shall be postponed if, and only as long as:

(i)     neither the Premises nor any part thereof, or interest therein or any income therefrom (except to the extent covered by security deposited in accordance with this Section 4.01(e)) would by reason of such postponement or deferment, be, in the reasonable judgment of Landlord, in imminent danger of being forfeited or lost or subject to any lien, encumbrance, or charge, and neither Landlord nor Tenant would by reason thereof be subject to any civil or criminal liability;

(ii)     Tenant shall have deposited with Depository cash or a letter of credit in a form and from an issuer reasonably satisfactory to Landlord in the amount so contested and unpaid, together with all interest and penalties in connection therewith and all charges that may or might be assessed against or become a charge on the Premises or any part thereof in such proceedings, or such other security as shall be reasonably satisfactory to Landlord; and

11

(iii)    no Event of Default has occurred and is continuing (in which event only Landlord may commence such proceedings but shall have no obligation to do so).

(f)    Upon the termination of such proceedings, it shall be the obligation of Tenant to pay the amount of such Imposition or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including reasonable attorneys' fees and disbursements), interest, penalties, or other liabilities in connection therewith. Upon such payment, Depository shall return, with interest, if any, any amount deposited with it as aforesaid; provided, however, that Depository at Tenant's request or upon Tenant's failure to do so in a timely manner, at Landlord's request, shall disburse said moneys on deposit with it directly to the Governmental Authority to whom such Imposition is payable and any remaining monies, with interest, if any, shall be returned promptly to Tenant.

(g)    Landlord shall not be required to join in any proceedings referred to in this Article IV unless the provisions of any Law at the time in effect shall require that such proceedings be brought by or in the name of Landlord, in which event, Landlord shall join and reasonably cooperate in such proceedings or permit the same to be brought in its name but shall not be liable for the payment of any costs or expenses in connection with any such proceedings and Tenant shall reimburse Landlord for any and all costs or expenses which Landlord may reasonably sustain or incur in connection with any such proceedings, including reasonable attorneys' fees and disbursements.

(h)    In the event that a Leasehold Mortgagee shall require Tenant to deposit funds with such Leasehold Mortgagee to ensure payment of Impositions, any amount so deposited by Tenant with such Leasehold Mortgagee shall be credited against the amount, if any, which Tenant would otherwise be required to deposit under this Section 4.01.

(i)    If there shall be any refunds or rebates on account of any Impositions paid by Landlord or Tenant, such refund or rebate shall belong to the party that paid the Imposition.

**Section 4.02    Reduction of Assessed Valuation.** Subject to the provisions of any Leasehold Mortgage, Tenant may, at Tenant's sole cost and expense, endeavor from time to time to reduce the assessed valuation of the Premises for the purpose of reducing the Impositions payable by Tenant. Landlord agrees to offer no objection to such contest or proceeding and, at the request of Tenant, to reasonably cooperate with Tenant in pursuing such contest or proceeding, but without expense to Landlord. Tenant agrees to indemnify and hold Landlord harmless from all Liabilities arising by reason of or in connection with any such contest or proceeding. If all any part of an Imposition is refunded to either Landlord or Tenant (whether through cash payment or credit against Impositions), the party who paid the Imposition to which the refund relates shall be entitled to such refund to the extent such refund relates to any Imposition paid by such party.

## ARTICLE V
## SECURITY; LETTER OF CREDIT

**Section 5.01    Reserved.**

12

**ARTICLE VI**
**PERMITTED USE**

**Section 6.01   Permitted Use.**

(a)      Subject to all applicable Laws and this Lease, Tenant shall use the Premises only for the Permitted Use.

(b)      Tenant shall not use or occupy, nor permit or suffer the Premises or any part thereof to be used or occupied for any unlawful, illegal, or extra hazardous business, use, or purpose, or in such manner as to constitute a nuisance of any kind (public or private), or for any purpose or in any way in violation of the Certificate of Occupancy or of any Laws, or which may make void or voidable any insurance then in force on the Premises. Tenant shall take, immediately upon the discovery of any such unpermitted, unlawful, illegal, or extra hazardous use, all necessary actions, legal and equitable, to compel the discontinuance of such use.

**ARTICLE VII**
**CONSTRUCTION OF FACILITY**

**Section 7.01   Reserved.**

**Section 7.02   Reserved.**

**Section 7.03   Default in Construction.** In the event of a default by the Contractor or the Architect in connection with the Initial Construction, Tenant shall exercise all the rights and remedies available to Tenant in each such agreement.

**Section 7.04   Commencement of Construction.** Tenant shall commence and pursue the Initial Construction to Substantial Completion in accordance with the contract documents as defined in the Construction Agreement (the "**Contract Documents**") and in accordance with the construction schedule set forth in the Construction Agreement (subject to Unavoidable Delays) (the "**Schedule of Performance**").

**Section 7.05   Reserved.**

**Section 7.06   Change Order.** Tenant may, without the prior written consent or approval of Landlord, order, authorize, or perform any change, substitute work, or materials in prosecuting the construction of the Improvements ("**Change Order**").  Tenant shall give Landlord notice of any change order.

**Section 7.07   Construction According to Approved Plans.** All building materials for the Facility must be new and of good quality in accordance with the Contract Documents and Plans. All construction will be performed in a good and workmanlike manner and only by contractors and subcontractors that are properly licensed in the State of Indiana to perform their respective work. Landlord reserves the right to monitor the Initial Construction, from its inception to its completion. Access to the construction site will be limited to those involved with the work. Prior to commencing construction, Tenant will provide a six (6) foot high chain link security fence (which may not contain razor or barbed wire) with lockable gates at the perimeter of the construction site and staging area.

13

**Section 7.08    Liens Subordinate to Landlord.** Tenant shall not create or permit to be created or to remain, and shall promptly discharge, any lien, encumbrance, or charge levied on account of any mechanic's, laborer's, or materialman's lien which might or does constitute a lien, encumbrance, or charge upon the Premises, or any part thereof, or the income therefrom, having a priority or preference over or ranking on a parity with the estate, rights, or interest of Landlord in the Premises or any part thereof, or the income therefrom. Nothing in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to the filing of any lien against the Premises by any contractor, subcontractor, laborer, materialman, architect, engineer, or other Person for the performance of any labor or the furnishing of any materials or services for or in connection with the Premises or any part thereof.

**Section 7.09    Completion of Construction by Landlord.** Tenant's failure to comply with the requirements of the Schedule of Performance and to Substantially Complete the Facility by the Completion Date (subject to Unavoidable Delays) shall be deemed to be a material default under this Lease and Landlord shall have the right to pursue any and all of its remedies as set forth in Section 14.02 hereof and any and all of its rights and remedies at law and in equity. Tenant covenants and agrees that in the event: (a) Tenant abandons or fails to Substantially Complete the Facility by the Completion Date (subject to Unavoidable Delays); (b) such failure is not solely the result of Landlord's being in material default under this Lease; and (c) the Leasehold Mortgagee does not elect to complete construction of the Facility, Landlord may, at its option (but without any obligation so to do and without prejudice to any other rights Landlord may have under this Lease) complete the construction of the Facility undertaken by Tenant as an expense of the Premises and, as nearly as practicable, according to the Plans previously approved by the Landlord.

**Section 7.10    Title to the Improvements and the Personalty.** The title to all Improvements and Personalty now or hereafter located on the Premises, including those to be constructed in accordance with the Plans and Contract Documents, shall be vested in Tenant until either the termination or expiration of this Lease, at which time all title to and ownership of the Improvements and Personalty shall automatically and immediately vest (without the necessity of any further action being taken by Tenant or Landlord or any instrument being executed and delivered by Tenant to Landlord) in Landlord.

**Section 7.11    Architects, Engineers, Contractors, Specialists, and Consultants.** Tenant shall require any architects, engineers, contractors, subcontractors, specialists, and consultants engaged in connection with the construction of the Facility to perform their respective obligations under the terms of the Contract Documents, to be licensed in accordance with the Laws of the State, and to obtain and maintain for a period of five (5) years after the Substantial Completion of the Facility errors and omissions insurance pursuant to Section 10.05.

**Section 7.12    Permits, Laws, and Ordinances.** Tenant shall, at its sole cost and expense, comply and cause its contractors and subcontractors to comply in all material respects with all Laws of all Governmental Authorities which may now or hereafter, from time to time, be established and which are or shall be applicable to Tenant or Landlord as they relate to the Premises and shall take, as otherwise provided herein, all action necessary to cause the Premises to comply in all material respects with all provisions of the Contract Documents, the loan documents evidencing and securing the Leasehold Mortgage, and this Lease applicable to Tenant.

**Section 7.13    Reserved.**

14

**Section 7.14   Reports and Information.** Tenant shall deliver or cause to be delivered to Landlord copies of all soil reports, surveys, hazardous wastes or toxic materials reports, feasibility studies, and other similar written materials prepared for Tenant pursuant to the Contract Documents with respect to the Premises (collectively, the "**Property Reports**") within thirty (30) days after receipt by Tenant.

**Section 7.15   Substantial Completion of Facility.** As soon as practicable (however, in no event to exceed thirty (30) days after the Substantial Completion of the Facility, Tenant will furnish to the Landlord:

(a)     One complete set of final "as-built" plans and specifications of the completed improvements in auto-CAD format; and

(b)     A current, accurate, properly labeled, and certified (by the hereafter stated surveyor or engineer), "as-built" plat of survey prepared by an Indiana registered land surveyor or professional engineer depicting to scale the location of the completed improvements, as the same have been constructed.

## ARTICLE VIII
## OPERATION OF THE PREMISES

**Section 8.01   Tenant's Operation of the Premises.** Upon completion of construction of the Facility, Tenant will operate the Premises in accordance with all Laws governing the Premises and this Lease.

**Section 8.02   Mechanics' Liens.** Tenant shall keep the Premises and this Lease free from any lien or other encumbrance filed or recorded in favor of any mechanic, materialman, architect, or engineer in accordance with Section 7.08 hereof.

**Section 8.03   Utilities.** Tenant shall obtain and pay for all utilities directly from and to the utilities and vendors serving the Premises, including fuel, gas, electric, water and sewer service, trash collection, telephone, and internet service.

## ARTICLE IX
## MAINTENANCE, REPAIRS, AND ALTERATIONS

**Section 9.01   Maintenance and Repair of the Premises.** Tenant shall, at all times during the Term of this Lease, at Tenant's sole cost and expense, keep and maintain the Premises, including the Improvements, appurtenances, and every part thereof that may exist on, in, or be made a part of the Premises, in good order and condition, ordinary wear and tear excepted, and make all necessary repairs thereto, interior and exterior, structural and non-structural, ordinary, and extraordinary, and foreseen and unforeseen. If Tenant fails to keep and maintain the Premises and the Improvements as required by this Lease, Landlord may (but shall not be required to) perform and satisfy same, and Tenant hereby agrees to reimburse Landlord, as Additional Rent, for the reasonable cost thereof promptly upon demand. Tenant shall not permit any material waste of the Premises. Tenant shall keep the entire Premises, including adjoining sidewalks, substantially free of any accumulation of dirt, rubbish, snow,

15

and ice. Unless otherwise expressly provided in this Lease, Landlord is not required to maintain, repair, clean, alter, or improve the Premises, or to provide any services to the Premises.

Section 9.02   Alterations. Tenant may, at its sole cost and expense, alter, replace, or remodel any Improvements upon the Premises ("**Alterations**"), provided that the foregoing: (a) are made in compliance with all Laws; (b) are completed in accordance with general accepted construction standards; (c) any remodeling shall not materially diminish the value of Improvements or the Premises; and (d) Tenant shall not allow mechanic's or materialmen's liens to affix to the Premises because of the Alterations.

## ARTICLE X
## INSURANCE

Section 10.01  Insurance. It is the intent of the parties that all risk of loss for the Premises be shifted to insurance to the maximum extent practicable. Accordingly, unless Landlord otherwise agrees in its sole discretion, Tenant shall maintain, or cause to be maintained, insurance covering the risks enumerated below. The premiums for such insurance shall be paid by Tenant, except for the coverages set forth in Section 10.10 below, which will be the responsibility of the party providing such insurance coverage. Such insurance shall be written on an occurrence basis unless Landlord otherwise consents in writing, but for errors and omissions insurance issued on a claims-made basis. The policy shall provide that: (a) such insurance shall be primary coverage without reduction or right of offset or contribution on account of any insurance provided by Landlord to itself or its officers, officials, or employees; (b) such insurance shall not be altered or cancelled without thirty (30) days' written notice to Landlord; (c) such insurance shall name Landlord as an additional insured; (d) any Fee Mortgagee and Leasehold Mortgagee shall be named as: (i) a loss payee or mortgagee on Tenant's property damage insurance policy under a standard mortgagee clause; and (ii) an additional insured on Tenant's liability insurance policies. The insurance policies purchased by Tenant must be issued by a company authorized to conduct business in the State or by a company acceptable to the Landlord and which has a rating of A or better by A.M. Best.

Section 10.02  Workers' Compensation and Employer's Liability. At all times prior to the expiration or earlier termination of this Lease during any construction or Alteration conducted by or on behalf of Tenant in or on the Premises, Tenant shall maintain, and cause its contractors to maintain, Workers' Compensation Insurance as required by the Laws of the State. Tenant shall require all subcontractors performing work under this Lease to obtain an insurance certificate showing proof of Workers' Compensation and Employer's Liability Insurance.

Section 10.03  Property/Business Interruption. Tenant shall, at its sole cost and expense throughout the entire Term of this Lease:

    (a)     Keep the Improvements insured against loss or damage by fire, windstorm, flood, earthquake, and such other, further and additional risks as now are or hereafter may be embraced by the ISO special form and Builder's Risk extended coverage form or endorsements, with a deductible of no more than Twenty five thousand  and 00/100 Dollars ($25,000.00) per occurrence, in each case in amounts equal to the full replacement cost of the Improvements from time to time. The full replacement cost shall be redetermined from time to time (but not more frequently than every one (1) years at the request of Landlord, by a Qualified Appraiser designated by Tenant and approved by Landlord; and

16

(b)    Maintain business interruption insurance covering loss of revenues or other income by Tenant due to total or partial suspension of, or interruption in, the operation of the Premises caused by damage or destruction of the Premises in an amount sufficient to meet rent payments and other recurring payments for three (3) months, subject to the reasonable discretion of Landlord.

**Section 10.04  Public Liability.** At all times during the Term of this Lease, Tenant shall maintain a primary commercial general liability insurance ("**CGL**") policy covering all claims for bodily injury (including death) and property damage, including loss of use thereof, in an amount not less than two million and 00/100 Dollars ($2,000,000.00) per occurrence and five million and 00/100 Dollars ($5,000,000.00) aggregate, with deductible provisions not to exceed twenty five thousand and 00/100 Dollars ($25,000.00) per occurrence, to include personal and advertising injury, general aggregate, products, and completed operations aggregate insurance beginning at the completion of each project component, and contract liability to cover all insurable obligations in this Lease. The policy limits shall be adjusted every ten (10) years from the Commencement Date. Coverage shall be specific for this project or, upon approval of Landlord, covered under umbrella or pooled policies. The policy or policies must be on an "occurrence" basis unless waived by the Landlord. The CGL policy shall include contractual liability coverage, which shall be endorsed to state that indemnity obligations specified in this Lease are insured by the carrier.

**Section 10.05  Errors and Omissions.** Tenant shall obtain and maintain or cause to be obtained and maintained Professional Errors and Omissions Insurance covering all architects, engineers, specialists, and consultants in an amount and with coverage subject to the reasonable approval of Landlord. Coverages shall be specific for this project and not aggregated with insurance for other undertakings of the insureds.

**Section 10.06  Umbrella.** Tenant shall obtain and maintain an additional umbrella or all-risk coverage in an amount of two million and 00/100 Dollars ($2,000,000.00) for any one occurrence and Five Million and 00/100 Dollars ($5,000,000.00) in the aggregate, which shall include all insured coverages required by this Article X. The policy limits shall be adjusted every ten (10) years from the Commencement Date.

**Section 10.07  Delivery of Insurance Certificates.** Upon the commencement of this Lease and at each policy renewal date, Tenant shall furnish to Landlord, any Fee Mortgagee, and any Leasehold Mortgagee, at the addresses set forth in Section 19.01of this Lease, insurance certificates or renewal certificates or, if requested by Landlord, Fee Mortgagee, or Leasehold Mortgagee, certified copies of policies, evidencing all insurance required to be carried by Tenant in accordance with the Lease. Such certificates or policies shall name Landlord as an insured and shall name any Fee Mortgagee and Leasehold Mortgagee as mortgagee and loss payee, in accordance with the requirements contained in this Article X. The insurance certificate or polices, as applicable, must document that the liability insurance coverage purchased by the Tenant includes contractual liability coverage to insure the indemnity agreement as stated.

**Section 10.08  Evidence of Payment of Premiums.** Tenant shall within thirty (30) days of payment furnish to Landlord duplicate receipts or satisfactory evidence of the payment of all premiums on any and all insurance required to be carried by Tenant in accordance with this Lease. The insurance

17

carrier shall give Landlord, any Fee Mortgagee, and all Leasehold Mortgagees thirty (30) days' prior notice (with respect to nonpayment of premiums) of cancellation, modification, or non-renewal.

**Section 10.09  Payments for Tenant by Landlord.** If Tenant fails to procure the insurance required to be procured by Tenant under this Lease, or fails to pay any premium of insurance, Impositions, or any other sum in this Lease required to be paid by Tenant (other than Rent), Landlord may, after expiration of the applicable cure period, at Landlord's option, procure on behalf of Tenant any such insurance, and pay on behalf of Tenant any such payment or payments as may be necessary. Any sum(s) so paid or expended by Landlord on behalf of Tenant shall immediately be reimbursed and paid by Tenant to Landlord, as Additional Rent, within thirty (30) days after demand by Landlord.

**Section 10.10  Insurance Requirements for Subtenants and Contractors.** Tenant also shall require the Persons described below to carry the following insurance:

(a)     Tenant shall require all its Subtenants to:

(i)     maintain customary insurance required of tenants in similar properties (which insurance, as to any tenant serving liquor, shall include liquor law sales and dram shop coverage);

(ii)     include Landlord and Tenant as additional insureds on their commercial general liability policies (or equivalent policies);

(iii)     obtain a waiver of subrogation endorsement in all policies in favor of Landlord and Tenant; and

(iv)     include any Fee Mortgagee and Leasehold Mortgagee as: (A) a loss payee or mortgagee on each Subtenant's property damage insurance policy under a standard mortgagee clause; and (B) an additional insured on each Subtenant's liability insurance policies.

(b)     Tenant shall require all its Subtenants' contractors, subcontractors, design-builders, construction managers, consultants, and other entities providing services, materials, or labor to all or any portion of the Premises to:

(i)     include Landlord and Tenant as additional insureds in their commercial general liability policies; and

(ii)     obtain a waiver of subrogation endorsement in all policies in favor of Landlord and Tenant.

The policy limits set forth above shall be adjusted every ten (10) years from the Commencement Date. Each of the required coverages, excluding the professional liability insurance, fidelity insurance, and automobile liability insurance, shall contain a waiver of subrogation endorsement, in form and substance reasonably satisfactory to Landlord, in favor of Landlord and Tenant.

**Section 10.11  Threshold Amount.** The loss under all policies required by this Lease insuring against damage to the Premises by fire or other casualty shall be payable to Depository, except that

amounts of less than the Threshold Amount shall be payable in trust directly to Tenant for application to the cost of Restoration in accordance with this Lease. Proceeds of business interruption insurance shall be paid to Depository and shall be applied to the Rent payable by Tenant under this Lease until completion of such Restoration by Tenant.

**ARTICLE XI**
**INDEMNIFICATION**

**Section 11.01  Indemnification.** Tenant hereby releases and agrees to indemnify and hold harmless Landlord and all of its trustees, officers, employees, directors, agents, and consultants (hereinafter collectively referred to as the "**Indemnitees**") of and from any and all claims, demands, liabilities, losses, costs, or expenses for any loss including but not limited to bodily injury (including death), personal injury, property damage, expenses, and attorneys' fees, caused by, growing out of, or otherwise happening in connection with this Lease, due to any negligent or intentional act or omission on the part of Tenant, its agents, employees, or others working at the direction of Tenant or on its behalf, or due to the application or violation of any pertinent Federal, State, or local Laws except for the gross negligence or intentional misconduct of the Indemnitees. In case any action or proceeding is brought against Landlord by reason of any claim mentioned in this Article XI, Tenant, upon notice from Landlord, shall, at Tenant's expense, resist or defend such action or proceeding in Landlord's name, if necessary, by counsel for the insurance company, if such claim is covered by insurance, or otherwise by counsel approved by Landlord. Landlord agrees to give Tenant prompt notice of any such claim or proceeding. This indemnification is binding on the successors and assigns of the Tenant, and this indemnification survives the expiration or earlier termination of the Lease, or the dissolution or, to the extent allowed by Law, the bankruptcy of Tenant. This indemnification does not extend beyond the scope of this Lease and the Contract Documents and the work undertaken thereunder and does not extend to claims exclusively between the undersigned parties arising from the terms, or regarding the interpretation of, this Lease.

**ARTICLE XII**
**ASSIGNMENT; SUBLEASE; NON-DISTURBANCE**

**Section 12.01  Assignment, Transfer, and Major Sublease.** Tenant shall have the right, subject to the applicable provisions of this Article XII, without the consent of Landlord, to enter into an Assignment, Transfer, or Major Sublease with a Person (hereinafter called the "**Transferee**") provided that: (a) the Facility is Substantially Completed; (b) the Transferee is not a debtor or debtor-in-possession in a voluntary or involuntary bankruptcy proceeding; and (c) with respect to an Assignment or a Transfer, the Transferee assumes all of Tenant's obligations under this Lease thereafter arising and Landlord is provided with a fully executed copy of the assignment and assumption agreement. If Tenant's interest in this Lease is assigned in violation of the provisions of this Article XII, such Assignment shall be void and of no force and effect against Landlord. Neither any Assignment, Transfer, nor any subleasing, occupancy, or use of the Premises or any part thereof by any Person, nor any collection of Rent by Landlord from any Person other than Tenant, nor any application of any such Rent shall, in any circumstances, relieve Tenant of its obligations under this Lease on Tenant's part to be observed and performed.

**Section 12.02  Subleases.**

19

(a)       Tenant shall have the right, subject to the applicable provisions of this Article XII, without the consent of Landlord, to enter into Subleases with any Person who is not a debtor or debtor-in-possession in a voluntary or involuntary bankruptcy proceeding at the commencement of the Sublease term for the use permitted by this Lease.

(b)       Each Sublease shall provide that: (i) it is subordinate and subject to this Lease; and (ii) the fixed expiration date thereunder shall not extend beyond the Expiration Date.

(c)       Tenant shall not, without Landlord's prior written consent, amend or modify any Sublease in a manner which would cause such Sublease (as amended or modified) to violate the provisions of this Article XII and Tenant shall deliver to Landlord, or shall cause to be delivered to Landlord, within five (5) Business Days after the full execution and delivery thereof, a true and complete copy of any executed Sublease or any material amendment and modification thereto.

**Section 12.03  Notice.** Tenant shall notify Landlord of its intention to enter into any Assignment, Transfer, or Major Sublease at least thirty (30) days prior to the proposed effective date or commencement date of the foregoing and with respect to any such Assignment, Transfer, or Major Sublease which Tenant shall not have notified Landlord, Tenant shall notify Landlord of the foregoing at least thirty (30) days after the effective date of such Assignment, Transfer, or Major Sublease, but failure to give such notice shall not invalidate the Assignment, Transfer, or Major Sublease.

**Section 12.04  Copies to Landlord.** Tenant shall deliver to Landlord, or shall cause to be delivered to Landlord, within five (5) Business Days after the effective date of an Assignment or the commencement date of a Major Sublease: (a) in the case of an Assignment, a fully executed copy of the instrument of assignment and assumption; or (b) in the case of a Major Sublease, a fully executed copy of the Major Sublease.

**Section 12.05  Subtenant NDA Request Notice.**

(a)       Tenant, from time to time, may request, by notice to Landlord, that Landlord grant non-disturbance protection to a Subtenant (other than an Affiliate of Tenant) under a particular Sublease, which notice shall be accompanied by a true and complete copy of the fully executed Sublease in question (any such notice being herein called a "**Subtenant NDA Request Notice**").

(b)       Landlord, subject to and in the manner provided in this Section 12.05, agrees to enter into a subordination, non-disturbance, and attornment agreement (a "**Subtenant NDA Agreement**") in form and substance reasonably acceptable to Landlord with the Subtenant under the Sublease described in the Subtenant NDA Request Notice, provided that such Sublease satisfies all the following criteria (herein collectively called the "**Subtenant NDA Criteria**"), as applicable:

(i)       such Sublease shall be in form and substance satisfactory to Landlord; provided, however, a Major Sublease which is on the same terms, provisions, and conditions as are contained in this Lease (i.e. the terms, provisions, and conditions of this Lease are incorporated by reference to and made a part of the Major Sublease) shall be deemed reasonably satisfactory to Landlord;

20

(ii)     such Subtenant shall be a creditworthy entity with sufficient assets to satisfy its obligations under such Sublease (and Landlord shall have been provided with reasonably satisfactory proof thereof), and such Sublease shall not provide for the Subtenant to be relieved of liability upon an assignment of its interest in such Sublease.

(c)     If: (i) Landlord receives a Subtenant NDA Request Notice; and (ii) the Sublease described in, and accompanying, such notice satisfies the Subtenant NDA Criteria, then: (A) Landlord, within five (5) Business Days after its receipt of a Subtenant NDA Request Notice, shall prepare and deliver to Tenant a form of Subtenant NDA Agreement (unexecuted) between Landlord, Tenant, and such Subtenant; and (B) Landlord, promptly after it shall receive: (1) back such form of Subtenant NDA Agreement fully executed by Tenant and such Subtenant; and (2) payment of the reasonable actual out-of-pocket costs, including without limitation, attorneys' fees and disbursements, incurred by Landlord in connection with the review of any Subleases under this Section 12.05(c) and the preparation and execution of any Subtenant NDA Agreement, shall counter-execute the same and return the same to Tenant (for delivery to such Subtenant); provided, however, that Landlord shall have no obligations under this Section 12.05(c) during any period that an Event of Default shall have occurred and be continuing.

(d)     If there shall be a dispute between Landlord and Tenant as to whether any Sublease described in, and accompanying, a Subtenant NDA Request Notice satisfies the Subtenant NDA Criteria, and such dispute is not resolved between Landlord or Tenant prior to the date which is ten (10) days after Landlord's receipt of such Subtenant NDA Request Notice, then, at any time thereafter, either party may submit such dispute to Arbitration.

**Section 12.06  Assignment to Leasehold Mortgagee.** Any other provisions of this Lease to the contrary notwithstanding, Tenant, and its permitted successors and assigns, shall have the right to Transfer this Lease or any interest herein or any right or privilege appurtenant hereto which Tenant desires to Transfer to a Leasehold Mortgagee, to the extent permitted in Article XIII of this Lease. Landlord agrees to recognize any Leasehold Mortgagee as Tenant for the performance of all duties and obligations arising due to the interest of this Lease being so Transferred; provided, however, it is hereby agreed and acknowledged by Landlord and Tenant that Tenant and its permitted successors and assigns shall not be relieved of its liability for the performance of such duties or obligations by any such Transfer.

### ARTICLE XIII
### FEE MORTGAGES; LEASEHOLD MORTGAGES

**Section 13.01  Fee Mortgages.** Tenant may mortgage Tenant's interest in this Lease at any time without the consent of the Landlord.  If Tenant, or Tenant's successors or assigns, shall mortgage this Lease, then so long as any such mortgage shall remain unsatisfied of record, the following provisions shall apply:

(a)	Landlord, upon serving on Tenant any notice of default by Tenant under this Lease, shall also simultaneously serve such notice upon the holder of such mortgage (the "Leasehold Mortgagee") at the address provided for in paragraph (f) of this Section, and no notice of default by Landlord to Tenant hereunder shall be deemed to have been duly given unless and until a duplicate thereof has been so served upon the Leasehold Mortgagee.

(b)	The Leasehold Mortgagee, in case Tenant shall be in default hereunder, shall, within the period herein provided for Tenant to remedy such default plus (x) an additional ten (10) days in the case of a default regarding the payment of rent or additional rent and (y) an additional thirty (30) days in the case of a default not involving the payment of money, have the right to remedy such default, or cause the same to be remedied, and Landlord shall accept such performance by or at the instance of such Leasehold Mortgagee as if the same had been made by Tenant.

(c)	For the purposes of this Section, no event of default shall be deemed to exist under this Lease in respect of the performance of work required to be performed, or of acts to be done, or of conditions to be remedied, if steps shall, in good faith, have been commenced by the Leasehold Mortgagee within the time period set forth in clause (b)(y) above to rectify the same and shall be prosecuted to completion with diligence and continuity.

(d)	Anything herein contained to the contrary notwithstanding, upon the occurrence of an event of default, Landlord shall take no action to effect a termination of this Lease or otherwise enforce its remedies hereunder without first giving to the Leasehold Mortgagee written notice thereof and (provided the Leasehold Mortgagee shall, within the appropriate period herein provided, cure any default which results from the failure to pay rent or additional rent) a reasonable time thereafter within which either (at Leasehold Mortgagee's option) (i) to obtain possession of the leased premises or (ii) to institute, prosecute and complete foreclosure proceedings or otherwise acquire Tenant's interest under this Lease with reasonable diligence, provided that if the operation of any law or a determination by any court stays, enjoins or restrains the Leasehold Mortgagee from taking the actions set forth in clauses (i) and/or (ii) above, the Leasehold Mortgagee shall have a reasonable period of time after the termination of such stay, injunction or restraint within which to complete the actions set forth in clauses (i) and/or (ii) above. In addition to curing any default which results from the failure to pay rent or additional rent, upon obtaining possession or acquiring Tenant's interest under this Lease, the Leasehold Mortgagee (or such other entity acquiring Tenant's interest in the Lease) shall be required, within a reasonable period of time, to cure all defaults by Tenant then reasonably susceptible of being cured by Leasehold Mortgagee (or such other entity acquiring Tenant's interest in the Lease) provided, however, that the Leasehold Mortgagee shall not be obligated to continue such possession or to continue such foreclosure or other proceedings. Any default by Tenant not reasonably susceptible of being cured by Leasehold Mortgagee (or by such other entity acquiring Tenant's interest in the Lease) or which is personal to Tenant or which is otherwise no longer applicable, shall be deemed to have been waived by Landlord upon completion of such foreclosure proceedings or upon such acquisition of Tenant's interest in this Lease. In no event shall the Leasehold Mortgagee be obligated to perform any obligation under this Lease which is personal to the Tenant. The Leasehold Mortgagee, or its nominee or designee, or any purchaser in foreclosure proceedings (including, without limitation, a corporation or other entity formed by the Leasehold Mortgagee or by the holder or holders of the bonds or obligations secured by the leasehold mortgage or

22

designated by any of them) may become the legal owner and holder of this Lease through such foreclosure proceedings, by assignment of this Lease in lieu of foreclosure or otherwise. Nothing contained herein shall obligate the Leasehold Mortgagee to exercise any of its rights to foreclose the mortgage or to continue any foreclosure or other similar proceeding to acquire Tenant's interest in the leased premises.

(e)    In the event of the termination of this Lease prior to the expiration of the term hereof for any reason, including, without limitation, any such termination purportedly arising by reason of any rejection of this Lease by a trustee, court or debtor in possession pursuant to the Federal Bankruptcy Code, or whether by summary proceedings to dispossess, service of notice to terminate, or otherwise, Landlord shall serve upon the Leasehold Mortgagee written notice that the Lease has been terminated together with a statement of any and all sums which would at that time be due under this Lease but for such termination, and of all other defaults, if any, under this Lease then known to Landlord. The Leasehold Mortgagee shall thereupon have the option to obtain a new lease in accordance with and upon the following terms and conditions:

Upon the written request (the "Request Notice") of the Leasehold Mortgagee, given within ninety (90) days after service of such notice that the Lease has been terminated (or if Tenant contests such termination, within ninety (90) days after Landlord gives Leasehold Mortgagee notice of a final adjudication adverse to Tenant), Landlord shall, within thirty (30) days of the service of the Request Notice, enter into a new lease of the leased premises with Leasehold Mortgagee, or such Leasehold Mortgagee's assignee or designee, as follows:

Such new lease shall be effective as at the date of termination of this Lease and shall be for the remainder of the term of this Lease and at the rent and upon all the agreements, terms, covenants and conditions hereof (except for any agreement, term, covenant or condition which is personal to Tenant or which is no longer applicable at the time the new lease is executed). Such new lease shall require the new tenant to perform (within a reasonable period of time) any unfulfilled obligations (except for any obligation which is personal to Tenant or no longer applicable) of Tenant under this Lease which is reasonably susceptible of being performed by such Tenant. Upon the execution of such new lease, the tenant named therein shall pay any and all sums which would at the time of the execution thereof be due under this Lease but for such termination less the rent or other income actually collected by Landlord from guests, subtenants, other occupants of the premises, or any other third parties. Any new lease granted to the Leasehold Mortgagee, or its assignee or designee, shall enjoy the same priority as this Lease over any lien, encumbrance or other interest created by Landlord before or after the date of such new lease. The Leasehold Mortgagee, or its assignee or designee may, anything in the Lease to the contrary notwithstanding, assign any such new lease upon notice to the Landlord, and upon such assignment, the Leasehold Mortgagee or its assignee or designee, as the case may be, shall have no further liability under such new lease.

(f)    Any notice or other communication which Landlord shall desire or is required to give to or serve upon the Leasehold Mortgagee shall be in writing and shall be served by registered or certified mail or reputable overnight courier, addressed to the Leasehold Mortgagee at its address as set forth in such leasehold mortgage, or in the last assignment thereof

23

delivered to Landlord or at such other address as shall be designated by such Leasehold Mortgagee by notice in writing given to Landlord.

(g)    Any notice or other communication which the Leasehold Mortgagee shall desire or is required to give to or serve upon Landlord shall be deemed to have duly been given or served if sent by registered mail addressed to Landlord at Landlord's address as set forth herein or at such other address as shall be designated by Landlord by notice in writing given to the Leasehold Mortgagee by registered or certified mail.

(h)    Effective upon the commencement of the term of any new lease executed pursuant to paragraph (e) of this Section, all subleases shall be assigned and transferred without recourse by Landlord to the tenant under such new lease, and all monies on deposit with Landlord which Tenant would have been entitled to use but for the termination or expiration of this Lease may be used by the tenant under such new lease for the purposes of and in accordance with the provisions of such new lease.

(i)    Landlord and Tenant shall not enter into any agreement amending, modifying, cancelling, terminating or surrendering this Lease or waiving rights. nor shall Landlord and Tenant enter into any related documentation pertaining to this Lease or the Premises, in each case without the prior written consent of the Leasehold Mortgagee.  Any such agreement entered into without Leasehold Mortgagee's prior written consent shall be void.

**Section 13.02**  If the Leasehold Mortgagee or its nominee or designee shall acquire title to Tenant's interest in this Lease, by foreclosure of a mortgage thereon or by assignment in lieu of foreclosure or by an assignment from a nominee or designee of such mortgagee, or under a new lease pursuant to this Section or otherwise, the Leasehold Mortgagee or its nominee or designee may assign such Lease without Landlord's consent and shall thereupon be released from all liability for the performance or observance of the covenants and conditions in such lease contained on tenant's part to be performed and observed.

**Section 13.03**  In the event the Leasehold Mortgagee or its nominee or designee succeeds to the interests of Tenant by reason of foreclosure or an assignment in lieu thereof or by reason of delivery of a new lease or otherwise, the Leasehold Mortgagee's, its nominee's, designee's or assignee's, liability to Landlord shall be limited to its interest in the leased premises, and Landlord shall have no recourse whatsoever to any other assets of the Leasehold Mortgagee, its nominee, designee or assignee.

**Section 13.04**  In the event two or more Leasehold Mortgagees each exercise their rights hereunder and there is a conflict which renders it impossible to comply with all such requests, the Leasehold Mortgagee whose leasehold mortgage would be senior in priority if there were a foreclosure shall prevail.  In the event any Leasehold Mortgagee pays any rental or other sums due hereunder which relate to periods other than during its actual ownership of the leasehold estate, such Leasehold Mortgagee shall be subrogated to any and all rights which may be asserted by Landlord with respect to such periods of time.

**Section 13.05**  Landlord covenants and agrees to execute any documents reasonably required by the Leasehold Mortgagee to effectuate the provisions of this Section.

24

**Section 13.06**  The provisions of this Section shall be self-operative and shall benefit any Leasehold Mortgagee of which Landlord has notice.  Notwithstanding the foregoing, Landlord shall at the request of Tenant or such Leasehold Mortgagee enter into an agreement directly with such leasehold mortgagee having terms and provisions substantially similar to the provisions of this Section.

**Section 13.07**  If any prospective leasehold mortgagee shall require a modification of the terms of this Section as a condition to entering into a leasehold mortgage transaction with Tenant, Landlord will not unreasonably withhold, delay or condition its consent thereto, provided that such modifications do not materially adversely affect the Landlord's rights, obligations or potential liability hereunder.

**Section 13.08**  So long as any leasehold mortgage remains outstanding, the fee title and the leasehold estate created by this Lease shall not merge but shall always be kept separate and distinct, notwithstanding the union of such estates in either the Landlord or Tenant or a third party, by purchase or otherwise.

**Section 13.09  Subordination of Fee Mortgage.** If one or more Leasehold Mortgages is in effect, the following shall apply: (a) all Fee Mortgages shall be expressly subject and subordinate to this Lease, any Mortgagee Lease, and all amendments, modifications, and extensions thereof and shall include the Fee Mortgagee's agreement to execute and deliver to Leasehold Mortgagee an agreement in accordance with Section 13.08 hereof; (b) Landlord shall not enter into any Fee Mortgage that violates this Section 13.09; (c) Tenant shall not subordinate this Lease without the prior written consents of all Leasehold Mortgagees; and (d) concurrently with the execution and delivery of this Lease, Landlord shall cause all Fee Mortgagees to execute and deliver to Tenant a subordination agreement that is in recordable form and that contains such terms as are reasonably acceptable to Tenant and Leasehold Mortgagee.

## ARTICLE XIV
## DEFAULT; REMEDIES

**Section 14.01  Events of Default.** Each of the following events shall be an event of default ("**Event of Default**"):

(a)    If Tenant shall fail to pay any item of Rent, or any part thereof, when the same shall become due and payable and such failure shall continue for ten (10) days after notice from Landlord to Tenant.

(b)    If (i) Commencement of Construction shall not have occurred on or before the Construction Commencement Date (subject to Unavoidable Delays) and such failure shall continue for ten (10)) days after notice from Landlord to Tenant or (ii) Substantial Completion of the Facility shall not have occurred on or before the Completion Date (subject to Unavoidable Delays) and such failure shall continue for thirty (30) days after notice from Landlord to Tenant.

(c)    If Tenant shall fail to observe or perform one or more of the other terms, conditions, covenants, or agreements contained in this Lease, and such failure shall continue for a period of thirty (30) days after notice thereof by Landlord to Tenant specifying such failure unless such failure requires work to be performed, acts to be done, or conditions to be removed which cannot by their nature or because of Unavoidable Delays reasonably be performed, done,

25

or removed, as the case may be, within such thirty (30) day period, in which case no Event of Default shall be deemed to exist as long as Tenant shall have commenced curing the same within such thirty (30) day period and shall, subject to Unavoidable Delays, diligently, continuously, and in good faith prosecute the same to completion.

(d)    If Tenant shall make an assignment for the benefit of creditors.

(e)    The filing of any voluntary petition in bankruptcy by Tenant, or the filing of any involuntary petition by Tenant's creditors, which involuntary petition remains undischarged for a period of thirty (30) days.

(f)    If within thirty (30) days after the commencement of any proceeding against Tenant seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future statute, law, or regulation, such proceeding shall not have been dismissed.

(g)    If Tenant shall abandon the Premises for greater than thirty (30) days; however, the Tenant shall not be deemed to have abandoned the Premises if the Premises becomes uninhabitable as a result of Landlord's default under this Lease or as a result of a casualty or condemnation proceeding.

(h)    If a levy under execution or attachment shall be made against the Premises and such execution or attachment shall not be vacated or removed by court order, bonding, or otherwise within a period of thirty (30) days.

Upon the occurrence of an Event of Default, Landlord may, at its option, give notice to Tenant of the termination of this Lease and, upon thirty (30) days after service of such notice, this Lease, the Term, and subject to the rights of Leasehold Mortgagee contained in this Lease, Tenant's estate shall terminate (whether or not the Commencement Date shall have occurred) and shall end with the same force and effect as if that day were the day fixed for the expiration of this Lease. Notwithstanding the foregoing, Tenant shall remain liable for any damages as provided in this Lease and Landlord may enforce any of the remedies provided in Section 14.02.

**Section 14.02  Remedies.** If this Lease is terminated pursuant to Section 14.01, or if Landlord reenters or obtains possession of the Premises by summary proceedings or any other legal action or proceeding or by any other legal act (without liability or obligation to Tenant or any Subtenant or any other occupant of the Premises), all the following provisions shall apply:

(a)    Tenant shall immediately vacate and surrender the Premises to Landlord in good order, condition, and repair, reasonable wear and tear and damage that Tenant is not obligated under the terms of this Lease to repair excepted.

(b)    Tenant shall promptly pay to Landlord all Rent payable to the date on which this Lease is terminated or the date on which Landlord reenters or obtains possession of the Premises.

(c)    Landlord, at its option, may elect to declare due and payable a sum equal to the amount by which the Rent reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term exceeds the fair and reasonable rental value of the

Premises for the same period, both discounted to present worth at the rate of three percent (3%) per annum, and such sum shall be due and payable by Tenant, as liquidated damages, ten (10) Business Days after notice by Landlord to Tenant of such election.

(d)     If Landlord shall not have declared Rent due and payable pursuant to Section 14.02(c), Tenant shall be liable for and shall pay to Landlord, as damages, any deficiency (referred to as "**Deficiency**") between the Rent reserved in this Lease for the period which otherwise would have constituted the unexpired portion of the Term and the net amount, if any, of rents collected under any reletting for any part of such period (first deducting from the rents collected under any such reletting all of the payments to which Landlord is entitled pursuant to Section 14.02(e)).

(e)     Landlord may: (i) complete all construction required to be performed by Tenant hereunder; (ii) repair and alter the Premises in such manner as Landlord may deem reasonably necessary or advisable (and may apply to the foregoing all funds, if any, then held by Depository pursuant to this Lease without relieving Tenant of any liability under this Lease or otherwise affecting any such liability); (iii) let or relet the Premises or any parts thereof for the whole or any part of the remainder of the Term or for a longer period, in Landlord's name or as agent of Tenant, and out of any rent and other sums collected or received as a result of such reletting Landlord shall: (A) first, pay to itself the reasonable cost and expense of terminating this Lease, re-entering, retaking, repossessing, completing construction, and repairing or altering the Premises, or any part thereof, and the cost and expense of removing all persons and property therefrom, including in such costs brokerage commissions, legal expenses, and reasonable attorneys' fees and disbursements; (B) second, pay to itself the reasonable cost and expense sustained in securing any new tenants and other occupants, including in such costs brokerage commissions, legal expenses, and reasonable attorneys' fees and disbursements and other expenses of preparing the Premises for reletting, and, if Landlord shall maintain and operate the Premises, the reasonable cost and expense of operating and maintaining the Premises; and (C) third, pay to itself any balance remaining on account of the liability of Tenant to Landlord. Landlord in no way shall be responsible or liable for any failure to relet the Premises or any part thereof, or for any failure to collect any rent due on any such reletting, and no such failure to relet or to collect rent shall operate to relieve Tenant of any liability under this Lease or to otherwise affect any such liability. Notwithstanding the foregoing, Landlord shall have no duty or obligation whatsoever to relet all or any portion of the Premises or to mitigate its damages hereunder.

(f)     Landlord may elect to proceed by appropriate judicial proceedings, either at law or in equity, to enforce the performance or observance by Tenant of the applicable provisions of this Lease or to recover damages for breach thereof. Each right and remedy of Landlord provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Landlord of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by Landlord of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise.

27

## ARTICLE XV
## EXPIRATION OR TERMINATION

**Section 15.01  Extinguishment of Tenant's Rights.** Upon the termination or expiration of this Lease from any cause, all rights and interests of Tenant, and all persons whomsoever claiming by, through or under Tenant (with the exception of the rights of Leasehold Mortgagees arising under Article XIII and the rights of Landlord arising under Section 14.02), shall immediately cease and terminate, and the Premises, all Improvements, and all Personalty located thereon, shall thence forward constitute and belong to and be the absolute property of Landlord or Landlord's successors and assigns, without further act or conveyance, and without liability to make such compensation to Tenant or to anyone whomsoever, and free and discharged from all and every lien, encumbrance, claim, and charge of any character created or attempted to be created by Tenant at any time. Tenant agrees, at the termination of this Lease, to surrender unto Landlord, all and singular the Premises with the then existing Improvements constructed and located thereon and therein, in the same condition as when the construction of Improvements was completed, only normal wear and tear excepted, unless Tenant shall be relieved of Tenant's obligation to repair, reconstruct, restore, or replace damaged or destroyed buildings, other structures, or improvements pursuant to Article XVI hereof.

**Section 15.02  Prepaid Items Assigned.** Upon the expiration of the Term of this Lease, or upon the prior termination of this Lease from any cause, all expense items prepaid by Tenant with respect to constructing, operating, maintaining, and protecting the Premises, including, but not limited to, prepaid insurance premiums, any tax and utility deposits, shall inure to the benefit of and become the property of Landlord, and to this extent Tenant does hereby transfer, assign, and convey any such prepaid expense items to Landlord.

## ARTICLE XVI
## DAMAGE AND DESTRUCTION

**Section 16.01  Damage and Destruction.** If all or any part of the Premises shall be destroyed or damaged in whole or in part by fire or other casualty (including any casualty for which insurance was not obtained or obtainable) of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, Tenant shall give to Landlord notice thereof within ten (10) days after such casualty occurs, except that no notice shall be required if the estimated cost of repairs, alterations, restorations, replacements, and rebuilding the Premises or portion thereof so damaged or destroyed (collectively, "**Restoration**") shall be less than the Threshold Amount. Tenant shall, whether or not such damage or destruction shall have been insured, and whether or not insurance proceeds, if any, shall be sufficient for the purpose of such Restoration, with reasonable diligence (subject to Unavoidable Delays) repair, alter, restore, replace, and rebuild the Premises or portion thereof so damaged or destroyed (collectively, "**Restore**") the same, at least to the extent of the value and as nearly as possible to the condition, quality, and class of the Premises existing immediately prior to such occurrence. Landlord in no event shall be obligated to Restore the Premises or any portion thereof or to pay any of the costs or expenses thereof. If Tenant shall fail or neglect to Restore with reasonable diligence (subject to Unavoidable Delays) the Premises or the portion thereof so damaged or destroyed, or having so commenced such Restoration, shall fail to complete the same with reasonable diligence (subject to Unavoidable Delays) in accordance with the terms of this Lease, and in either case such failure or neglect continues for thirty (30) days after notice from Landlord, or if prior to the completion of any such Restoration by Tenant, this Lease shall expire or be terminated for any reason, Landlord, upon notice to Tenant, may, but shall not be required to,

28

complete such Restoration at Tenant's expense. Each such Restoration shall be done in accordance with the provisions of this Lease. Tenant's obligations under this Section 16.01shall survive the expiration or earlier termination of this Lease.

**Section 16.02  Restoration Funds.**

(a)     Subject to the provisions of this Article XVI, Depository shall pay over to Tenant from time to time, upon the following terms, any monies which may be received by Depository from insurance provided by Tenant (other than business interruption insurance) or cash or the proceeds of any security deposited with Depository (collectively, the "**Restoration Funds**"); provided, however, that Depository, before paying such moneys over to Tenant, shall be entitled to reimburse itself, Landlord, and Leasehold Mortgagee therefrom to the extent, if any, of the necessary, reasonable and proper expenses (including, without limitation, reasonable attorneys' fees) paid or incurred by Depository, Landlord, and Leasehold Mortgagee in the collection of such monies. Depository shall pay to Tenant, as hereinafter provided, the Restoration Funds, for the purpose of the Restoration.

(b)     Prior to commencing any Restoration, Tenant shall furnish Landlord with an estimate of the cost of such Restoration, prepared by a licensed professional engineer or registered architect selected by Tenant and approved by Landlord. Landlord may engage a licensed professional engineer or registered architect to prepare its own estimate of the cost of such Restoration. If there is any dispute as to the estimated cost of the Restoration, such dispute shall be resolved by Arbitration.

(c)     Subject to the provisions of this Article XVI, the Restoration Funds shall be paid to Tenant in installments as the Restoration progresses, less retainage equal to Ten percent (10%) of such installment until completion of ninety five percent  (95%) of the Restoration and one hundred percent (100%) of each installment thereafter until completion of the Restoration, upon application to be submitted by Tenant to Depository and, for information only, to Landlord, showing the cost of labor and materials purchased and delivered to the Premises for incorporation in the Restoration, or incorporated therein since the last previous application, and due and payable or paid by Tenant. If any vendor's, mechanic's, laborer's, or materialman's lien is filed against the Premises or any part thereof, or if any public improvement lien relating to the Restoration of the Premises is created or permitted to be created by Tenant and is filed against Landlord, or any assets of, or funds appropriated to, Landlord, Tenant shall not be entitled to receive any further installment until such lien is satisfied or discharged (by bonding or otherwise). Notwithstanding the foregoing, the existence of any such lien shall not preclude Tenant from receiving any installment of Restoration Funds, provided: (i) such lien will be discharged with funds from such installment; or (ii) if Depository shall be holding funds for the Restoration: (A) Depository certifies that it is retaining, in addition to amounts required to be retained hereunder, an amount equal to the funds required to satisfy or discharge such lien; and (B) failure to pay or discharge such lien will not result in the imminent loss or forfeiture of the Premises or the termination of Tenant's interest under this Lease and will not subject Tenant or Landlord to any civil or criminal penalty or liability.

(d)     Upon completion of and payment for the Restoration by Tenant, the balance of the Restoration Funds shall be paid over to Tenant.

29

(e)      Notwithstanding the foregoing, if Landlord makes the Restoration at Tenant's expense, as provided in Section 16.01hereof, then Depository shall pay over the Restoration Funds to Landlord, upon request, to the extent not previously paid to Tenant pursuant to this Article XVI, and Tenant shall pay to Landlord, within ten (10) Business Days after demand, any sums in excess of the portion of the Restoration Funds received by Landlord necessary to complete the Restoration.

**Section 16.03  Restoration Costs Exceed the Threshold Amount.** If any loss, damage, or destruction occurs, the cost of Restoration of which equals or exceeds the Threshold Amount in the aggregate, in addition to the other requirements contained in this Article XVI, Tenant shall furnish to Landlord the documents and shall comply with the requirements set forth in Section 7.05 through Section 7.15 of this Lease as required for the initial construction of the Facility.

**Section 16.04  Excess Costs of Restoration.** If the cost of any Restoration, determined as provided in Section 16.02, exceeds both: (a) the Threshold Amount; and (b) the net insurance proceeds, then, prior to the commencement of such Restoration, Tenant shall deposit with Depository, as security for completion of the Restoration, a bond, cash, or other security reasonably satisfactory to Landlord in the amount of such excess, to be held and applied by Depository in accordance with the provisions of Section 12.02.

**Section 16.05  No Termination; No Abatement.** This Lease shall not terminate or be forfeited or be affected in any manner, and there shall be no reduction or abatement of the Rent, by reason of damage to or total, substantial, or partial destruction of the Premises or any part thereof or by reason of the untenantability of the same or any part thereof, for or due to any reason or cause whatsoever, and Tenant, notwithstanding any Law, waives any and all rights to quit or surrender the Premises or any part thereof. Tenant expressly agrees that its obligations hereunder, including the payment of Rent, shall continue as though the Premises had not been damaged or destroyed and without abatement, suspension, diminution, or reduction of any kind.

**Section 16.06  Conflict, Priority**. Notwithstanding anything contained herein to the contrary, in the event of any conflict between the terms and provisions of this Article XVI and a leasehold mortgage, the terms of the leasehold mortgage shall apply.

**ARTICLE XVII**
**CONDEMNATION**

**Section 17.01  Total Taking.**

(a)      If all or substantially all the Premises shall be taken for any public or quasi-public purpose by any lawful power or authority by the exercise of the right of condemnation, eminent domain, or by agreement among Landlord, Tenant, and those authorized to exercise such right, the Term shall terminate on the Date of Taking and the Rent payable by Tenant hereunder shall be equitably apportioned as of the date of such taking.

(b)      If all or substantially all of the Premises shall be taken or condemned as provided in Section 17.01, the award, awards or damages in respect thereof shall be apportioned as follows: (i) there shall first be paid to Landlord so much of the award which is for or attributable

30

to the Land Value; (ii) there shall next be paid to the Leasehold Mortgagee so much of the balance of such award as shall equal the unpaid principal indebtedness secured by such Leasehold Mortgage with interest thereon at the rate specified therein to the date of payment (such payments to be made in order of lien priority and *pari passu* to Leasehold Mortgagee with liens of the same priority); and (iii) subject to rights of any Leasehold Mortgagee, Tenant shall receive the balance, if any, of the award (but if the taking occurs prior to Completion of the Facility, the balance, if any, shall be paid to Landlord). If there be any dispute as to which portion of the award is attributable to the Land and which portion is attributable to the Improvements, such dispute shall be resolved by Arbitration (unless the condemning authority or a court of competent jurisdiction has made such determination, in which case its determination shall control).

(c)    Each of the parties shall execute any and all documents that may be reasonably required in order to facilitate collection by them of such awards.

**Section 17.02  Partial Taking.** If less than substantially all of the Premises shall be so taken, this Lease and the Term shall continue as to the portion of the Premises remaining without diminution of any of Tenant's obligations hereunder, and the Base Rent shall not be affected. Tenant, whether or not the award or awards, if any, shall be sufficient for the purpose shall (subject to Unavoidable Delays) proceed diligently to Restore any remaining part of the Premises not so taken so that the latter shall be a complete, operable, and self-contained architectural unit in good condition and repair in conformity with this Land. In the event of any taking pursuant to this Section 17.02, the entire award for or attributable to the Land taken and the Land Value thereof, shall be first paid to Landlord, and the balance of the award, if any, shall be paid to Depository, except that if such balance shall be less than the Threshold Amount, such balance shall be payable, in trust, to Tenant for application to the cost of Restoration of the part of the Premises not so taken. Subject to the provisions and limitations in this Section 17.02, Depository shall make available to Tenant as much of that portion of the award actually received and held by Depository, if any, less all necessary and proper expenses paid or incurred by Depository, the Leasehold Mortgagee most senior in lien and Landlord in the condemnation proceedings, as may be necessary to pay the cost of Restoration of the part of the Premises remaining. Such Restoration shall be done in accordance with and subject to the provisions of Article XVI. Payments to Tenant as aforesaid shall be disbursed in the manner and subject to the conditions set forth in Article XVI. Any balance of the award held by Depository and any cash and the proceeds of any security deposited with Depository remaining after completion of the Restoration shall be paid to Tenant. Each of the parties shall execute any and all documents that may be reasonably required in order to facilitate collection by them of such awards.

**Section 17.03  Depository.** With respect to any Restoration required by the terms of Section 17.02, the cost of which, as determined in the manner set forth in Section 16.02(b), exceeds both: (a) the Threshold Amount; and (b) the balance of the condemnation award after payment of the expenses set forth in Section 17.02, then, prior to the commencement of such Restoration, Tenant shall deposit with Depository a bond, cash, or other security reasonably satisfactory to Landlord in the amount of such excess, to be held and applied by Depository in accordance with the provisions of Section 17.02, as security for the completion of the Restoration.

**Section 17.04  Temporary Taking.** If the temporary use of the whole or any part of the Premises shall be taken for any public or quasi-public purpose by any lawful power or authority by the exercise of the right of condemnation or eminent domain or by agreement between Tenant and those

31

authorized to exercise such right, Tenant shall give prompt notice thereof to Landlord and the Term shall not be reduced or affected in any way and Tenant shall continue to pay in full the Rent payable by Tenant hereunder without reduction or abatement, and Tenant shall be entitled to receive for itself any award or payments for such use; provided, however, that:

(a)     If the taking is for a period not extending beyond the Term and if such award or payment is made less frequently than in monthly installments, the same shall be paid to and held by Depository as a fund which Depository shall apply from time to time to the payment of Rent, except that, if such taking results in changes or alterations in the Premises which would necessitate an expenditure to Restore the Premises to its former condition, then, a portion of such award or payment considered by Landlord, in its reasonable opinion, as appropriate to cover the expenses of the Restoration shall be retained by Depository, without application as aforesaid, and applied and paid over toward the Restoration of the Premises to its former condition, substantially in the same manner and subject to the same conditions as provided in Section 17.02; and any portion of such award or payment which shall not be required pursuant to this Section 17.04(a) to be applied to the Restoration of the Building or to the payment of Rent until the end of the Term (or, if the taking is for a period terminating prior to the end of the Term, until the end of such period), shall be paid to Tenant.

(b)     If the taking is for a period extending beyond the Term, such award or payment shall be apportioned between Landlord and Tenant as of the Expiration Date, and Landlord's and Tenant's share thereof, if paid less frequently than in monthly installments, shall be paid to Depository and applied in accordance with the provisions of this Section 17.04; provided, however, that the amount of any award or payment allowed or retained for the Restoration of the Premises and not previously applied for such purpose shall remain the property of Landlord if this Lease shall expire prior to such Restoration.

**Section 17.05  Negotiated Sale in Lieu of Condemnation.** In the event of a negotiated sale of all or a portion of the Premises in lieu of condemnation, the proceeds shall be distributed as provided in cases of condemnation.

**Section 17.06  Participation in Condemnation Proceeding.** Landlord, Tenant, and any Leasehold Mortgagee shall be entitled to file a claim and otherwise participate in any condemnation or similar proceeding and all hearings, trials, and appeals in respect thereof.

**Section 17.07  Rights of Tenant and Subtenants to File Claims.** Notwithstanding anything to the contrary contained in this Section 17.07, in the event of any permanent or temporary taking of all or any part of the Premises, Tenant and its Subtenants shall have the exclusive right to assert claims for any trade fixtures and personal property so taken which were the property of Tenant or its Subtenants and for relocation expenses of Tenant or its Subtenants, and all awards and damages in respect thereof shall belong to Tenant and its Subtenants, and Landlord hereby waives any and all claims to any part thereof, provided, however, that if there shall be no separate award or allocation for such trade fixtures or personal property, then such claims of Tenant and its Subtenants, or awards and damages, shall be subject and subordinate to Landlord's claims under this Article XVII.

**Section 17.08 Conflict, Priority.** Notwithstanding anything contained herein to the contrary, in the event of any conflict between the terms and provisions of this Article XVII and a leasehold mortgage, the terms of the leasehold mortgage shall apply.

## ARTICLE XVIII
## ESTOPPEL CERTIFICATES

**Section 18.01 Estoppel Certificates.** Landlord and Tenant will execute, acknowledge, and deliver to the other promptly upon request, a certificate certifying as to the following:

(a) That this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect, as modified, and stating the modifications).

(b) The dates through which the Rent under this Lease has been paid.

(c) The amount of the Rent then payable.

(d) That no notice has been given by Landlord to Tenant of any Event of Default under this Lease that has not been cured and to the best of its knowledge and belief no Event of Default exists (or, if there has been any notice given or an Event of Default exists, describing the same).

Certificates from Landlord and Tenant pertaining to the same matters may be relied upon by any prospective Leasehold Mortgagee or Fee Mortgagee, or by any prospective assignee of an interest under this Lease or by any prospective [Major Subtenant/subtenant] of all or any portion of the Premises.

## ARTICLE XIX
## NOTICES

**Section 19.01 Notices.** Until a different address is provided in a notice to the other party, all notices, demands or requests made by either party to the other which are required or permitted by the provisions of this Lease shall be in writing and shall be deemed sufficiently given if: (a) delivered by hand (against a signed receipt); (b) mailed by United States certified or registered mail, return receipt requested, postage prepaid; or (c) sent by nationally recognized commercial overnight delivery service at the following address:

Landlord: Commerce Center Development LLC
401 E Colfax Ave Ste 277, South Bend, IN 46617

with a copy to: David Matthews
401 E Colfax Ave Ste 277, South Bend, IN 46617

Tenant: Matthews 350 E LaSalle LLC
401 E Colfax Ave Ste 277, South Bend, IN 46617

with a copy to:                                    Local Vision Fund LLC
                                                   9821 Banyan Court
                                                   Fort Wayne, IN 46835


Leasehold Mortgagee:                               DW South Bend, LLC
                                                   c/o DW Partner
                                                   590 Madison Avenue, 13th Floor
[Fee Mortgagee:                                    New York, NY 10022
                                                   Attn:  DW Legal
                                                   Email: DW.Legal@dwpartners.com


with a copy to:                                    Windels Marx Lane & Mittendorf, LLP
                                                   156 West 56th Street
                                                   New York, NY 10019-3877
                                                   Attn: Wayne S. Cook, Jr., Esq.
                                                   Email: wcook@windelsmarx.com


Notwithstanding anything contained in this Lease to the contrary, any notice required to be given by Landlord or Tenant hereunder shall be deemed to be effective as of the date such notice is received or refused as reflected on said notice.


## ARTICLE XX
## SUBMISSION OF MATTERS TO LANDLORD FOR APPROVAL

**Section 20.01  Submission of Matters to Landlord for Approval.** Any matter which must be submitted to and consented to or approved in writing by Landlord or any matter which must be submitted to Landlord which may become effective if not denied by Landlord, as required under this Lease, shall be submitted to Landlord in the manner and to the address of Landlord designated for the giving of notice to Landlord under Article XIX of this Lease and shall either be approved or rejected by Landlord within twenty (20) days after receipt unless a shorter period of time is expressly stated elsewhere in this Lease. If Landlord should fail so to approve or reject within such twenty (20) day period as provided for herein, Landlord's approval shall be deemed rejected. Upon Tenant's written request, Landlord shall inform Tenant in writing of its rejection or approval of such submitted matter in the manner and to the address of Tenant designated for the giving of notice to Tenant under Article XIX of this Lease. Any review by Landlord of any matter submitted to Landlord is for Landlord's own convenience and purpose only. By undertaking such review, Landlord does not obtain or have any liability to Tenant or any other person, including, without limitation, the insurers and lenders of Tenant.


## ARTICLE XXI
## HOLDING OVER

**Section 21.01  Holding Over by Tenant.** Tenant shall not use or remain in possession of the Premises after the expiration of sooner termination of this Lease. Any holding over, or continued use or

34

occupancy by Tenant after the termination of this Lease, without the written consent of Landlord, shall not constitute a tenant-at-will interest on behalf of Tenant, but Tenant shall become a tenant-at-sufferance and liable for Rent and all other expenses, obligations, and payments in effect for the immediately preceding year of the Term of this Lease. There shall be no renewal whatsoever of this Lease by operation of Law.

## ARTICLE XXII
## COMPLIANCE WITH LAWS; ENVIRONMENTAL LAWS

**Section 22.01  Compliance with Laws.** Tenant warrants and agrees that, during the entire Term of this Lease and at its expense: (a) Tenant will conduct Tenant's business and activities on or related to the Premises only in full compliance with all applicable Laws; (b) Tenant will neither do or permit any act or omission which could cause the Premises and Tenant's use thereof to fail to be in full compliance with all applicable Laws; and (c) Tenant will neither do or permit any act or omission which could cause any Liabilities to exist or be asserted against Landlord or the Premises. Without limiting the foregoing, Tenant shall promptly cure all violations of Law for which Tenant has received notice or a public notice of violation has been issued and pay all fines, penalties, interest, or other costs imposed by any Governmental Authorities in connection with any violation or requirement of any Law.

**Section 22.02  Environmental Laws.**

(a)    Tenant warrants and agrees that, during the entire Term of this Lease and at its expense, Tenant shall comply with all Environmental Laws. Such compliance shall include Tenant's obligation to take Remedial Action when required by Law and to pay all fines, penalties, interest, or other costs imposed by any Governmental Authorities in connection with any violation or requirement of any Law.

(b)    Tenant shall notify Landlord promptly in writing if: (i) Tenant becomes aware of the presence or Release of any Hazardous Material at, on, under, over, emanating from, or migrating to the Premises in any quantity or manner which could reasonably be expected to violate in any material respect any Environmental Law or give rise to any material Liability or the obligation to take Remedial Action; or (ii) Tenant receives any written notice, claim, demand, request for information, or other communication from a Governmental Authority regarding the presence or Release of any Hazardous Material at, on, under, over, emanating from, or migrating to the Premises.

(c)    Tenant shall take and complete any Remedial Action with respect to the Premises in full compliance with all Laws and shall, when such Remedial Action is completed, submit to Landlord written confirmation from the applicable Governmental Authority that no further Remedial Action is required.

(d)    Tenant shall provide Landlord with copies of all tests, studies, notices, claims, demands, requests for information, or other communications relating to the presence or Release of any Hazardous Materials at, on, under, over, emanating from, or migrating to the Premises.

## ARTICLE XXIII
## BROKERS

35

**Section 23.01  Brokers.** Landlord and Tenant each represent and warrant to the other that it has not dealt with any broker.  Landlord and Tenant shall each indemnify and hold harmless the other from and against any and all claims for any brokerage fee or commission with respect to this Lease transaction by any broker with whom either Landlord or Tenant has dealt with or is alleged to have dealt with. The provisions of this Section 23.01shall survive any termination of this Lease.

## ARTICLE XXIV
## NO IMPAIRMENT OF LANDLORD'S TITLE

**Section 24.01  No Impairment of Landlord's Title.** Tenant shall not permit the Premises to be used by any Person at any time or times during the Term of this Lease in such a manner as would impair Landlord's title to or interest in the Premises or in such a manner as would cause a claim or claims of adverse possession, adverse use, prescription, or other similar claims of, in, to, or with respect to the Premises.

## ARTICLE XXV
## QUIET ENJOYMENT

**Section 25.01  Quiet Enjoyment.** Landlord covenants and agrees that, if and so long as Tenant observes and performs each and every covenant, agreement, provision, and condition of this Lease on the part of Tenant to be observed and performed throughout the Term of this Lease, Tenant may peaceably and quietly enjoy the Premises without hindrance or molestation of Landlord or any Person acting through Landlord.

## ARTICLE XXVI
## LIMITATION OF LANDLORD'S LIABILITY

**Section 26.01  Limitation of Landlord's Liability.**

(a)      If Landlord sells, assigns, or otherwise transfers (whether by operation of Law or otherwise) all or part of its interests in the Premises or this Lease: (i) Landlord shall be relieved of all obligations and Liabilities of Landlord under this Lease accruing after the effective date of such transfer; and (ii) the transferee shall be deemed to have assumed all of Landlord's obligations and Liabilities under this Lease effective from and after the effective date of the transfer.

(b)      Landlord, its partners, members, shareholders, officers, directors, and principals, whether disclosed or undisclosed, shall have no personal liability under or in connection with this Lease. Tenant agrees that it shall look solely to Landlord's interest in the Premises and this Lease for the satisfaction of Tenant's remedies or to collect any judgment requiring payment of any money by Landlord.

## ARTICLE XXVII
## RESERVED

36

## ARTICLE XXVIII
## MEMORANDUM

**Section 28.01  Memorandum.** Either Landlord or Tenant may record a memorandum of this Lease or a memorandum of any amendment or modification of this Lease, provided the memorandum shall not include the financial terms of this Lease. Each party shall, upon the request of the other, join in the execution of a memorandum of this Lease or a memorandum of any amendment or modification of this Lease in proper form for recordation together with any transfer tax returns or forms necessary for such recordation. The party requesting such memorandum of Lease shall be responsible for the payment of any recording fees and/or taxes. Upon the expiration or sooner termination of this Lease, Tenant covenants that it will, at the request of Landlord, execute, acknowledge, and deliver an instrument canceling any memorandum of Lease that is recorded and all other documentation required to record same. If Tenant fails or refuses to execute, acknowledge, and deliver such instrument of cancellation, then Tenant hereby appoints Landlord as Tenant's attorney-in-fact, coupled with an interest, to execute, acknowledge, and deliver such instrument of cancellation on Tenant's behalf.

## ARTICLE XXIX
## RESERVED

## ARTICLE XXX
## MISCELLANEOUS

**Section 30.01  Landlord and Tenant Representations and Warranties.** Landlord and Tenant each represent and warrant that:

(a)     This Lease has been duly authorized, executed, and delivered by such party and constitutes the legal, valid, and binding obligation of such party.

(b)     There are no actions, suits, or proceedings pending or, to the knowledge of such party, threatened against or affecting such party, at law or at equity or before any Governmental Authority that would impair such party's ability to perform its obligations under this lease.

(c)     The consummation of the transactions hereby contemplated, and the performance of this Lease will not result in any breach or violation of, or constitute a default under, any lease or financing agreement.

Tenant agrees that, if it is not an individual, it shall provide to Landlord, upon Landlord's request, evidence that the execution and delivery of this Lease have been duly authorized by Tenant.

**Section 30.02.  Patriot Act.**

(a)     Tenant hereby represents and warrants to Landlord that Tenant: (i) is in compliance with the Office of Foreign Assets Control sanctions and regulations promulgated under the authority granted by the Trading with the Enemy Act, 12 U.S.C. § 95(a) et seq., and the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., as the same apply to it or its activities; (ii) is in compliance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as

amended from time to time (the "Patriot Act") and all rules and regulations promulgated under the Patriot Act applicable to Tenant; and (iii) (A) is not now, nor has ever been, under investigation by any governmental authority for, nor has been charged with or convicted of a crime under, 18 U.S.C. §§ 1956 or 1957 or any predicate offense thereunder; (B) has never been assessed a civil penalty under any anti-money laundering laws or predicate offenses thereunder; (C) has not had any of its funds seized, frozen or forfeited in any action relating to any anti-money laundering laws or predicate offenses thereunder; (D) has taken such steps and implemented such policies as are reasonably necessary to ensure that it is not promoting, facilitating or otherwise furthering, intentionally or unintentionally, the transfer, deposit or withdrawal of criminally derived property, or of money or monetary instruments which are (or which Tenant suspects or has reason to believe are) the proceeds of any illegal activity or which are intended to be used to promote or further any illegal activity; and (E) has taken such steps and implemented such policies as are reasonably necessary to ensure that it is in compliance with all laws and regulations applicable to its business for the prevention of money laundering and with anti-terrorism laws and regulations, with respect both to the source of funds from its investors and from its operations, and that such steps include the development and implementation of an anti-money laundering compliance program within the meaning of Section 352 of the Patriot Act, to the extent such a party is required to develop such a program under the rules and regulations promulgated pursuant to Section 352 of the Patriot Act. Neither Tenant nor any other person owning a direct or indirect, legal, or beneficial interest in Tenant is in violation of the Executive Order or the Patriot Act. Neither the Tenant nor any of its respective constituents, investors (direct or indirect and whether or not holding a legal or beneficial interest) or affiliates, acting or benefiting, directly or indirectly, in any capacity in connection with the Landlord and/or the Building Complex or this Agreement or any of the transactions contemplated hereby or thereby, is: (w) listed in the Annex to, or otherwise subject to the provisions of, that certain Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (the "**Executive Order**"); (x) named as a "specifically designated national (SDN)" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website (http://www.treas.gov.ofac/t11sdn.pdf) or at any replacement website or other replacement official publication of such list or that is named on any other Governmental Authority list issued post 9/11/01; (y) acting, directly or indirectly for terrorist organizations or narcotics traffickers, including those persons that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Financial Action Task Force on Money Laundering, U.S. Office of Foreign Assets Control, U.S. Securities and Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, all as may be amended or superseded from time to time; or (z) owned or controlled by, or acting for or on behalf of, any person described in clauses (w), (x) or (y) above (a "**Prohibited Person**"). None of the funds or other assets of the Tenant constitute property of, or are beneficially owned, directly or indirectly, by any person, entity or government subject to trade restrictions under U.S. law, including but not limited to: (1) the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq.; (2) The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq.; and (3) any Executive Orders or regulations promulgated thereunder, with the result that sale by Tenant or other Persons (whether directly or indirectly), is prohibited by law (an "**Embargoed Person**"). No Embargoed Person has any interest of any nature whatsoever in Tenant (whether directly or

indirectly); and none of the funds of Tenant have been derived from any unlawful activity with the result that an investment in the Tenant (whether directly or indirectly) or sale by the Tenant, is prohibited by law or that execution, delivery, and performance of this Lease or any of the transactions or other documents contemplated hereby or thereby is in violation of law.

(b)       Landlord hereby represents and warrants to Tenant that Landlord: (i) is in compliance with Patriot Act and all rules and regulations promulgated under the Patriot Act applicable to Tenant; and (ii) (A) is not now, nor has ever been, under investigation by any governmental authority for, nor has been charged with or convicted of a crime under, 18 U.S.C. §§ 1956 or 1957 or any predicate offense thereunder; (B) has never been assessed a civil penalty under any anti-money laundering laws or predicate offenses thereunder; (C) has not had any of its funds seized, frozen or forfeited in any action relating to any anti-money laundering laws or predicate offenses thereunder; (D) has taken such steps and implemented such policies as are reasonably necessary to ensure that it is not promoting, facilitating or otherwise furthering, intentionally or unintentionally, the transfer, deposit or withdrawal of criminally derived property, or of money or monetary instruments which are (or which Tenant suspects or has reason to believe are) the proceeds of any illegal activity or which are intended to be used to promote or further any illegal activity; and (E) has taken such steps and implemented such policies as are reasonably necessary to ensure that it is in compliance with all laws and regulations applicable to its business for the prevention of money laundering and with anti-terrorism laws and regulations, with respect both to the source of funds from its investors and from its operations, and that such steps include the development and implementation of an anti-money laundering compliance program within the meaning of Section 352 of the Patriot Act, to the extent such a party is required to develop such a program under the rules and regulations promulgated pursuant to Section 352 of the Patriot Act. Neither Landlord nor any other person owning a direct or indirect, legal, or beneficial interest in Landlord is in violation of the Executive Order or the Patriot Act. Neither Landlord nor any of its respective constituents, investors (direct or indirect and whether or not holding a legal or beneficial interest) or affiliates, acting or benefiting, directly or indirectly, in any capacity in connection with the Landlord and/or the Building Complex or this Agreement or any of the transactions contemplated hereby or thereby, is a Prohibited Person. None of the funds or other assets of the Landlord constitute property of, or are beneficially owned, directly or indirectly, by an Embargoed Person. No Embargoed Person has any interest of any nature whatsoever in Landlord (whether directly or indirectly); and none of the funds of Landlord have been derived from any unlawful activity with the result that an investment in the Landlord (whether directly or indirectly) or sale by the Landlord, is prohibited by law or that execution, delivery, and performance of this Lease or any of the transactions or other documents contemplated hereby or thereby is in violation of law.

### Section 30.03  No Waiver; Cumulative Rights of Landlord.

(a)       No failure of Landlord to exercise any power given Landlord hereunder or to insist upon strict compliance by Tenant with its undertakings, duties, and obligations hereunder, and no custom or practice of the parties hereto at variance with the provisions hereof shall constitute a waiver of Landlord's right to demand exact compliance with the provisions contained in this Lease.

(b)      All rights, powers, and privileges conferred herein upon both parties hereto are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

Section 30.04  **Attorneys' Fees.** If any action is brought by either party against the other in connection with or arising out of this Lease, the Prevailing Party shall be entitled to recover from the other party its reasonable out-of-pocket costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection with the prosecution or defense of such action. The term, "**Prevailing Party**" shall include, without limitation, a party that substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other party of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Landlord shall be entitled to attorneys' fees, costs, and expenses incurred in the preparation and service of notices of default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such default.

Section 30.05  **Provisions Are Binding Upon Successors and Assigns.** It is mutually covenanted, understood, and agreed by and between the parties hereto, that each of the provisions of this Lease shall apply to, extend to, be binding upon, and inure to the benefit or detriment of not only the parties hereto, but also the legal representatives, successors, and assigns of Landlord and Tenant hereto, and shall be deemed and treated as covenants running with the Premises during the term of this Lease. Whenever a reference to the parties hereto is made, such reference shall be deemed to include the legal representatives, successors, and assigns of said party, the same as if in each case expressed.

Section 30.06  **Applicable Law.** This Lease shall be governed, construed, performed, and enforced in accordance with the Laws of the State of Indiana.

Section 30.07  **Waiver of Jury Trial. LANDLORD AND TENANT EACH WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, OR TENANT'S USE OR OCCUPANCY OF THE PREMISES.**

Section 30.08  **Interpretation and Construction.** This Lease shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. Any captions or headings used in this Lease are for convenience only and do not define or limit the scope of this Lease. The singular of any term, including any defined term, shall include the plural and the plural of any term shall include the singular. Whenever the singular or plural number, or masculine or feminine gender is used in this Lease, it shall equally apply to, extend to, and include the other.

Section 30.09  **Severability.** In the event any provision, or any portion of any provision of this Lease is held invalid, the other provisions of this Lease and the remaining portion of said provision, shall not be affected thereby and shall continue in full force and effect.

**Section 30.10  Time Is of the Essence.** All time limits stated in this Lease are of the essence of this Lease.

**Section 30.11  No Agency.** Nothing in this Lease is intended, or shall in any way be construed, so as to create any form of partnership or agency relationship between the parties. The parties hereby expressly disclaim any intention of any kind to create any partnership or agency relationship between themselves. Nothing in this Lease shall be construed to make either party liable for any of the indebtedness of the other, except as specifically provided in this Lease.

**Section 30.12  Entire Agreement.** The making, execution, and delivery of this Lease by Tenant has not been induced by any representations, statements, covenants, or warranties by Landlord except for those contained in this Lease. This Lease constitutes the full, complete, and entire agreement between and among the parties hereto; no agent, employee, officer, representative, or attorney of the parties hereto has authority to make, or has made, any statement, agreement, representation, or contemporaneous agreement, oral or written, in connection herewith modifying, adding to, or changing the provisions of this Lease. No amendment of this Lease shall be binding unless such amendment shall be in writing, signed by both parties hereto and attached to, incorporated in and by reference made a part of this Lease.

**Section 30.13  Counterparts.** This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the Effective Date.

LANDLORD:
**Commerce Center Development LLC**, an Indiana LLC

By:_____

Name: David Matthews
Title: Sole Member

**TENANT: Matthews 350 E LaSalle LLC**

By: _____

Name: David Matthews
Title: Managing Member

*[Signature Page to Ground Lease for Matthews 350 E LaSalle LLC]*

# Exhibit A

**AIA**®

# Document A141™ – 2014 Exhibit A

## *Design-Build Amendment*

This Amendment is incorporated into the accompanying AIA Document A141™–2014, Standard Form of Agreement Between Owner and Design-Builder dated the Eight day of October in the year Two Thousand Eighteen (the "Agreement")
*(Paragraph deleted)*
**for the following PROJECT:**

Commerce Center Mixed Use Development – Phase 1 Building Core and Shell
350 East LaSalle Avenue
South Bend IN 46617

**THE OWNER:**

Matthews 350 E LaSalle, LLC
401 E Colfax Ave #277
South Bend, IN 46617

**THE DESIGN-BUILDER:**

F.A. Wilhelm Construction Co., Inc.
3914 Prospect Street
Indianapolis, IN 46203

The Owner and Design-Builder hereby amend the Agreement as follows.

**TABLE OF ARTICLES**

**A.1**      **CONTRACT SUM**

**A.2**      **CONTRACT TIME**

**A.3**      **INFORMATION UPON WHICH AMENDMENT IS BASED**

**A.4**      **DESIGN-BUILDER'S PERSONNEL, CONTRACTORS AND SUPPLIERS**

**A.5**      **COST OF THE WORK**

**ARTICLE A.1   CONTRACT SUM**
**§ A.1.1** The Owner shall pay the Design-Builder the Contract Sum in current funds for the Design-Builder's performance of the Contract after the execution of this Amendment. The Contract Sum shall be one of the following:

     []      Stipulated Sum, in accordance with Section A.1.2 below

     []      Cost of the Work plus the Design-Builder's Fee, in accordance with Section A.1.3 below

     [ **X** ]      Cost of the Work plus the Design-Builder's Fee with a Guaranteed Maximum Price, in accordance with Section A.1.4 below

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Consultation with an attorney is also encouraged with respect to professional licensing requirements in the jurisdiction where the Project is located.

---

**Init.**

**/**

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**      (794119746)

**1**

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD5F-265524A634B0

**§ A.1.2 Stipulated Sum (SECTION NOT APPLICABLE)**

*(Table deleted)*
*(Paragraphs deleted)*
**§ A.1.3 Cost of the Work Plus Design-Builder's Fee (SECTION NOT APPLICABLE)**

*(Paragraphs deleted)*
**§ A.1.4 Cost of the Work Plus Design-Builder's Fee With a Guaranteed Maximum Price**
**§ A.1.4.1** The Cost of the Work is as defined in Article A.5, Cost of the Work.

**§ A.1.4.2** The Design-Builder's Fee: The Design-Builder's Fee shall be three percent (3%) of the Cost of the Work. The Design-Builder's Fee for any changes in the Work shall be three percent (3%) of the Cost of the Work associated with any such changes in the Work.

§A.1.4.2.1 As set forth in §A5.1.1.1.1 and §A5.1.3.2.1, the Design-Builder shall be allowed an additional 7% markup on any labor, materials, and equipment utilized in the Design-Builder's potential self-performance of the construction of concrete and/or masonry related portions of the Work prior to the calculation of the 3% Design-Builder's Fee set forth in §A.1.4.2. Once the design is complete, the Owner and Design Builder may negotiate lump sum pricing for work self-performed by the Design Builder.

§A.1.4.2.2 Shared Savings.  In the event that the actual Cost of Work plus Design-Builder's Fee is less than the Guaranteed Maximum Price, including remaining Design-Builder's Contingency, then the difference ("Shared Savings") shall be shared between the Owner and Design-Builder in the following order: The amount equal to 70% of the Shared Savings to the Owner and the amount equal to 30% of the Shared Savings to the Design-Builder, however the Design Builder's portion of the Shared Savings shall not exceed (1%) of the Cost of the Work.

§A1.4.2.3 Design-Builder Contingency. The Guaranteed Maximum Price shall include a contingency (the "Design-Builder Contingency") which is available for Design-Builder's exclusive use for additional Costs of the Work and additional General Conditions Costs it has necessarily incurred in connection with the proper performance of the bidding and construction of the Work that are not the basis for a Change Order under the Contract Documents.  By way of example, and not as a limitation, such costs may include (a) trade buy-out differentials; (b) escalation of market costs for materials; and (c) overtime or acceleration; (d) correction of defective, damaged or nonconforming Work, (d) Subcontractor defaults; and (f) those events that result in an extension of the Contract Time but do not result in an increase in the Guaranteed Maximum Price.  The amount of the Design-Builder's Contingency that remains unused when the Project reaches Final Completion shall be applied to Shared Savings as defined in in this Agreement.

**§ A.1.4.3 Guaranteed Maximum Price**
**§ A.1.4.3.1** The sum of the Cost of the Work and the Design-Builder's Fee is guaranteed by the Design-Builder not to exceed Thirty-Two Million Nine Hundred Eighty-Eight Thousand Dollars ($ 32,988,000.00 ), subject to additions and deductions for changes in the Work as provided in the Design-Build Documents. Costs that would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Design-Builder without reimbursement by the Owner. *(Paragraphs deleted)*

**§ A.1.4.3.2 Itemized Statement of the Guaranteed Maximum Price**
Provided below is an itemized statement of the Guaranteed Maximum Price organized by trade categories, allowances, contingencies, alternates, the Design-Builder's Fee, and other items that comprise the Guaranteed Maximum Price.

See attached Exhibit G.  This Exhibit G is for accounting purposes only and is not to be intended to be a line-item guaranteed maximum price.

**§ A.1.4.3.3** The Guaranteed Maximum Price is based on the following
*(Paragraphs deleted)*
value engineering options generated after the August 1, 2018 Guaranteed Maximum Price Proposal as listed in the Exhibit H Clarification and Assumptions.

**Init.**

**/**

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:** (794119746)

**2**

**§ A.1.4.3.4** Unit
*(Paragraphs deleted)*
Prices (SECTION NOT APPLICABLE)
*(Table deleted)*
**§ A.1.4.3.5** Clarifications and Assumptions, if any, on which the Guaranteed Maximum Price is based:

See attached Exhibit H

### § A.1.5 Payments
### § A.1.5.1 Progress Payments
**§ A.1.5.1.1** Based upon Applications for Payment submitted to the Owner by the Design-Builder, the Owner shall make progress payments on account of the Contract Sum to the Design-Builder as provided below and elsewhere in the Design-Build Documents.

**§ A.1.5.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month:

**§ A.1.5.1.3** Provided that an Application for Payment is received not later than the 25th day of the month, the Owner shall make payment of the certified amount to the Design-Builder not later than the 15th day of the following month. If an Application for Payment is received by the Owner after the application date fixed above, payment shall be made by the Owner not later than thirty ( 30 ) days after the Owner receives the Application for Payment.

**§ A.1.5.1.4** With each Application for Payment where the Contract Sum is based upon the Cost of the Work, or the Cost of the Work with a Guaranteed Maximum Price, the Design-Builder shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner to demonstrate that cash disbursements already made by the Design-Builder on account of the Cost of the Work equal or exceed (1) progress payments already received by the Design-Builder, less (2) that portion of those payments attributable to the Design-Builder's Fee; plus (3) payrolls for the period covered by the present Application for Payment.

**§ A.1.5.1.5** With each Application for Payment where the Contract Sum is based upon a Stipulated Sum or Cost of the Work with a Guaranteed Maximum Price, the Design-Builder shall submit the most recent schedule of values in accordance with the Design-Build Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. Compensation for design services, if any, shall be shown separately. Where the Contract Sum is based on the Cost of the Work with a Guaranteed Maximum Price, the Design-Builder's Fee shall be shown separately. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule of values, unless objected to by the Owner, shall be used as a basis for reviewing the Design-Builder's Applications for Payment.

**§ A.1.5.1.6** In taking action on the Design-Builder's Applications for Payment, the Owner shall be entitled to rely on the accuracy and completeness of the information furnished by the Design-Builder and shall not be deemed to have made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Sections A.1.5.1.4 or A.1.5.1.5, or other supporting data; to have made exhaustive or continuous on-site inspections; or to have made examinations to ascertain how or for what purposes the Design-Builder has used amounts previously paid. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's auditors acting in the sole interest of the Owner.

**§ A.1.5.1.7** Except with the Owner's prior approval, the Design-Builder shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

### § A.1.5.2 Progress Payments—Stipulated Sum (SECTION NOT APPLICABLE)

*(Paragraphs deleted)*
### § A.1.5.3 Progress Payments—Cost of the Work Plus a Fee (SECTION NOT APPLICABLE)

*(Paragraphs deleted)*

Init.

/

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                        (794119746)

3

**§ A.1.5.4 Progress Payments—Cost of the Work Plus a Fee with a Guaranteed Maximum Price**
**§ A.1.5.4.1** Applications for Payment where the Contract Sum is based upon the Cost of the Work Plus a Fee with a Guaranteed Maximum Price shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed; or (2) the percentage obtained by dividing (a) the expense that has actually been incurred by the Design-Builder on account of that portion of the Work for which the Design-Builder has made or intends to make actual payment prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values.

**§ A.1.5.4.2** Subject to other provisions of the Design-Build Documents, the amount of each progress payment shall be computed as follows:

.1    Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 6.3.9 of the Agreement.

.2    Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing;

.3    Add the Design-Builder's Fee, less retainage of ten percent ( 10 %) withheld on the first fifty percent (50%) of work completed. The Design-Builder's Fee shall be computed upon the Cost of the Work at the rate stated in Section A.1.4.2 or, if the Design-Builder's Fee is stated as a fixed sum in that Section, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work bears to a reasonable estimate of the probable Cost of the Work upon its completion;

.4    Subtract retainage of ten percent (10 %) withheld on the first fifty percent (50%) of work completed. from that portion of the Work that the Design-Builder self-performs;

.5    Subtract the aggregate of previous payments made by the Owner;

.6    Subtract the shortfall, if any, indicated by the Design-Builder in the documentation required by Section A.1.5.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's auditors in such documentation; and

.7    Subtract amounts, if any, for which the Owner has withheld or nullified a payment as provided in Section 9.5 of the Agreement.

*(Paragraph deleted)*
**§ A.1.5.5 Final Payment**
**§ A.1.5.5.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Design-Builder not later than 30 days after the Design-Builder has fully performed the Contract and the requirements of Section 9.10 of the Agreement have been satisfied, except for the Design-Builder's responsibility to correct non-conforming Work discovered after final payment or to satisfy other requirements, if any, which extend beyond final payment.

**§ A.1.5.5.2** If the Contract Sum is based on the Cost of the Work, the Owner's auditors will review and report in writing on the Design-Builder's final accounting within 30 days after the Design-Builder delivers the final accounting to the Owner. Based upon the Cost of the Work the Owner's auditors report to be substantiated by the Design-Builder's final accounting, and provided the other conditions of Section 9.10 of the Agreement have been met, the Owner will, within seven days after receipt of the written report of the Owner's auditors, either issue a final Certificate for Payment, or notify the Design-Builder in writing of the reasons for withholding a certificate as provided in Section 9.5.1 of the Agreement.

**ARTICLE A.2   CONTRACT TIME**
**§ A.2.1** Contract Time, as defined in the Agreement at Section 1.4.13, is the period of time, including authorized adjustments, for Substantial Completion of the Work.

**§ A.2.2** The Design-Builder shall achieve Substantial Completion of the Work not later than as follows:
*(Paragraphs deleted)*

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                                              (794119746)

Init.

/

4

| Portion of Work | Substantial Completion Date |
|---|---|
| Phase I | April 1, 2020 |

, subject to adjustments of the Contract Time as provided in the Design-Build Documents.
*(Paragraphs deleted)*
Meeting this Substantial Completion Date is contingent upon the Owner providing proof of financing per §7.2.7 of the AIA A141-2014 by October 29, 2018 and a Notice to Proceed by October 29, 2018.

### ARTICLE A.3   INFORMATION UPON WHICH AMENDMENT IS BASED

**§ A.3.1** The Contract Sum and Contract Time set forth in this Amendment are based on the following:

**§ A.3.1.1** The Supplementary and other Conditions of the Contract: (SECTION NOT APPLICABLE)
*(Table deleted)*
**§ A.3.1.2** The Specifications:
*(Paragraphs deleted)*
(SECTION NOT APPLICABLE)
*(Table deleted)*
**§ A.3.1.3** The Drawings:

(a) Subsurface Investigation & Geotechnical Recommendations prepared by Alt & Witzig dated December 2, 2016.
(b) Civil & Environmental Consultants drawings dated July 16, 2018.
(c) 5G Studio Miami drawings dated July 16, 2018.
(d) American Structurepoint structural mark-ups dated July 26, 2018.
(e) DEEM mechanical and electrical mark-ups dated July 3, 2018.
(f) 5G  Studio Miami drawings dated July 16, 2018 marked-up and emailed to David Matthews on Septeber 26, 2018.
(g) Matthews LLC drawings dated August 6, 2018.

*(Table deleted)*
**§ A.3.1.4** The Sustainability Plan, if any:
*(Paragraphs deleted)*
(SECTION NOT APPLICABLE)

**§ A.3.1.5** Allowances and Contingencies:

**.1** Allowances:
| | | |
|---|---|---|
| i. | Material testing services | $100,000.00 |
| ii. | Contaminated soils, obstructions, & utility relocates | $150,000.00 |
| iii. | Architectural site lighting | $30,000.00 |
| iv. | Site restoration | $125,000.00 |
| v. | Utility tap fees | $50,000.00 |
| vi. | Permits (excludes tenant improvement permits) | $100,000.00 |

**.2** Contingencies:
Design Builder's Contingency - $1,216,926.00

**§ A.3.1.6** Design-Builder's assumptions and clarifications:

See attached Exhibit H

**§ A.3.1.7** Deviations from the Owner's Criteria as adjusted by a Modification: (SECTION NOT APPLICABLE)

**§ A.3.1.8** To the extent the Design-Builder shall be required to submit any additional Submittals to the Owner for review, indicate any such submissions below:

N/A

**Init.**

**/**

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                               (794119746)

## ARTICLE A.4   DESIGN-BUILDER'S PERSONNEL, CONTRACTORS AND SUPPLIERS

§ A.4.1 The Design-Builder's key personnel are identified below:
*(Paragraph deleted)*

.1    Superintendent

Bill Woolbright

.2    Contract Manager

Mitch Davison

.3    Others

i.    Project Executive – Mike Kerr
ii.    Project Engineer – Patrick Alander

§ A.4.2 The Design-Builder shall retain the following Consultants, Contractors and suppliers, identified below:

Architect:
5G Studio Collaborative
117 NW 1ˢᵗ Avenue
Miami, FL 33132

Structural Engineer:
American Structurepoint
7260 Shadeland Station
Indianapolis, IN 46256

Civil Engineer:
Civil & Environmental Consultants, Inc.
530 E. Ohio St. Suite G
Indianapolis, IN 46204

Plumbing, Mechanical, Electrical Contractor
DEEM
6831 East 32ⁿᵈ Street, Suite 200
Indianpolis, IN 46226

## ARTICLE A.5   COST OF THE WORK
§ A.5.1 Cost To Be Reimbursed as Part of the Contract
§ A.5.1.1 Labor Costs
§ A.5.1.1.1 Wages of construction workers directly employed by the Design-Builder to perform the construction of the Work (with the modifications set forth in § A5.1.1.1.1), at the site or, with the Owner's prior approval, at off-site workshops.

§ A5.1.1.1.1 Wages of construction workers directly employed by the Design-Builder to self-perform the construction of concrete and/or masonry related portions of the Work shall be subject to an additional seven percent (7%) markup before calculation of the Design Builder's Fee.

§ A.5.1.1.2 With the Owner's prior approval, wages or salaries of the Design-Builder's supervisory and administrative personnel when stationed at the site.
*(Paragraph deleted)*

| Person Included | Status (full-time/part-time) | Rate ($0.00) | Rate (unit of time) |
|---|---|---|---|
| Project Executive | Part-time | $90.00 | 1 hour |
| *Contract Manager | Part-time | $90.00 | 1 hour |
| *Sr. Preconstruction Manager | Part-time | $90.00 | 1 hour |

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                          (794119746)

Init.

/

6

| | | | |
|---|---|---|---|
| *Preconstruction Manager | Part-time | $75.00 | 1 hour |
| Superintendent | Full-time | $85.00 | 1 hour |
| Project Engineer | Full-time | $75.00 | 1 hour |
| *Quality Assurance Manager | Part-time | $70.00 | 1 hour |
| *Virtual Design Engineer | Part-time | $70.00 | 1 hour |
| *Scheduling Engineer | Part-time | $70.00 | 1 hour |

*may be stationed at Design Builder's principal or other office*

**§ A.5.1.1.3** Wages and salaries of the Design-Builder's supervisory or administrative personnel engaged at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

**§ A.5.1.1.4** Costs paid or incurred by the Design-Builder for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Section A.5.1.1.

**§ A.5.1.1.5** Bonuses, profit sharing, incentive compensation and any other discretionary payments paid to anyone hired by the Design-Builder or paid to the Architect or any Consultant, Contractor or supplier, with the Owner's prior approval.

**§ A.5.1.2 Contract Costs.** Payments made by the Design-Builder to the Architect, Consultants, Contractors and suppliers in accordance with the requirements of their subcontracts.

**§ A.5.1.3 Costs of Materials and Equipment Incorporated in the Completed Construction**
**§ A.5.1.3.1** Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

**§ A.5.1.3.2** Costs of materials described in the preceding Section A.5.1.3.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Design-Builder. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

**§ A.5.1.3.2.1** Costs of Materials and Equipment Incorporated in the Completed Construction by the Design-Builder to self-perform the construction of concrete and/or masonry related portions of the Work shall be subject to an additional seven percent (7%) markup before calculation of the Design Builder's Fee.

**§ A.5.1.4 Costs of Other Materials and Equipment, Temporary Facilities and Related Items**
**§ A.5.1.4.1** Costs of transportation, storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Design-Builder at the site and fully consumed in the performance of the Work. Costs of materials, supplies, temporary facilities, machinery, equipment and tools that are not fully consumed shall be based on the cost or value of the item at the time it is first used on the Project site less the value of the item when it is no longer used at the Project site. Costs for items not fully consumed by the Design-Builder shall mean fair market value.

**§ A.5.1.4.2** Rental charges for temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Design-Builder at the site and costs of transportation, installation, minor repairs, dismantling and removal. The total rental cost of any Design-Builder-owned item may not exceed the purchase price of any comparable item. Rates of Design-Builder-owned equipment and quantities of equipment shall be subject to the Owner's prior approval.

**§ A.5.1.4.3** Costs of removal of debris from the site of the Work and its proper and legal disposal.

**§ A.5.1.4.4** Costs of document reproductions, electronic communications, postage and parcel delivery charges, dedicated data and communications services, teleconferences, Project websites, extranets and reasonable petty cash expenses of the site office.

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                          (794119746)

Init.

/

7

**§ A.5.1.4.5** Costs of materials and equipment suitably stored off the site at a mutually acceptable location, with the Owner's prior approval.

### § A.5.1.5 Miscellaneous Costs

**§ A.5.1.5.1** Premiums for that portion of insurance and bonds required by the Design-Build Documents that can be directly attributed to the Contract. With the Owner's prior approval self-insurance for either full or partial amounts of the coverages required by the Design-Build Documents.

**§ A.5.1.5.2** Sales, use or similar taxes imposed by a governmental authority that are related to the Work and for which the Design-Builder is liable.

**§ A.5.1.5.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Design-Builder is required by the Design-Build Documents to pay.

**§ A.5.1.5.4** Fees of laboratories for tests required by the Design-Build Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section 15.5.3 of the Agreement or by other provisions of the Design-Build Documents, and which do not fall within the scope of Section A.5.1.6.3.

**§ A.5.1.5.5** Royalties and license fees paid for the use of a particular design, process or product required by the Design-Build Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Design-Build Documents; and payments made in accordance with legal judgments against the Design-Builder resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Design-Builder's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the second to last sentence of Section 3.1.13.2 of the Agreement or other provisions of the Design-Build Documents, then they shall not be included in the Cost of the Work.

**§ A.5.1.5.6** With the Owner's prior approval, costs for electronic equipment and software directly related to the Work.

**§ A.5.1.5.7** Deposits lost for causes other than the Design-Builder's negligence or failure to fulfill a specific responsibility in the Design-Build Documents.

**§ A.5.1.5.8** With the Owner's prior approval, which shall not be unreasonably withheld, legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Design-Builder, reasonably incurred by the Design-Builder after the execution of the Agreement and in the performance of the Work.

**§ A.5.1.5.9** With the Owner's prior approval, expenses incurred in accordance with the Design-Builder's standard written personnel policy for relocation, and temporary living allowances of, the Design-Builder's personnel required for the Work.

**§ A.5.1.5.10** That portion of the reasonable expenses of the Design-Builder's supervisory or administrative personnel incurred while traveling in discharge of duties connected with the Work.

### § A.5.1.6 Other Costs and Emergencies

**§ A.5.1.6.1** Other costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner.

**§ A.5.1.6.2** Costs incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property.

**§ A.5.1.6.3** Costs of repairing or correcting damaged or nonconforming Work executed by the Design-Builder, Contractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Design-Builder and only to the extent that the cost of repair or correction is not recovered by the Design-Builder from insurance, sureties, Contractors, suppliers, or others.

---

Init.

/

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                    (794119746)

8

### § A.5.1.7 Related Party Transactions

**§ A.5.1.7.1** For purposes of Section A.5.1.7, the term "related party" shall mean a parent, subsidiary, affiliate or other entity having common ownership or management with the Design-Builder; any entity in which any stockholder in, or management employee of, the Design-Builder owns any interest in excess of ten percent in the aggregate; or any person or entity which has the right to control the business or affairs of the Design-Builder. The term "related party" includes any member of the immediate family of any person identified above.

**§ A.5.1.7.2** If any of the costs to be reimbursed arise from a transaction between the Design-Builder and a related party, the Design-Builder shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred. If the Owner, after such notification, authorizes the proposed transaction, then the cost incurred shall be included as a cost to be reimbursed, and the Design-Builder shall procure the Work, equipment, goods or service from the related party, as a Contractor, according to the terms of Section A.5.4. If the Owner fails to authorize the transaction, the Design-Builder shall procure the Work, equipment, goods or service from some person or entity other than a related party according to the terms of Section A.5.4.

### § A.5.1.8 Cost of Portions of the Work Which Must be Publicly Bid as Required by a Governmental Entity

**§ A.5.1.8.1** Should it be required at any time during the term of the Agreement that portions of the Work must be subject to any public bidding procedures, the cost of any contracts resulting from such portions of the Work so bid shall be considered inclusive of the Design-Builder's Cost of the Work for the purposes of determining the Design-Builder's Fee.

### § A.5.2 Costs Not to Be Reimbursed as Part of this Contract

The Cost of the Work shall not include the items listed below:

.1 Salaries and other compensation of the Design-Builder's personnel stationed at the Design-Builder's principal office or offices other than the site office, except as specifically provided in Section A.5.1.1;

.2 Expenses of the Design-Builder's principal office and offices other than the site office;

.3 Overhead and general expenses, except as may be expressly included in Section A.5.1;

.4 The Design-Builder's capital expenses, including interest on the Design-Builder's capital employed for the Work;

.5 Except as provided in Section A.5.1.6.3 of this Agreement, costs due to the negligence or failure of the Design-Builder, Contractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable to fulfill a specific responsibility of the Contract;

.6 Any cost not specifically and expressly described in Section A.5.1; and

.7 Costs, other than costs included in Change Orders approved by the Owner, that would cause the Guaranteed Maximum Price to be exceeded.

### § A.5.3 Discounts, Rebates, and Refunds

**§ A.5.3.1** Cash discounts obtained on payments made by the Design-Builder shall accrue to the Owner if (1) before making the payment, the Design-Builder included them in an Application for Payment and received payment from the Owner, or (2) the Owner has deposited funds with the Design-Builder with which to make payments; otherwise, cash discounts shall accrue to the Design-Builder. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Design-Builder shall make provisions so that they can be obtained.

**§ A.5.3.2** Amounts that accrue to the Owner in accordance with Section A.5.3.1 shall be credited to the Owner as a deduction from the Cost of the Work.

### § A.5.4  Other Agreements

**§ A.5.4.1** When the Design-Builder has provided a Guaranteed Maximum Price, and a specific bidder (1) is recommended to the Owner by the Design-Builder; (2) is qualified to perform that portion of the Work; and (3) has submitted a bid that conforms to the requirements of the Design-Build Documents without reservations or exceptions, but the Owner requires that another bid be accepted, then the Design-Builder may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Design-Builder and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

**Init.**

**/**

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                       (794119746)

**9**

**§ A.5.4.2** Agreements between the Design-Builder and Contractors shall conform to the applicable payment provisions of the Design-Build Documents, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner. If an agreement between the Design Builder and a Contractor is awarded on a cost plus a fee basis, the Design-Builder shall provide in the agreement for the Owner to receive the same audit rights with regard to the Cost of the Work performed by the Contractor as the Owner receives with regard to the Design-Builder in Section A.5.5, below.

**§ A.5.4.3** The agreements between the Design-Builder and Architect and other Consultants identified in the Agreement shall be in writing. These agreements shall be promptly provided to the Owner upon the Owner's written request.

**§ A.5.5 Accounting Records**
The Design-Builder shall keep full and detailed records and accounts related to the cost of the Work and exercise such controls as may be necessary for proper financial management under the Contract and to substantiate all costs incurred. The accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's auditors shall, during regular business hours and upon reasonable notice, be afforded access to, and shall be permitted to audit and copy, the Design-Builder's records and accounts, including complete documentation supporting accounting entries, books, correspondence, instructions, drawings, receipts, subcontracts, Contractor's proposals, purchase orders, vouchers, memoranda and other data relating to the Contract. The Design-Builder shall preserve these records for a period of three years after final payment, or for such longer period as may be required by law.

**§ A.5.6 Relationship of the Parties**
The Design-Builder accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to exercise the Design-Builder's skill and judgment in furthering the interests of the Owner; to furnish efficient construction administration, management services and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests.

This Amendment to the Agreement entered into as of the day and year first written above.

DocuSigned by:

*David Matthews*

**OWNER** *(Signature)*

David Matthews    Member

_____
*(Printed name and title)*

DocuSigned by:

*Mike Kerr*

**DESIGN-BUILDER** *(Signature)*

Mike Kerr          Vice President & General Counsel

_____
*(Printed name and title)*

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                  (794119746)

Init.

/

## Additions and Deletions Report for

*AIA® Document A141™ – 2014 Exhibit A*

This Additions and Deletions Report, as defined on page 1 of the associated document, reproduces below all text the author has added to the standard form AIA document in order to complete it, as well as any text the author may have added to or deleted from the original AIA text. Added text is shown underlined. Deleted text is indicated with a horizontal line through the original AIA text.

Note:  This Additions and Deletions Report is provided for information purposes only and is not incorporated into or constitute any part of the associated AIA document. This Additions and Deletions Report and its associated document were generated simultaneously by AIA software at 11:04:08 on 10/25/2018.

**PAGE 1**

This Amendment is incorporated into the accompanying AIA Document A141™–2014, Standard Form of Agreement Between Owner and Design-Builder dated the Eight day of October in the year Two Thousand Eighteen (the "Agreement")
*(In words, indicate day, month and year.)*

...

(Name and location or address)
Commerce Center Mixed Use Development – Phase 1 Building Core and Shell
350 East LaSalle Avenue
South Bend IN 46617

...

(Name, legal status and address)
Matthews 350 E LaSalle, LLC
401 E Colfax Ave #277
South Bend, IN 46617

...

(Name, legal status and address)
F.A. Wilhelm Construction Co., Inc.
3914 Prospect Street
Indianapolis, IN 46203

...

**§ A.1.1** The Owner shall pay the Design-Builder the Contract Sum in current funds for the Design-Builder's performance of the Contract after the execution of this Amendment. The Contract Sum shall be one of the ~~following and shall not include compensation the Owner paid the Design-Builder for Work performed prior to execution of this Amendment:~~following:
(Check the appropriate box.)

        [—]—[]_ Stipulated Sum, in accordance with Section A.1.2 below

        [—]—[]_ Cost of the Work plus the Design-Builder's Fee, in accordance with Section A.1.3 below

        [ **X** ]   Cost of the Work plus the Design-Builder's Fee with a Guaranteed Maximum Price, in accordance with ~~Section A.1.4 below~~

**Additions and Deletions Report for AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                     (794119746)

**1**

(Based on the selection above, complete Section A.1.2, A.1.3 or A.1.4 below.)<u>Section A.1.4 below</u>

## § A.1.2 Stipulated Sum (SECTION NOT APPLICABLE)

~~§ A.1.2.1 The Stipulated Sum shall be    ($    ), subject to authorized adjustments as provided in the Design-Build Documents.~~

~~§ A.1.2.2 The Stipulated Sum is based upon the following alternates, if any, which are described in the Design-Build Documents and are hereby accepted by the Owner:~~
*~~(State the numbers or other identification of accepted alternates. If the Owner is permitted to accept other alternates subsequent to the execution of this Amendment, attach a schedule of such other alternates showing the change in Stipulated Sum for each and the deadline by which the alternate must be accepted.)~~*

~~§ A.1.2.3 Unit prices, if any:~~
*~~(Identify item, state the unit price, and state any applicable quantity limitations.)~~*

| Item | Units and Limitations | Price per Unit ($0.00) |
|---|---|---|

## § A.1.3 Cost of the Work Plus Design-Builder's Fee (SECTION NOT APPLICABLE)

~~§ A.1.3.1 The Cost of the Work is as defined in Article A.5, Cost of the Work.~~

~~§ A.1.3.2 The Design-Builder's Fee:~~
*~~(State a lump sum, percentage of Cost of the Work or other provision for determining the Design-Builder's Fee, and the method for adjustment to the Fee for changes in the Work.)~~*

## PAGE 2

**§ A.1.4.2** The Design-Builder's Fee:
~~(State a lump sum, percentage of Cost of the Work or other provision for determining the Design-Builder's Fee and the method for adjustment to the Fee for changes in the Work.)~~<u>The Design-Builder's Fee shall be three percent (3%) of the Cost of the Work.  The Design-Builder's Fee for any changes in the Work shall be three percent (3%) of the Cost of the Work associated with any such changes in the Work.</u>

<u>§A.1.4.2.1 As set forth in §A5.1.1.1.1 and §A5.1.3.2.1, the Design-Builder shall be allowed an additional 7% markup on any labor, materials, and equipment utilized in the Design-Builder's potential self-performance of the construction of concrete and/or masonry related portions of the Work prior to the calculation of the 3% Design-Builder's Fee set forth in §A.1.4.2. Once the design is complete, the Owner and Design Builder may negotiate lump sum pricing for work self-performed by the Design Builder.</u>

<u>§A.1.4.2.2 Shared Savings.  In the event that the actual Cost of Work plus Design-Builder's Fee is less than the Guaranteed Maximum Price, including remaining Design-Builder's Contingency, then the difference ("Shared Savings") shall be shared between the Owner and Design-Builder in the following order: The amount equal to 70% of the Shared Savings to the Owner and the amount equal to 30% of the Shared Savings to the Design-Builder, however the Design Builder's portion of the Shared Savings shall not exceed (1%) of the Cost of the Work.</u>

<u>§A1.4.2.3 Design-Builder Contingency. The Guaranteed Maximum Price shall include a contingency (the "Design-Builder Contingency") which is available for Design-Builder's exclusive use for additional Costs of the Work and additional General Conditions Costs it has necessarily incurred in connection with the proper performance of the bidding and construction of the Work that are not the basis for a Change Order under the Contract Documents.  By way of example, and not as a limitation, such costs may include (a) trade buy-out differentials; (b) escalation of market costs for materials; and (c) overtime or acceleration; (d) correction of defective, damaged or nonconforming Work, (d) Subcontractor defaults; and (f) those events that result in an extension of the Contract Time but do not result in an increase in the Guaranteed Maximum Price.  The amount of the Design-Builder's Contingency</u>

**Additions and Deletions Report for AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                      (794119746)

that remains unused when the Project reaches Final Completion shall be applied to Shared Savings as defined in in this Agreement.

...

**§ A.1.4.3.1** The sum of the Cost of the Work and the Design-Builder's Fee is guaranteed by the Design-Builder not to exceed <u>Thirty-Two Million Nine Hundred Eighty-Eight Thousand Dollars</u> ($ <u>32,988,000.00</u> ), subject to additions and deductions for changes in the Work as provided in the Design-Build Documents. Costs that would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Design-Builder without reimbursement by the Owner. *(Insert specific provisions if the Design-Builder is to participate in any savings.)*


...

(Provide information below or reference an attachment.)
See attached Exhibit G.  This Exhibit G is for accounting purposes only and is not to be intended to be a line-item guaranteed maximum price.

**§ A.1.4.3.3** The Guaranteed Maximum Price is based on the following ~~alternates, if any, which are described in the Design-Build Documents and are hereby accepted by the Owner:~~
*~~(State the numbers or other identification of accepted alternates. If the Owner is permitted to accept other alternates subsequent to the execution of this Amendment, attach a schedule of such other alternates showing the change in the Cost of the Work and Guaranteed Maximum Price for each and the deadline by which the alternate must be accepted.)~~*

value engineering options generated after the August 1, 2018 Guaranteed Maximum Price Proposal as listed in the Exhibit H Clarification and Assumptions.

**§ A.1.4.3.4** Unit ~~Prices, if any:~~
*(Identify item, state the unit price, and state any applicable quantity limitations.)*
Prices (SECTION NOT APPLICABLE)

| **Item** | **Units and Limitations** | **Price per Unit ($0.00)** |
| --- | --- | --- |

**§ A.1.4.3.5** <u>Clarifications and</u> Assumptions, if any, on which the Guaranteed Maximum Price is based:

See attached Exhibit H
**PAGE 3**

**§ A.1.5.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the ~~month, or as follows:~~

month:

**§ A.1.5.1.3** Provided that an Application for Payment is received not later than the <u>25th</u> day of the month, the Owner shall make payment of the certified amount to the Design-Builder not later than the <u>15th</u> day of the <u>following</u> month. If an Application for Payment is received by the Owner after the application date fixed above, payment shall be made by the Owner not later than <u>thirty</u> ( <u>30</u> ) days after the Owner receives the Application for Payment.
*(Federal, state or local laws may require payment within a certain period of time.)*

...

**§ A.1.5.2 Progress Payments—Stipulated Sum <u>(SECTION NOT APPLICABLE)</u>**
**§ A.1.5.2.1** ~~Applications for Payment where the Contract Sum is based upon a Stipulated Sum shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.~~

**Additions and Deletions Report for AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                       (794119746)

**§ A.1.5.2.2** Subject to other provisions of the Design-Build Documents, the amount of each progress payment shall be computed as follows:

.1     Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of    percent (    %) on the Work. Pending final determination of cost to the Owner of Changes in the Work, amounts not in dispute shall be included as provided in Section 6.3.9 of the Agreement;

.2     Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of    percent (    %);

.3     Subtract the aggregate of previous payments made by the Owner; and

.4     Subtract amounts, if any, the Owner has withheld or nullified, as provided in Section 9.5 of the Agreement.

**§ A.1.5.2.3** The progress payment amount determined in accordance with Section A.1.5.2.2 shall be further modified under the following circumstances:

.1     Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Owner shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and
       *(Section 9.8.6 of the Agreement discusses release of applicable retainage upon Substantial Completion of Work.)*

.2     Add, if final completion of the Work is thereafter materially delayed through no fault of the Design-Builder, any additional amounts payable in accordance with Section 9.10.3 of the Agreement.

**§ A.1.5.2.4** Reduction or limitation of retainage, if any, shall be as follows:
*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Sections A.1.5.2.2.1 and A.1.5.2.2 above, and this is not explained elsewhere in the Design-Build Documents, insert provisions here for such reduction or limitation.)*

**§ A.1.5.3 Progress Payments—Cost of the Work Plus a Fee (SECTION NOT APPLICABLE)**
**§ A.1.5.3.1** Where the Contract Sum is based upon the Cost of the Work plus a fee without a Guaranteed Maximum Price, Applications for Payment shall show the Cost of the Work actually incurred by the Design-Builder through the end of the period covered by the Application for Payment and for which Design-Builder has made or intends to make actual payment prior to the next Application for Payment.

**§ A.1.5.3.2** Subject to other provisions of the Design-Build Documents, the amount of each progress payment shall be computed as follows:

.1     Take the Cost of the Work as described in Article A.5 of this Amendment;

.2     Add the Design-Builder's Fee, less retainage of    percent (    %). The Design-Builder's Fee shall be computed upon the Cost of the Work described in the preceding Section A.1.5.3.2.1 at the rate stated in Section A.1.3.2; or if the Design-Builder's Fee is stated as a fixed sum in that Section, an amount which bears the same ratio to that fixed-sum Fee as the Cost of the Work in that Section bears to a reasonable estimate of the probable Cost of the Work upon its completion;

.3     Subtract retainage of    percent (    %) from that portion of the Work that the Design-Builder self-performs;

.4     Subtract the aggregate of previous payments made by the Owner;

.5     Subtract the shortfall, if any, indicated by the Design-Builder in the documentation required by Section A.1.5.1.4 or resulting from errors subsequently discovered by the Owner's auditors in such documentation; and

.6     Subtract amounts, if any, for which the Owner has withheld or withdrawn a Certificate of Payment as provided in the Section 9.5 of the Agreement.

**§ A.1.5.3.3** The Owner and Design-Builder shall agree upon (1) a mutually acceptable procedure for review and approval of payments to the Architect, Consultants, and Contractors and (2) the percentage of retainage held on agreements with

---

**Additions and Deletions Report for AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                                                        (794119746)

**4**

the Architect, Consultants, and Contractors, and the Design-Builder shall execute agreements in accordance with those terms.

**PAGE 4**

> **.3** Add the Design-Builder's Fee, less retainage of ~~percent ( %).~~ ten percent ( 10 %) withheld on the first fifty percent (50%) of work completed. The Design-Builder's Fee shall be computed upon the Cost of the Work at the rate stated in Section A.1.4.2 or, if the Design-Builder's Fee is stated as a fixed sum in that Section, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work bears to a reasonable estimate of the probable Cost of the Work upon its completion;
>
> **.4** Subtract retainage of ~~percent ( %)~~ ten percent (10 %) withheld on the first fifty percent (50%) of work completed. from that portion of the Work that the Design-Builder self-performs;

...

~~**§ A.1.5.4.3** The Owner and Design-Builder shall agree upon (1) a mutually acceptable procedure for review and approval of payments to the Architect, Consultants, and Contractors and (2) the percentage of retainage held on agreements with the Architect, Consultants, and Contractors; and the Design-Builder shall execute agreements in accordance with those terms.~~

...

**§ A.2.2** The Design-Builder shall achieve Substantial Completion of the Work not later than ~~( ) days from the date of this Amendment, or~~ as follows:
*~~(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. If appropriate, insert requirements for earlier Substantial Completion of certain portions of the Work.)~~*

**PAGE 5**

> Phase I                                        April 1, 2020

, subject to adjustments of the Contract Time as provided in the Design-Build Documents.
*~~(Insert provisions, if any, for liquidated damages relating to failure to achieve Substantial Completion on time or for bonus payments for early completion of the Work.)~~*

Meeting this Substantial Completion Date is contingent upon the Owner providing proof of financing per §7.2.7 of the AIA A141-2014 by October 29, 2018 and a Notice to Proceed by October 29, 2018.

...

**§ A.3.1.1** The Supplementary and other Conditions of the Contract: (SECTION NOT APPLICABLE)

| ~~Document~~ | ~~Title~~ | ~~Date~~ | ~~Pages~~ |
|---|---|---|---|

**§ A.3.1.2** The Specifications:
*(Either list the specifications here or refer to an exhibit attached to this Amendment.)*

(SECTION NOT APPLICABLE)

| ~~Section~~ | ~~Title~~ | ~~Date~~ | ~~Pages~~ |
|---|---|---|---|

**Additions and Deletions Report for AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:** (794119746)

...

~~(Either list the drawings here or refer to an exhibit attached to this Amendment.)~~(a)    Subsurface Investigation & Geotechnical Recommendations prepared by Alt & Witzig dated December 2, 2016.
(b)   Civil & Environmental Consultants drawings dated July 16, 2018.
(c)   5G Studio Miami drawings dated July 16, 2018.
(d)   American Structurepoint structural mark-ups dated July 26, 2018.
(e)   DEEM mechanical and electrical mark-ups dated July 3, 2018.
(f)   5G  Studio Miami drawings dated July 16, 2018 marked-up and emailed to David Matthews on Septeber 26, 2018.
(g)   Matthews LLC drawings dated August 6, 2018.

| ~~Number~~ | ~~Title~~ | ~~Date~~ |
|---|---|---|

**§ A.3.1.4** The Sustainability Plan, if any:
*~~(If the Owner identified a Sustainable Objective in the Owner's Criteria, identify the document or documents that comprise the Sustainability Plan by title, date and number of pages, and include other identifying information. The Sustainability Plan identifies and describes the Sustainable Objective; the targeted Sustainable Measures; implementation strategies selected to achieve the Sustainable Measures; the Owner's and Design-Builder's roles and responsibilities associated with achieving the Sustainable Measures; the specific details about design reviews, testing or metrics to verify achievement of each Sustainable Measure; and the Sustainability Documentation required for the Project, as those terms are defined in Exhibit C to the Agreement.)~~*

| ~~Title~~ | ~~Date~~ | ~~Pages~~ |
|---|---|---|

*~~Other identifying information:~~*
(SECTION NOT APPLICABLE)

...

~~(Identify any agreed upon allowances and contingencies, including a statement of their basis.)~~

.1   Allowances:

| | | |
|---|---|---|
| i.   Material testing services | $100,000.00 | |
| ii.   Contaminated soils, obstructions, & utility relocates | $150,000.00 | |
| iii.   Architectural site lighting | $30,000.00 | |
| ~~.1   Allowances~~iv.     Site restoration | | $125,000.00 |
| v.   Utility tap fees | $50,000.00 | |
| vi.   Permits (excludes tenant improvement permits) | $100,000.00 | |

.2   ~~Contingencies~~Contingencies:
Design Builder's Contingency - $1,216,926.00

...

See attached Exhibit H

...

**§ A.3.1.7** Deviations from the Owner's Criteria as adjusted by a Modification: (SECTION NOT APPLICABLE)

...

N/A
**PAGE 6**

**Additions and Deletions Report for AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                                         (794119746)

*(Identify name, title and contact information.)*

...

        Bill Woolbright

  **.2**  ~~Project~~ Contract Manager

        Mitch Davison

...

    i.  Project Executive – Mike Kerr
    ii.  Project Engineer – Patrick Alander

...

*(List name, discipline, address and other information.)*
Architect:
        5G Studio Collaborative
        117 NW 1st Avenue
        Miami, FL 33132

Structural Engineer:
        American Structurepoint
        7260 Shadeland Station
        Indianapolis, IN 46256

Civil Engineer:
        Civil & Environmental Consultants, Inc.
        530 E. Ohio St. Suite G
        Indianapolis, IN 46204

Plumbing, Mechanical, Electrical Contractor
        DEEM
        6831 East 32nd Street, Suite 200
        Indianpolis, IN 46226

...

**§ A.5.1.1.1** Wages of construction workers directly employed by the Design-Builder to perform the construction of the Work (with the modifications set forth in § A5.1.1.1.1), at the site or, with the Owner's prior approval, at off-site workshops.

**§ A5.1.1.1.1** Wages of construction workers directly employed by the Design-Builder to self-perform the construction of concrete and/or masonry related portions of the Work shall be subject to an additional seven percent (7%) markup before calculation of the Design Builder's Fee.

...

*(If it is intended that the wages or salaries of certain personnel stationed at the Design-Builder's principal or other offices shall be included in the Cost of the Work, identify below the personnel to be included, whether for all or only part of their time, and the rates at which their time will be charged to the Work.)*

...

**Additions and Deletions Report for AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:** (794119746)

**7**

| | | | |
|---|---|---|---|
| Project Executive | Part-time | $90.00 | 1 hour |
| *Contract Manager | Part-time | $90.00 | 1 hour |
| *Sr. Preconstruction Manager | Part-time | $90.00 | 1 hour |
| *Preconstruction Manager | Part-time | $75.00 | 1 hour |
| Superintendent | Full-time | $85.00 | 1 hour |
| Project Engineer | Full-time | $75.00 | 1 hour |
| *Quality Assurance Manager | Part-time | $70.00 | 1 hour |
| *Virtual Design Engineer | Part-time | $70.00 | 1 hour |
| *Scheduling Engineer | Part-time | $70.00 | 1 hour |

*may be stationed at Design Builder's principal or other office*

**PAGE 7**

**§ A.5.1.3.2.1** Costs of Materials and Equipment Incorporated in the Completed Construction by the Design-Builder to self-perform the construction of concrete and/or masonry related portions of the Work shall be subject to an additional seven percent (7%) markup before calculation of the Design Builder's Fee.

**PAGE 9**

**§ A.5.1.8 Cost of Portions of the Work Which Must be Publicly Bid as Required by a Governmental Entity**
**§ A.5.1.8.1** Should it be required at any time during the term of the Agreement that portions of the Work must be subject to any public bidding procedures, the cost of any contracts resulting from such portions of the Work so bid shall be considered inclusive of the Design-Builder's Cost of the Work for the purposes of determining the Design-Builder's Fee.

**Additions and Deletions Report for AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                 (794119746)

## *Certification of Document's Authenticity*
*AIA® Document D401™ – 2003*

I, Michael R. Kerr, hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with its associated Additions and Deletions Report and this certification at 11:04:08 on 10/25/2018 under Order No. 8562017676 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document A141™ – 2014 Exhibit A, Design-Build Amendment , as published by the AIA in its software, other than those additions and deletions shown in the associated Additions and Deletions Report.

DocuSigned by:

*Mike Kerr*

*(Signed)* C1B0B2E40483...

Vice President & General Counsel

*(Title)*

10/25/2018 | 11:54 AM EDT

*(Dated)*

---

**AIA Document D401™ – 2003.** Copyright © 1992 and 2003 by The American Institute of Architects**. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:04:08 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                              (794119746)

**1**



# AIA® Document A141™ – 2014

## *Standard Form of Agreement Between Owner and Design-Builder*

**AGREEMENT** made as of the 8th day of October in the year 2018

**BETWEEN** the Owner:

Matthews 350 E LaSalle, LLC
401 E Colfax Ave #277
South Bend, IN 46617

and the Design-Builder:

F.A. Wilhelm Construction Co., Inc.
3914 Prospect Street
Indianapolis, IN 46203

for the following Project:

Commerce Center Mixed Use Development – Phase 1 Building Core and Shell
350 East LaSalle Avenue
South Bend IN 46617

The Owner and Design-Builder agree as follows.

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Consultation with an attorney is also encouraged with respect to professional licensing requirements in the jurisdiction where the Project is located.

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects**. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                 (1866936912)

**1**

**TABLE OF ARTICLES**

1       GENERAL PROVISIONS

2       COMPENSATION AND PROGRESS PAYMENTS

3       GENERAL REQUIREMENTS OF THE WORK OF THE DESIGN-BUILD CONTRACT

4       WORK PRIOR TO EXECUTION OF THE DESIGN-BUILD AMENDMENT

5       WORK FOLLOWING EXECUTION OF THE DESIGN-BUILD AMENDMENT

6       CHANGES IN THE WORK

7       OWNER'S RESPONSIBILITIES

8       TIME

9       PAYMENT APPLICATIONS AND PROJECT COMPLETION

10      PROTECTION OF PERSONS AND PROPERTY

11      UNCOVERING AND CORRECTION OF WORK

12      COPYRIGHTS AND LICENSES

13      TERMINATION OR SUSPENSION

14      CLAIMS AND DISPUTE RESOLUTION

15      MISCELLANEOUS PROVISIONS

16      SCOPE OF THE AGREEMENT

**TABLE OF EXHIBITS**

A       DESIGN-BUILD AMENDMENT

B       INSURANCE AND BONDS

C       NOT APPLICABLE

D       OWNER'S PROGRAM

E       NOT APPLICABLE

F       PRECONSTRUCTION SERVICES AND PRELIMINARY DESIGN PROPOSAL AND CORRESPONDING NOTICE TO
        PROCEED

G       CORE AND SHELL – GMP – R1 – COST BREAKDOWN

H       CLARIFICATIONS AND ASSUMPTIONS

**ARTICLE 1   GENERAL PROVISIONS**
**§ 1.1 Owner's Criteria**
This Agreement is based on the Owner's Criteria set forth in this Section 1.1.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                      (1866936912)

Init.

/

**2**

*(Paragraph deleted)*
**§ 1.1.1** The Owner's program for the Project:

See attached Exhibit D.

**§ 1.1.2** The Owner's design requirements for the Project and related documentation:
*(Paragraph deleted)*
See attached Exhibit D.

**§ 1.1.3** The Project's physical characteristics:

See attached Exhibit D.

**§ 1.1.4** The Owner's anticipated Sustainable Objective for the Project, if any:

Not applicable.

**§ 1.1.5** Incentive programs the Owner intends to pursue for the Project, including those related to the Sustainable Objective, and any deadlines for receiving the incentives that are dependent on, or related to, the Design-Builder's services, are as follows:
*(Paragraph deleted)*
$20,000,000.00 of Work under this Agreement must be completed and spent by the Owner prior to April 1, 2020 in order to qualify for certain state credits and/or tax abatements.

**§ 1.1.6** The Owner's budget for the Work to be provided by the Design-Builder is set forth below:

Thirty-Three Million Dollars ($33,000,000.00)

**§ 1.1.7** The Owner's design and construction milestone dates:

    **.1**    Design phase milestone dates:
        a)   Phase I Preliminary design complete by July 16, 2018;

    **.2**    Submission of Design-Builder Proposal:
        a)   Phase I Guaranteed Maximum Price Proposal submission on August 1, 2018.
        b)   Revised Phase I Guaranteed Maximum Price Proposal submission on September 26, 2018.

    **.3**    Phased completion dates:
*(Paragraphs deleted)*
        a)   Phase I substantially complete by April 1, 2020.  Meeting this Substantial Completion Date is contingent upon the Owner providing proof of financing per §7.2.7 of the AIA A141-2014 by October 29, 2018 and a Notice to Proceed by October 29, 2018.

**§ 1.1.8** The Owner requires the Design-Builder to retain the following Architect, Consultants and Contractors at the Design-Builder's cost:
    **.1**    Architect:
        5G Studio Collaborative
        117 NE 1st Avenue
        Miami, FL 33132

    **.2**    Consultants:
        Structural Engineer:
        American Structurepoint
        7260 Shadeland Station
        Indianapolis, IN 46256

        Civil Engineer:

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                                          (1866936912)

**3**

Civil & Environmental Consultants, Inc.
530 E. Ohio St. Suite G
Indianapolis, IN 46204

.3      Contractors:
DEEM
6831 East 32nd Street, Suite 200
Indianapolis, IN 46226

**§ 1.1.9** Additional Owner's Criteria upon which the Agreement is based:

Not applicable.

**§ 1.1.10** The Design-Builder shall confirm that the information included in the Owner's Criteria complies with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities.

**§ 1.1.10.1** If the Owner's Criteria conflicts with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, the Design-Builder shall notify the Owner of the conflict.

**§ 1.1.11** If there is a change in the Owner's Criteria, the Owner and the Design-Builder shall execute a Modification in accordance with Article 6.

**§ 1.1.12** If the Owner and Design-Builder intend to transmit Instruments of Service or any other information or documentation in digital form, they shall endeavor to establish necessary protocols governing such transmissions. Unless otherwise agreed, the parties will use AIA Document E203™–2013 to establish the protocols for the development, use, transmission, and exchange of digital data and building information modeling.

**§ 1.2 Project Team**
**§ 1.2.1** The Owner identifies the following representative in accordance with Section 7.1.1:

David Matthews
Matthews 350 E LaSalle, LLC
401 E Colfax Ave #277
South Bend, IN 46617
765-409-3841

**§ 1.2.2** The persons or entities, in addition to the Owner's representative, who are required to review the Design-Builder's Submittals are as follows:

 Unknown at time of execution.

**§ 1.2.3** The Owner will retain the following consultants and separate contractors:
*(Paragraph deleted)*
All design services and contractors necessary for work not associated with the building core and shell.

**§ 1.2.4** The Design-Builder identifies the following representative in accordance with Section 3.1.2:

Michael R. Kerr, Vice President
F.A. Wilhelm Construction Co., Inc.
3914 Prospect Street Indianapolis, IN 46203
317-359-5411

**§ 1.2.5** Neither the Owner's nor the Design-Builder's representative shall be changed without ten days' written notice to the other party.

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                      (1866936912)

**4**

### § 1.3 Binding Dispute Resolution

For any Claim subject to, but not resolved by, mediation pursuant to Section 14.3, the method of binding dispute resolution shall be the following:

*(Paragraph deleted)*

        [ ]        Arbitration pursuant to Section 14.4

        [ X ]       Litigation in a court of competent jurisdiction

        [ ]        Other:

### § 1.4 Definitions

**§ 1.4.1 Design-Build Documents.** The Design-Build Documents consist of this Agreement between Owner and Design-Builder and its attached Exhibits (hereinafter, the "Agreement"); other documents listed in this Agreement; and Modifications issued after execution of this Agreement. A Modification is (1) a written amendment to the Contract signed by both parties, including the Design-Build Amendment, (2) a Change Order, or (3) a Change Directive.

**§ 1.4.2 The Contract.** The Design-Build Documents form the Contract. The Contract represents the entire and integrated agreement between the parties and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Design-Build Documents shall not be construed to create a contractual relationship of any kind between any persons or entities other than the Owner and the Design-Builder.

**§ 1.4.3 The Work.** The term "Work" means the design, construction and related services required to fulfill the Design-Builder's obligations under the Design-Build Documents, whether completed or partially completed, and includes all labor, materials, equipment and services provided or to be provided by the Design-Builder. The Work may constitute the whole or a part of the Project.

**§ 1.4.4 The Project.** The Project is the total design and construction of which the Work performed under the Design-Build Documents may be the whole or a part, and may include design and construction by the Owner and by separate contractors.

**§ 1.4.5 Instruments of Service.** Instruments of Service are representations, in any medium of expression now known or later developed, of the tangible and intangible creative work performed by the Design-Builder, Contractor(s), Architect, and Consultant(s) under their respective agreements. Instruments of Service may include, without limitation, studies, surveys, models, sketches, drawings, specifications, digital models and other similar materials.

**§ 1.4.6 Submittal.** A Submittal is any submission to the Owner for review and approval demonstrating how the Design-Builder proposes to conform to the Design-Build Documents for those portions of the Work for which the Design-Build Documents require Submittals. Submittals include, but are not limited to, shop drawings, product data, and samples. Submittals are not Design-Build Documents unless incorporated into a Modification.

**§ 1.4.7 Owner.** The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Design-Build Documents as if singular in number. The term "Owner" means the Owner or the Owner's authorized representative.

**§ 1.4.8 Design-Builder.** The Design-Builder is the person or entity identified as such in the Agreement and is referred to throughout the Design-Build Documents as if singular in number. The term "Design-Builder" means the Design-Builder or the Design-Builder's authorized representative.

**§ 1.4.9 Consultant.** A Consultant is a person or entity providing professional services for the Design-Builder for all or a portion of the Work, and is referred to throughout the Design-Build Documents as if singular in number. To the extent required by the relevant jurisdiction, the Consultant shall be lawfully licensed to provide the required professional services.

---

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                          (1866936912)

**§ 1.4.10 Architect.** The Architect is a person or entity providing design services for the Design-Builder for all or a portion of the Work, and is lawfully licensed to practice architecture in the applicable jurisdiction. The Architect is referred to throughout the Design-Build Documents as if singular in number.

**§ 1.4.11 Contractor.** A Contractor is a person or entity performing all or a portion of the construction, required in connection with the Work, for the Design-Builder. The Contractor shall be lawfully licensed, if required in the jurisdiction where the Project is located. The Contractor is referred to throughout the Design-Build Documents as if singular in number and means a Contractor or an authorized representative of the Contractor.

**§ 1.4.12 Confidential Information.** Confidential Information is information containing confidential or business proprietary information that is clearly marked as "confidential."

**§ 1.4.13 Contract Time.** Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, as set forth in the Design-Build Amendment for Substantial Completion of the Work.

**§ 1.4.14 Day.** The term "day" as used in the Design-Build Documents shall mean calendar day unless otherwise specifically defined.

**§ 1.4.15 Contract Sum.** The Contract Sum is the amount to be paid to the Design-Builder for performance of the Work after execution of the Design-Build Amendment, as identified in Article A.1 of the Design-Build Amendment.

*(Paragraph deleted)*
**ARTICLE 2   COMPENSATION AND PROGRESS PAYMENTS**
**§ 2.1 Compensation for Work Performed Prior To Execution of Design-Build Amendment**
**§ 2.1.1** Unless otherwise agreed, payments for Work performed prior to Execution of the Design-Build Amendment shall be made monthly. For the Design-Builder's performance of Work prior to the execution of the Design-Build Amendment, the Owner shall compensate the Design-Builder as follows:
*(Paragraph deleted)*
Per the June 20, 2018 Preconstruction Services and Preliminary Design Proposal and corresponding June 20, 2018 Notice to Proceed email from David Matthews to Dan Fetz – See attached Exhibit F.

**§ 2.1.2** The hourly billing rates for services of the Design-Builder and the Design-Builder's Architect, Consultants and Contractors, if any, are set forth below.

See attached Exhibit F.

**§ 2.1.3 Compensation for Reimbursable Expenses Prior To Execution of Design-Build Amendment**

See attached Exhibit F.

*(Paragraphs deleted)*
**§ 2.1.4 Payments to the Design-Builder Prior To Execution of Design-Build Amendment**
**§ 2.1.4.1** Payments are due and payable upon presentation of the Design-Builder's invoice. Amounts unpaid thirty (30) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Design-Builder.
*(Paragraphs deleted)*

**§ 2.1.4.2** Records of Reimbursable Expenses and services performed on the basis of hourly rates shall be available to the Owner at mutually convenient times for a period of two years following execution of the Design-Build Amendment or termination of this Agreement, whichever occurs first.

**§ 2.2 Contract Sum and Payment for Work Performed After Execution of Design-Build Amendment**
For the Design-Builder's performance of the Work after execution of the Design-Build Amendment, the Owner shall pay to the Design-Builder the Contract Sum in current funds as agreed in the Design-Build Amendment.

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                      (1866936912)

**6**

*(Paragraph deleted)*

**ARTICLE 3   GENERAL REQUIREMENTS OF THE WORK OF THE DESIGN-BUILD CONTRACT**

**§ 3.1 General**

**§ 3.1.1** The Design-Builder shall comply with any applicable licensing requirements in the jurisdiction where the Project is located.

**§ 3.1.2** The Design-Builder shall designate in writing a representative who is authorized to act on the Design-Builder's behalf with respect to the Project.

**§ 3.1.3** The Design-Builder shall perform the Work in accordance with the Design-Build Documents. The Design-Builder shall not be relieved of the obligation to perform the Work in accordance with the Design-Build Documents by the activities, tests, inspections or approvals of the Owner.

**§ 3.1.3.1** The Design-Builder shall perform the Work in compliance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities. If the Design-Builder performs Work contrary to applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities, the Design-Builder shall assume responsibility for such Work and shall bear the costs attributable to correction.

**§ 3.1.3.2** Neither the Design-Builder nor any Contractor, Consultant, or Architect shall be obligated to perform any act which they believe will violate any applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities. If the Design-Builder determines that implementation of any instruction received from the Owner, including those in the Owner's Criteria, would cause a violation of any applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, the Design-Builder shall notify the Owner in writing. Upon verification by the Owner that a change to the Owner's Criteria is required to remedy the violation, the Owner and the Design-Builder shall execute a Modification in accordance with Article 6.

**§ 3.1.4** The Design-Builder shall be responsible to the Owner for acts and omissions of the Design-Builder's employees, Architect, Consultants, Contractors, and their agents and employees, and other persons or entities performing portions of the Work.

**§ 3.1.5 General Consultation.** The Design-Builder shall schedule and conduct periodic meetings with the Owner to review matters such as procedures, progress, coordination, and scheduling of the Work.

**§ 3.1.6** When applicable law requires that services be performed by licensed professionals, the Design-Builder shall provide those services through qualified, licensed professionals. The Owner understands and agrees that the services of the Design-Builder's Architect and the Design-Builder's other Consultants are performed in the sole interest of, and for the exclusive benefit of, the Design-Builder.

**§ 3.1.7** The Design-Builder, with the assistance of the Owner, shall prepare and file documents required to obtain necessary approvals of governmental authorities having jurisdiction over the Project.

**§ 3.1.8 Progress Reports**

**§ 3.1.8.1** The Design-Builder shall keep the Owner informed of the progress and quality of the Work. On a monthly basis, or otherwise as agreed to by the Owner and Design-Builder, the Design-Builder shall submit written progress reports to the Owner, showing estimated percentages of completion and other information identified below:

.1   Work completed for the period;
.2   Project schedule status;
.3   Submittal schedule and status report, including a summary of outstanding Submittals;
.4   Responses to requests for information to be provided by the Owner;
.5   Approved Change Orders and Change Directives;
.6   Pending Change Order and Change Directive status reports;
.7   Tests and inspection reports;
.8   Status report of Work rejected by the Owner;
.9   Status of Claims previously submitted in accordance with Article 14;
.10  Cumulative total of the Cost of the Work to date including the Design-Builder's compensation and Reimbursable Expenses, if any;
.11  Current Project cash-flow and forecast reports; and

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.

**User Notes:**                                                                                        (1866936912)

.12    Additional information as agreed to by the Owner and Design-Builder.

**§ 3.1.8.2** In addition, where the Contract Sum is the Cost of the Work with or without a Guaranteed Maximum Price, the Design-Builder shall include the following additional information in its progress reports:

.1    Design-Builder's work force report;

.2    Equipment utilization report; and

.3    Cost summary, comparing actual costs to updated cost estimates.

**§ 3.1.9 Design-Builder's Schedules**

**§ 3.1.9.1** The Design-Builder, promptly after execution of this Agreement, shall prepare and submit for the Owner's information a schedule for the Work. The schedule, including the time required for design and construction, shall not exceed time limits current under the Design-Build Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Design-Build Documents, shall provide for expeditious and practicable execution of the Work, and shall include allowances for periods of time required for the Owner's review and for approval of submissions by authorities having jurisdiction over the Project.

**§ 3.1.9.2** The Design-Builder shall perform the Work in general accordance with the most recent schedules submitted to the Owner.

**§ 3.1.10 Certifications.** Upon the Owner's written request, the Design-Builder shall obtain from the Architect, Consultants, and Contractors, and furnish to the Owner, certifications with respect to the documents and services provided by the Architect, Consultants, and Contractors (a) that, to the best of their knowledge, information and belief, the documents or services to which the certifications relate (i) are consistent with the Design-Build Documents, except to the extent specifically identified in the certificate, and (ii) comply with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities governing the design of the Project; and (b) that the Owner and its consultants shall be entitled to rely upon the accuracy of the representations and statements contained in the certifications. The Design-Builder's Architect, Consultants, and Contractors shall not be required to execute certificates or consents that would require knowledge, services or responsibilities beyond the scope of their services.

**§ 3.1.11 Design-Builder's Submittals**

**§ 3.1.11.1** Prior to submission of any Submittals, the Design-Builder shall prepare a Submittal schedule, and shall submit the schedule for the Owner's approval. The Owner's approval shall not unreasonably be delayed or withheld. The Submittal schedule shall (1) be coordinated with the Design-Builder's schedule provided in Section 3.1.9.1, (2) allow the Owner reasonable time to review Submittals, and (3) be periodically updated to reflect the progress of the Work. If the Design-Builder fails to submit a Submittal schedule, the Design-Builder shall not be entitled to any increase in Contract Sum or extension of Contract Time based on the time required for review of Submittals.

**§ 3.1.11.2** By providing Submittals the Design-Builder represents to the Owner that it has (1) reviewed and approved them, (2) determined and verified materials, field measurements and field construction criteria related thereto, or will do so and (3) checked and coordinated the information contained within such Submittals with the requirements of the Work and of the Design-Build Documents.

**§ 3.1.11.3** The Design-Builder shall perform no portion of the Work for which the Design-Build Documents require Submittals until the Owner has approved the respective Submittal.

**§ 3.1.11.4** The Work shall be in accordance with approved Submittals except that the Design-Builder shall not be relieved of its responsibility to perform the Work consistent with the requirements of the Design-Build Documents. The Work may deviate from the Design-Build Documents only if the Design-Builder has notified the Owner in writing of a deviation from the Design-Build Documents at the time of the Submittal and a Modification is executed authorizing the identified deviation. The Design-Builder shall not be relieved of responsibility for errors or omissions in Submittals by the Owner's approval of the Submittals.

**§ 3.1.11.5** All professional design services or certifications to be provided by the Design-Builder, including all drawings, calculations, specifications, certifications, shop drawings and other Submittals, shall contain the signature and seal of the licensed design professional preparing them. Submittals related to the Work designed or certified by the licensed design professionals, if prepared by others, shall bear the licensed design professional's written approval. The

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                  (1866936912)

Init.

/

**8**

Owner and its consultants shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals.

**§ 3.1.12 Warranty.** The Design-Builder warrants to the Owner that materials and equipment furnished under the Contract will be of good quality and new unless the Design-Build Documents require or permit otherwise. The Design-Builder further warrants that the Work will conform to the requirements of the Design-Build Documents and will be free from defects, except for those inherent in the quality of the Work or otherwise expressly permitted by the Design-Build Documents. Work, materials, or equipment not conforming to these requirements may be considered defective. The Design-Builder's warranty excludes remedy for damage or defect caused by abuse, alterations to the Work not executed by the Design-Builder, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Owner, the Design-Builder shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

**§ 3.1.13 Royalties, Patents and Copyrights**
**§ 3.1.13.1** The Design-Builder shall pay all royalties and license fees.

**§ 3.1.13.2** The Design-Builder shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and its separate contractors and consultants harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Owner, or where the copyright violations are required in the Owner's Criteria. However, if the Design-Builder has reason to believe that the design, process or product required in the Owner's Criteria is an infringement of a copyright or a patent, the Design-Builder shall be responsible for such loss unless such information is promptly furnished to the Owner. If the Owner receives notice from a patent or copyright owner of an alleged violation of a patent or copyright, attributable to the Design-Builder, the Owner shall give prompt written notice to the Design-Builder.

**§ 3.1.14 Indemnification**
**§ 3.1.14.1** To the fullest extent permitted by law, the Design-Builder shall indemnify and hold harmless the Owner, including the Owner's agents and employees, from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, but only to the extent caused by the negligent acts or omissions of the Design-Builder, Architect, a Consultant, a Contractor, or anyone directly or indirectly employed by them or anyone for whose acts they may be liable. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity that would otherwise exist as to a party or person described in this Section 3.1.14.

**§ 3.1.14.2** The indemnification obligation under this Section 3.1.14 shall not be limited by a limitation on amount or type of damages, compensation, or benefits payable by or for Design-Builder, Architect, a Consultant, a Contractor, or anyone directly or indirectly employed by them, under workers' compensation acts, disability benefit acts or other employee benefit acts.

**§ 3.1.15 Contingent Assignment of Agreements**
**§ 3.1.15.1** Each agreement for a portion of the Work is assigned by the Design-Builder to the Owner, provided that
  .1    assignment is effective only after termination of the Contract by the Owner for cause, pursuant to Sections 13.1.4 or 13.2.2, and only for those agreements that the Owner accepts by written notification to the Design-Builder and the Architect, Consultants, and Contractors whose agreements are accepted for assignment; and
  .2    assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

When the Owner accepts the assignment of an agreement, the Owner assumes the Design-Builder's rights and obligations under the agreement.

**§ 3.1.15.2** Upon such assignment, if the Work has been suspended for more than 30 days, the compensation under the assigned agreement shall be equitably adjusted for increases in cost resulting from the suspension.

**§ 3.1.15.3** Upon such assignment to the Owner under this Section 3.1.15, the Owner may further assign the agreement to a successor design-builder or other entity. If the Owner assigns the agreement to a successor design-builder or other

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                           (1866936912)

**Init.**

**/**

**9**

entity, the Owner shall nevertheless remain legally responsible for all of the successor design-builder's or other entity's obligations under the agreement.

**§ 3.1.16 Design-Builder's Insurance and Bonds.** The Design-Builder shall purchase and maintain insurance and provide bonds as set forth in Exhibit B.

*(Paragraph deleted)*
**ARTICLE 4   WORK PRIOR TO EXECUTION OF THE DESIGN-BUILD AMENDMENT**
**§ 4.1 General**
**§ 4.1.1** Any information submitted by the Design-Builder, and any interim decisions made by the Owner, shall be for the purpose of facilitating the design process and shall not modify the Owner's Criteria unless the Owner and Design-Builder execute a Modification.

**§ 4.1.2** The Design-Builder shall advise the Owner on proposed site use and improvements, selection of materials, and building systems and equipment. The Design-Builder shall also provide the Owner with recommendations, consistent with the Owner's Criteria, on constructability; availability of materials and labor; time requirements for procurement, installation and construction; and factors related to construction cost including, but not limited to, costs of alternative designs or materials, preliminary budgets, life-cycle data, and possible cost reductions.

**§ 4.2 Evaluation of the Owner's Criteria**
**§ 4.2.1** The Design-Builder shall schedule and conduct meetings with the Owner and any other necessary individuals or entities to discuss and review the Owner's Criteria as set forth in Section 1.1.The Design-Builder shall thereafter again meet with the Owner to discuss a preliminary evaluation of the Owner's Criteria. The preliminary evaluation shall address possible alternative approaches to design and construction of the Project and include the Design-Builder's recommendations, if any, with regard to accelerated or fast-track scheduling, procurement, or phased construction. The preliminary evaluation shall consider cost information, constructability, and procurement and construction scheduling issues.

**§ 4.2.2** After the Design-Builder meets with the Owner and presents the preliminary evaluation, the Design-Builder shall provide a written report to the Owner, summarizing the Design-Builder's evaluation of the Owner's Criteria. The report shall also include

    **.1**    allocations of program functions, detailing each function and their square foot areas;
    **.2**    a preliminary estimate of the Cost of the Work, and, if necessary, recommendations to adjust the Owner's Criteria to conform to the Owner's budget;
    **.3**    a preliminary schedule, which shall include proposed design milestones; dates for receiving additional information from, or for work to be completed by, the Owner; anticipated date for the Design-Builder's Proposal; and dates of periodic design review sessions with the Owner; and
    **.4**    the following:
*(Paragraphs deleted)*
**§ 4.2.3** The Owner shall review the Design-Builder's written report and, if acceptable, provide the Design-Builder with written consent to proceed to the development of the Preliminary Design as described in Section 4.3. The consent to proceed shall not be understood to modify the Owner's Criteria unless the Owner and Design-Builder execute a Modification.

**§ 4.3 Preliminary Design**
**§ 4.3.1** Upon the Owner's issuance of a written consent to proceed under Section 4.2.3, the Design-Builder shall prepare and submit a Preliminary Design to the Owner. The Preliminary Design shall include a report identifying any deviations from the Owner's Criteria, and shall include the following:

    **.1**    Confirmation of the allocations of program functions;
    **.2**    Site plan;
    **.3**    Building plans, sections and elevations;
    **.4**    Structural system;
    **.5**    Selections of major building systems, including but not limited to mechanical, electrical and plumbing systems; and
    **.6**    Outline specifications or sufficient drawing notes describing construction materials.

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                   (1866936912)

**10**

The Preliminary Design may include some combination of physical study models, perspective sketches, or digital modeling.

**§ 4.3.2** The Owner shall review the Preliminary Design and, if acceptable, provide the Design-Builder with written consent to proceed to development of the Design-Builder's Proposal. The Preliminary Design shall not modify the Owner's Criteria unless the Owner and Design-Builder execute a Modification.

**§ 4.4 Design-Builder's Proposal**
**§ 4.4.1** Upon the Owner's issuance of a written consent to proceed under Section 4.3.2, the Design-Builder shall prepare and submit the Design-Builder's Proposal to the Owner. The Design-Builder's Proposal shall include the following:

    **.1**    A list of the Preliminary Design documents and other information, including the Design-Builder's clarifications, assumptions and deviations from the Owner's Criteria, upon which the Design-Builder's Proposal is based;

    **.2**    The proposed Contract Sum, including the compensation method and, if based upon the Cost of the Work plus a fee, a written statement of estimated cost organized by trade categories, allowances, contingencies, Design-Builder's Fee, and other items that comprise the Contract Sum;

    **.3**    The proposed date the Design-Builder shall achieve Substantial Completion;

    **.4**    An enumeration of any qualifications and exclusions, if applicable;

    **.5**    A list of the Design-Builder's key personnel, Contractors and suppliers; and

    **.6**    The date on which the Design-Builder's Proposal expires.

**§ 4.4.2** Submission of the Design-Builder's Proposal shall constitute a representation by the Design-Builder that it has visited the site and become familiar with local conditions under which the Work is to be completed.

**§ 4.4.3** If the Owner and Design-Builder agree on a proposal, the Owner and Design-Builder shall execute the Design-Build Amendment setting forth the terms of their agreement.

*(Paragraph deleted)*
**ARTICLE 5   WORK FOLLOWING EXECUTION OF THE DESIGN-BUILD AMENDMENT**
**§ 5.1 Construction Documents**
**§ 5.1.1** Upon the execution of the Design-Build Amendment, the Design-Builder shall prepare Construction Documents. The Construction Documents shall establish the quality levels of materials and systems required. The Construction Documents shall be consistent with the Design-Build Documents.

**§ 5.1.2** The Design-Builder shall provide the Construction Documents to the Owner for the Owner's information. If the Owner discovers any deviations between the Construction Documents and the Design-Build Documents, the Owner shall promptly notify the Design-Builder of such deviations in writing. The Construction Documents shall not modify the Design-Build Documents unless the Owner and Design-Builder execute a Modification. The failure of the Owner to discover any such deviations shall not relieve the Design-Builder of the obligation to perform the Work in accordance with the Design-Build Documents.

**§ 5.2 Construction**
**§ 5.2.1 Commencement.** Except as permitted in Section 5.2.2, construction shall not commence prior to execution of the Design-Build Amendment.

**§ 5.2.2** If the Owner and Design-Builder agree in writing, construction may proceed prior to the execution of the Design-Build Amendment. However, such authorization shall not waive the Owner's right to reject the Design-Builder's Proposal.

**§ 5.2.3** The Design-Builder shall supervise and direct the Work, using the Design-Builder's best skill and attention. The Design-Builder shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under the Contract, unless the Design-Build Documents give other specific instructions concerning these matters.

**§ 5.2.4** The Design-Builder shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:** (1866936912)

**11**

### § 5.3 Labor and Materials

**§ 5.3.1** Unless otherwise provided in the Design-Build Documents, the Design-Builder shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services, necessary for proper execution and completion of the Work, whether temporary or permanent, and whether or not incorporated or to be incorporated in the Work.

**§ 5.3.2** When a material or system is specified in the Design-Build Documents, the Design-Builder may make substitutions only in accordance with Article 6.

**§ 5.3.3** The Design-Builder shall enforce strict discipline and good order among the Design-Builder's employees and other persons carrying out the Work. The Design-Builder shall not permit employment of unfit persons or persons not properly skilled in tasks assigned to them.

### § 5.4 Taxes

The Design-Builder shall pay sales, consumer, use and similar taxes, for the Work provided by the Design-Builder, that are legally enacted when the Design-Build Amendment is executed, whether or not yet effective or merely scheduled to go into effect.

### § 5.5 Permits, Fees, Notices and Compliance with Laws

**§ 5.5.1** Unless otherwise provided in the Design-Build Documents or the August 1, 2018 Matthews, LLC Commerce Center Mixed Use Development Phase 1 (Core & Shell) – GMP Proposal, the Design-Builder shall secure and pay for the building permit as well as any other permits, fees, licenses, and inspections by government agencies, necessary for proper execution of the Work and Substantial Completion of the Project.

**§ 5.5.2** The Design-Builder shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities, applicable to performance of the Work.

**§ 5.5.3 Concealed or Unknown Conditions.** If the Design-Builder encounters conditions at the site that are (1) subsurface or otherwise concealed physical conditions that differ materially from those indicated in the Design-Build Documents or (2) unknown physical conditions of an unusual nature that differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Design-Build Documents, the Design-Builder shall promptly provide notice to the Owner before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Owner shall promptly investigate such conditions and, if the Owner determines that they differ materially and cause an increase or decrease in the Design-Builder's cost of, or time required for, performance of any part of the Work, shall recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Owner determines that the conditions at the site are not materially different from those indicated in the Design-Build Documents and that no change in the terms of the Contract is justified, the Owner shall promptly notify the Design-Builder in writing, stating the reasons. If the Design-Builder disputes the Owner's determination or recommendation, the Design-Builder may proceed as provided in Article 14.

**§ 5.5.4** If, in the course of the Work, the Design-Builder encounters human remains, or recognizes the existence of burial markers, archaeological sites, or wetlands, not indicated in the Design-Build Documents, the Design-Builder shall immediately suspend any operations that would affect them and shall notify the Owner. Upon receipt of such notice, the Owner shall promptly take any action necessary to obtain governmental authorization required to resume the operations. The Design-Builder shall continue to suspend such operations until otherwise instructed by the Owner but shall continue with all other operations that do not affect those remains or features. Requests for adjustments in the Contract Sum and Contract Time arising from the existence of such remains or features may be made as provided in Article 14.

### § 5.6 Allowances

**§ 5.6.1** The Design-Builder shall include in the Contract Sum all allowances stated in the Design-Build Documents. Items covered by allowances shall be supplied for such amounts, and by such persons or entities as the Owner may direct, but the Design-Builder shall not be required to employ persons or entities to whom the Design-Builder has reasonable objection.

---

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                     (1866936912)

**12**

**§ 5.6.2** Unless otherwise provided in the Design-Build Documents,

  **.1**  allowances shall cover the cost to the Design-Builder of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;

  **.2**  the Design-Builder's costs for unloading and handling at the site, labor, installation costs, overhead, profit, and other expenses contemplated for stated allowance amounts, shall be included in the Contract Sum but not in the allowances; and

  **.3**  whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Section 5.6.2.1 and (2) changes in Design-Builder's costs under Section 5.6.2.2.

**§ 5.6.3** The Owner shall make selections of materials and equipment with reasonable promptness for allowances requiring Owner selection.

**§ 5.7 Key Personnel, Contractors and Suppliers**
**§ 5.7.1** The Design-Builder shall not employ personnel, or contract with Contractors or suppliers to whom the Owner has made reasonable and timely objection. The Design-Builder shall not be required to contract with anyone to whom the Design-Builder has made reasonable and timely objection.

**§ 5.7.2** If the Design-Builder changes any of the personnel, Contractors or suppliers identified in the Design-Build Amendment, the Design-Builder shall notify the Owner and provide the name and qualifications of the new personnel, Contractor or supplier. The Owner may reply within 14 days to the Design-Builder in writing, stating (1) whether the Owner has reasonable objection to the proposed personnel, Contractor or supplier or (2) that the Owner requires additional time to review. Failure of the Owner to reply within the 14-day period shall constitute notice of no reasonable objection.

**§ 5.7.3** Except for those persons or entities already identified or required in the Design-Build Amendment, the Design-Builder, as soon as practicable after execution of the Design-Build Amendment, shall furnish in writing to the Owner the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Owner may reply within 14 days to the Design-Builder in writing stating (1) whether the Owner has reasonable objection to any such proposed person or entity or (2) that the Owner requires additional time for review. Failure of the Owner to reply within the 14-day period shall constitute notice of no reasonable objection.

**§ 5.7.3.1** If the Owner has reasonable objection to a person or entity proposed by the Design-Builder, the Design-Builder shall propose another to whom the Owner has no reasonable objection. If the rejected person or entity was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute person or entity's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Design-Builder has acted promptly and responsively in submitting names as required.

**§ 5.8 Documents and Submittals at the Site**
The Design-Builder shall maintain at the site for the Owner one copy of the Design-Build Documents and a current set of the Construction Documents, in good order and marked currently to indicate field changes and selections made during construction, and one copy of approved Submittals. The Design-Builder shall deliver these items to the Owner in accordance with Section 9.10.2 as a record of the Work as constructed.

**§ 5.9 Use of Site**
The Design-Builder shall confine operations at the site to areas permitted by applicable laws, statutes, ordinances, codes, rules and regulations, lawful orders of public authorities, and the Design-Build Documents, and shall not unreasonably encumber the site with materials or equipment.

**§ 5.10 Cutting and Patching**
The Design-Builder shall not cut, patch or otherwise alter fully or partially completed construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                                    (1866936912)

unreasonably withheld. The Design-Builder shall not unreasonably withhold from the Owner or a separate contractor the Design-Builder's consent to cutting or otherwise altering the Work.

### § 5.11 Cleaning Up
**§ 5.11.1** The Design-Builder shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Design-Builder shall remove waste materials, rubbish, the Design-Builder's tools, construction equipment, machinery and surplus materials from and about the Project.

**§ 5.11.2** If the Design-Builder fails to clean up as provided in the Design-Build Documents, the Owner may do so and Owner shall be entitled to reimbursement from the Design-Builder.

### § 5.12 Access to Work
The Design-Builder shall provide the Owner and its separate contractors and consultants access to the Work in preparation and progress wherever located. The Design-Builder shall notify the Owner regarding Project safety criteria and programs, which the Owner, and its contractors and consultants, shall comply with while at the site.

### § 5.13 Construction by Owner or by Separate Contractors
### § 5.13.1 Owner's Right to Perform Construction and to Award Separate Contracts
**§ 5.13.1.1** The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces; and to award separate contracts in connection with other portions of the Project, or other construction or operations on the site, under terms and conditions identical or substantially similar to this Contract, including those terms and conditions related to insurance and waiver of subrogation. The Owner shall notify the Design-Builder promptly after execution of any separate contract. If the Design-Builder claims that delay or additional cost is involved because of such action by the Owner, the Design-Builder shall make a Claim as provided in Article 14.

**§ 5.13.1.2** When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Design-Builder" in the Design-Build Documents in each case shall mean the individual or entity that executes each separate agreement with the Owner.

**§ 5.13.1.3** The Owner shall provide for coordination of the activities of the Owner's own forces, and of each separate contractor, with the Work of the Design-Builder, who shall cooperate with them. The Design-Builder shall participate with other separate contractors and the Owner in reviewing their construction schedules. The Design-Builder shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Design-Builder, separate contractors and the Owner until subsequently revised.

**§ 5.13.1.4** Unless otherwise provided in the Design-Build Documents, when the Owner performs construction or operations related to the Project with the Owner's own forces or separate contractors, the Owner shall be deemed to be subject to the same obligations, and to have the same rights, that apply to the Design-Builder under the Contract.

### § 5.14 Mutual Responsibility
**§ 5.14.1** The Design-Builder shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Design-Builder's construction and operations with theirs as required by the Design-Build Documents.

**§ 5.14.2** If part of the Design-Builder's Work depends upon construction or operations by the Owner or a separate contractor, the Design-Builder shall, prior to proceeding with that portion of the Work, prepare a written report to the Owner, identifying apparent discrepancies or defects in the construction or operations by the Owner or separate contractor that would render it unsuitable for proper execution and results of the Design-Builder's Work. Failure of the Design-Builder to report shall constitute an acknowledgment that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Design-Builder's Work, except as to defects not then reasonably discoverable.

**§ 5.14.3** The Design-Builder shall reimburse the Owner for costs the Owner incurs that are payable to a separate contractor because of the Design-Builder's delays, improperly timed activities or defective construction. The Owner

---

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:** (1866936912)

**14**

shall be responsible to the Design-Builder for costs the Design-Builder incurs because of a separate contractor's delays, improperly timed activities, damage to the Work or defective construction.

**§ 5.14.4** The Design-Builder shall promptly remedy damage the Design-Builder wrongfully causes to completed or partially completed construction or to property of the Owner or separate contractors as provided in Section 10.2.5.

**§ 5.14.5** The Owner and each separate contractor shall have the same responsibilities for cutting and patching the Work as the Design-Builder has with respect to the construction of the Owner or separate contractors in Section 5.10.

### § 5.15 Owner's Right to Clean Up

If a dispute arises among the Design-Builder, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and will allocate the cost among those responsible.

*(Paragraph deleted)*
### ARTICLE 6   CHANGES IN THE WORK
### § 6.1 General
**§ 6.1.1** Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order or Change Directive, subject to the limitations stated in this Article 6 and elsewhere in the Design-Build Documents.

**§ 6.1.2** A Change Order shall be based upon agreement between the Owner and Design-Builder. The Owner may issue a Change Directive without agreement by the Design-Builder.

**§ 6.1.3** Changes in the Work shall be performed under applicable provisions of the Design-Build Documents, and the Design-Builder shall proceed promptly, unless otherwise provided in the Change Order or Change Directive.

### § 6.2 Change Orders
A Change Order is a written instrument signed by the Owner and Design-Builder stating their agreement upon all of the following:

 **.1** The change in the Work;
 **.2** The amount of the adjustment, if any, in the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation; and
 **.3** The extent of the adjustment, if any, in the Contract Time.

### § 6.3 Change Directives
**§ 6.3.1** A Change Directive is a written order signed by the Owner directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation, or Contract Time. The Owner may by Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation, and Contract Time being adjusted accordingly.

**§ 6.3.2** A Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

**§ 6.3.3** If the Change Directive provides for an adjustment to the Contract Sum or, if prior to execution of the Design-Build Amendment, an adjustment in the Design-Builder's compensation, the adjustment shall be based on one of the following methods:

 **.1** Mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;
 **.2** Unit prices stated in the Design-Build Documents or subsequently agreed upon;
 **.3** Cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or
 **.4** As provided in Section 6.3.7.

**§ 6.3.4** If unit prices are stated in the Design-Build Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Change Directive so that application of

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:** (1866936912)

Init.

/

**15**

such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Design-Builder, the applicable unit prices shall be equitably adjusted.

**§ 6.3.5** Upon receipt of a Change Directive, the Design-Builder shall promptly proceed with the change in the Work involved and advise the Owner of the Design-Builder's agreement or disagreement with the method, if any, provided in the Change Directive for determining the proposed adjustment in the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation, or Contract Time.

**§ 6.3.6** A Change Directive signed by the Design-Builder indicates the Design-Builder's agreement therewith, including adjustment in Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation, and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**§ 6.3.7** If the Design-Builder does not respond promptly or disagrees with the method for adjustment in the Contract Sum or, if prior to execution of the Design-Build Amendment, the method for adjustment in the Design-Builder's compensation, the Owner shall determine the method and the adjustment on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase, an amount for overhead and profit as set forth in the Agreement, or if no such amount is set forth in the Agreement, a reasonable amount. In such case, and also under Section 6.3.3.3, the Design-Builder shall keep and present, in such form as the Owner may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Design-Build Documents, costs for the purposes of this Section 6.3.7 shall be limited to the following:

.1 Additional costs of professional services;

.2 Costs of labor, including social security, unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.3 Costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.4 Rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Design-Builder or others;

.5 Costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and

.6 Additional costs of supervision and field office personnel directly attributable to the change.

**§ 6.3.8** The amount of credit to be allowed by the Design-Builder to the Owner for a deletion or change that results in a net decrease in the Contract Sum or, if prior to execution of the Design-Build Amendment, in the Design-Builder's compensation, shall be actual net cost. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**§ 6.3.9** Pending final determination of the total cost of a Change Directive to the Owner, the Design-Builder may request payment for Work completed under the Change Directive in Applications for Payment. The Owner will make an interim determination for purposes of certification for payment for those costs deemed to be reasonably justified. The Owner's interim determination of cost shall adjust the Contract Sum or, if prior to execution of the Design-Build Amendment, the Design-Builder's compensation, on the same basis as a Change Order, subject to the right of Design-Builder to disagree and assert a Claim in accordance with Article 14.

**§ 6.3.10** When the Owner and Design-Builder agree with a determination concerning the adjustments in the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and the Owner and Design-Builder shall execute a Change Order. Change Orders may be issued for all or any part of a Change Directive.

*(Paragraph deleted)*
**ARTICLE 7   OWNER'S RESPONSIBILITIES**
**§ 7.1 General**
**§ 7.1.1** The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all Project matters requiring the Owner's approval or authorization.

Init.

/

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                       (1866936912)

16

§ 7.1.2 The Owner shall render decisions in a timely manner and in accordance with the Design-Builder's schedule agreed to by the Owner. The Owner shall furnish to the Design-Builder, within 15 days after receipt of a written request, information necessary and relevant for the Design-Builder to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

### § 7.2 Information and Services Required of the Owner

§ 7.2.1 The Owner shall furnish information or services required of the Owner by the Design-Build Documents with reasonable promptness.

§ 7.2.2 The Owner shall provide, to the extent under the Owner's control and if not required by the Design-Build Documents to be provided by the Design-Builder, the results and reports of prior tests, inspections or investigations conducted for the Project involving structural or mechanical systems; chemical, air and water pollution; hazardous materials; or environmental and subsurface conditions and information regarding the presence of pollutants at the Project site. Upon receipt of a written request from the Design-Builder, the Owner shall also provide surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site under the Owner's control.

§ 7.2.3 The Owner shall promptly obtain easements, zoning variances, and legal authorizations or entitlements regarding site utilization where essential to the execution of the Project.

§ 7.2.4 The Owner shall cooperate with the Design-Builder in securing building and other permits, licenses and inspections.

§ 7.2.5 The services, information, surveys and reports required to be provided by the Owner under this Agreement, shall be furnished at the Owner's expense, and except as otherwise specifically provided in this Agreement or elsewhere in the Design-Build Documents or to the extent the Owner advises the Design-Builder to the contrary in writing, the Design-Builder shall be entitled to rely upon the accuracy and completeness thereof. In no event shall the Design-Builder be relieved of its responsibility to exercise proper precautions relating to the safe performance of the Work.

§ 7.2.6 If the Owner observes or otherwise becomes aware of a fault or defect in the Work or non-conformity with the Design-Build Documents, the Owner shall give prompt written notice thereof to the Design-Builder.

§ 7.2.7 Prior to the execution of the Design-Build Amendment, the Owner shall provide evidence, satisfactory to the Design-Builder, that the Owner has made financial arrangements sufficient to fulfill the Owner's obligations under the Design-Build Documents and the Design-Builder's Proposal and that the financing arrangements are fully in effect and funded ("Evidence of Financing").  The Design-Builder shall have no obligation to the Owner to commence the Work, or if the Work has been commenced, no obligation to continue the Work, until the Design-Builder shall have notified the Owner in writing that the Design-Builder is satisfied with the Evidence of Financing.

Thereafter, the Design-Builder may request further Evidence of Financing if (1) the Owner fails to make payments to the Design-Builder as the Design-Build Documents require; (2) a change in the Work materially changes the Contract Sum; or (3) the Design-Builder identifies in writing a reasonable concern regarding the Owner's ability to make payment when due for the Work. The Design-Builder may from time to time have those entities that are providing financing for the Work to confirm that there have been no changes to their financing arrangements and that the Owner is not in default under their financing arrangements.  The Owner shall furnish such evidence as a condition precedent to commencement or continuation of the Work or the portion of the Work affected by a material change. After the Owner furnishes the evidence, the Owner shall not materially vary such financial arrangements without prior notice to the Design-Builder.

§ 7.2.8 Except as otherwise provided in the Design-Build Documents or when direct communications have been specially authorized, the Owner shall communicate through the Design-Builder with persons or entities employed or retained by the Design-Builder.

§ 7.2.9 Unless required by the Design-Build Documents to be provided by the Design-Builder, the Owner shall, upon request from the Design-Builder, furnish the services of geotechnical engineers or other consultants for investigation

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                           (1866936912)

**17**

of subsurface, air and water conditions when such services are reasonably necessary to properly carry out the design services furnished by the Design-Builder. In such event, the Design-Builder shall specify the services required. Such services may include, but are not limited to, test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion and resistivity tests, and necessary operations for anticipating subsoil conditions. The services of geotechnical engineer(s) or other consultants shall include preparation and submission of all appropriate reports and professional recommendations.

§ 7.2.10 The Owner shall purchase and maintain insurance as set forth in Exhibit B.

### § 7.3 Submittals

§ 7.3.1 The Owner shall review and approve or take other appropriate action on Submittals. Review of Submittals is not conducted for the purpose of determining the accuracy and completeness of other details, such as dimensions and quantities; or for substantiating instructions for installation or performance of equipment or systems; or for determining that the Submittals are in conformance with the Design-Build Documents, all of which remain the responsibility of the Design-Builder as required by the Design-Build Documents. The Owner's action will be taken in accordance with the submittal schedule approved by the Owner or, in the absence of an approved submittal schedule, with reasonable promptness while allowing sufficient time in the Owner's judgment to permit adequate review. The Owner's review of Submittals shall not relieve the Design-Builder of the obligations under Sections 3.1.11, 3.1.12, and 5.2.3. The Owner's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Owner, of any construction means, methods, techniques, sequences or procedures. The Owner's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

§ 7.3.2 Upon review of the Submittals required by the Design-Build Documents, the Owner shall notify the Design-Builder of any non-conformance with the Design-Build Documents the Owner discovers.

§ 7.4 Visits to the site by the Owner shall not be construed to create an obligation on the part of the Owner to make on-site inspections to check the quality or quantity of the Work. The Owner shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, because these are solely the Design-Builder's rights and responsibilities under the Design-Build Documents.

§ 7.5 The Owner shall not be responsible for the Design-Builder's failure to perform the Work in accordance with the requirements of the Design-Build Documents. The Owner shall not have control over or charge of, and will not be responsible for acts or omissions of the Design-Builder, Architect, Consultants, Contractors, or their agents or employees, or any other persons or entities performing portions of the Work for the Design-Builder.

§ 7.6 The Owner has the authority to reject Work that does not conform to the Design-Build Documents. The Owner shall have authority to require inspection or testing of the Work in accordance with Section 15.5.2, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Owner nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Owner to the Design-Builder, the Architect, Consultants, Contractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

§ 7.7 The Owner shall determine the date or dates of Substantial Completion in accordance with Section 9.8 and the date of final completion in accordance with Section 9.10.

### § 7.8 Owner's Right to Stop Work

If the Design-Builder fails to correct Work which is not in accordance with the requirements of the Design-Build Documents as required by Section 11.2 or persistently fails to carry out Work in accordance with the Design-Build Documents, the Owner may issue a written order to the Design-Builder to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Design-Builder or any other person or entity, except to the extent required by Section 5.13.1.3.

### § 7.9 Owner's Right to Carry Out the Work

If the Design-Builder defaults or neglects to carry out the Work in accordance with the Design-Build Documents and fails within a ten-day period after receipt of written notice from the Owner to commence and continue correction of

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                               (1866936912)

**18**

such default or neglect with diligence and promptness, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case, an appropriate Change Order shall be issued deducting from payments then or thereafter due the Design-Builder the reasonable cost of correcting such deficiencies. If payments then or thereafter due the Design-Builder are not sufficient to cover such amounts, the Design-Builder shall pay the difference to the Owner.

## ARTICLE 8   TIME
### § 8.1 Progress and Completion
**§ 8.1.1** Time limits stated in the Design-Build Documents are of the essence of the Contract. By executing the Design-Build Amendment the Design-Builder confirms that the Contract Time is a reasonable period for performing the Work.

**§ 8.1.2** The Design-Builder shall not, except by agreement of the Owner in writing, commence the Work prior to the effective date of insurance, other than property insurance, required by this Contract. The Contract Time shall not be adjusted as a result of the Design-Builder's failure to obtain insurance required under this Contract.

**§ 8.1.3** The Design-Builder shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

### § 8.2 Delays and Extensions of Time
**§ 8.2.1** If the Design-Builder is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner or of a consultant or separate contractor employed by the Owner; or by changes ordered in the Work by the Owner; or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Design-Builder's control; or by delay authorized by the Owner pending mediation and binding dispute resolution or by other causes that the Owner determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Owner may determine.

**§ 8.2.2** Claims relating to time shall be made in accordance with applicable provisions of Article 14.

**§ 8.2.3** This Section 8.2 does not preclude recovery of damages for delay by either party under other provisions of the Design-Build Documents.

*(Paragraph deleted)*
## ARTICLE 9   PAYMENT APPLICATIONS AND PROJECT COMPLETION
### § 9.1 Contract Sum
The Contract Sum is stated in the Design-Build Amendment.

### § 9.2 Schedule of Values
Where the Contract Sum is based on a stipulated sum or Guaranteed Maximum Price, the Design-Builder, prior to the first Application for Payment after execution of the Design-Build Amendment shall submit to the Owner a schedule of values allocating the entire Contract Sum to the various portions of the Work and prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless objected to by the Owner, shall be used as a basis for reviewing the Design-Builder's Applications for Payment.

### § 9.3 Applications for Payment
**§ 9.3.1** At least ten days before the date established for each progress payment, the Design-Builder shall submit to the Owner an itemized Application for Payment for completed portions of the Work. The application shall be notarized, if required, and supported by data substantiating the Design-Builder's right to payment as the Owner may require, such as copies of requisitions from the Architect, Consultants, Contractors, and material suppliers, and shall reflect retainage if provided for in the Design-Build Documents.

**§ 9.3.1.1** As provided in Section 6.3.9, Applications for Payment may include requests for payment on account of changes in the Work that have been properly authorized by Change Directives, or by interim determinations of the Owner, but not yet included in Change Orders.

**§ 9.3.1.2** Applications for Payment shall not include requests for payment for portions of the Work for which the Design-Builder does not intend to pay the Architect, Consultant, Contractor, material supplier, or other persons or

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
User Notes:                                                                                                      (1866936912)

Init.

/

**19**

entities providing services or work for the Design-Builder, unless such Work has been performed by others whom the Design-Builder intends to pay.

§ 9.3.2 Unless otherwise provided in the Design-Build Documents, payments shall be made for services provided as well as materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Design-Builder with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

§ 9.3.3 The Design-Builder warrants that title to all Work, other than Instruments of Service, covered by an Application for Payment will pass to the Owner no later than the time of payment. The Design-Builder further warrants that, upon submittal of an Application for Payment, all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall be free and clear of liens, claims, security interests or encumbrances in favor of the Design-Builder, Architect, Consultants, Contractors, material suppliers, or other persons or entities entitled to make a claim by reason of having provided labor, materials and equipment relating to the Work.

### § 9.4 Certificates for Payment
The Owner shall, within seven days after receipt of the Design-Builder's Application for Payment, issue to the Design-Builder a Certificate for Payment indicating the amount the Owner determines is properly due, and notify the Design-Builder in writing of the Owner's reasons for withholding certification in whole or in part as provided in Section 9.5.1.

### § 9.5 Decisions to Withhold Certification
§ 9.5.1 The Owner may withhold a Certificate for Payment in whole or in part to the extent reasonably necessary to protect the Owner due to the Owner's determination that the Work has not progressed to the point indicated in the Design-Builder's Application for Payment, or the quality of the Work is not in accordance with the Design-Build Documents. If the Owner is unable to certify payment in the amount of the Application, the Owner will notify the Design-Builder as provided in Section 9.4. If the Design-Builder and Owner cannot agree on a revised amount, the Owner will promptly issue a Certificate for Payment for the amount that the Owner deems to be due and owing. The Owner may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued to such extent as may be necessary to protect the Owner from loss for which the Design-Builder is responsible because of

 .1 defective Work, including design and construction, not remedied;
 .2 third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Design-Builder;
 .3 failure of the Design-Builder to make payments properly to the Architect, Consultants, Contractors or others, for services, labor, materials or equipment;
 .4 reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;
 .5 damage to the Owner or a separate contractor;
 .6 reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or
 .7 repeated failure to carry out the Work in accordance with the Design-Build Documents.

§ 9.5.2 When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

§ 9.5.3 If the Owner withholds certification for payment under Section 9.5.1.3, the Owner may, at its sole option, issue joint checks to the Design-Builder and to the Architect or any Consultants, Contractor, material or equipment suppliers, or other persons or entities providing services or work for the Design-Builder to whom the Design-Builder failed to make payment for Work properly performed or material or equipment suitably delivered.

### § 9.6 Progress Payments
§ 9.6.1 After the Owner has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Design-Build Documents.

Init.

/

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:** (1866936912)

20

§ **9.6.2** The Design-Builder shall pay each Architect, Consultant, Contractor, and other person or entity providing services or work for the Design-Builder no later than the time period required by applicable law, but in no event more than seven days after receipt of payment from the Owner the amount to which the Architect, Consultant, Contractor, and other person or entity providing services or work for the Design-Builder is entitled, reflecting percentages actually retained from payments to the Design-Builder on account of the portion of the Work performed by the Architect, Consultant, Contractor, or other person or entity. The Design-Builder shall, by appropriate agreement with each Architect, Consultant, Contractor, and other person or entity providing services or work for the Design-Builder, require each Architect, Consultant, Contractor, and other person or entity providing services or work for the Design-Builder to make payments to subconsultants and subcontractors in a similar manner.

§ **9.6.3** The Owner will, on request and if practicable, furnish to the Architect, a Consultant, Contractor, or other person or entity providing services or work for the Design-Builder, information regarding percentages of completion or amounts applied for by the Design-Builder and action taken thereon by the Owner on account of portions of the Work done by such Architect, Consultant, Contractor or other person or entity providing services or work for the Design-Builder.

§ **9.6.4** The Owner has the right to request written evidence from the Design-Builder that the Design-Builder has properly paid the Architect, Consultants, Contractors, or other person or entity providing services or work for the Design-Builder, amounts paid by the Owner to the Design-Builder for the Work. If the Design-Builder fails to furnish such evidence within seven days, the Owner shall have the right to contact the Architect, Consultants, and Contractors to ascertain whether they have been properly paid. The Owner shall have no obligation to pay or to see to the payment of money to a Consultant or Contractor, except as may otherwise be required by law.

§ **9.6.5** Design-Builder payments to material and equipment suppliers shall be treated in a manner similar to that provided in Sections 9.6.2, 9.6.3 and 9.6.4.

§ **9.6.6** A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Design-Build Documents.

§ **9.6.7** Unless the Design-Builder provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Design-Builder for Work properly performed by the Architect, Consultants, Contractors and other person or entity providing services or work for the Design-Builder, shall be held by the Design-Builder for the Architect and those Consultants, Contractors, or other person or entity providing services or work for the Design-Builder, for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Design-Builder, shall create any fiduciary liability or tort liability on the part of the Design-Builder for breach of trust or shall entitle any person or entity to an award of punitive damages against the Design-Builder for breach of the requirements of this provision.

### § 9.7 Failure of Payment
If the Owner does not issue a Certificate for Payment, through no fault of the Design-Builder, within the time required by the Design-Build Documents, then the Design-Builder may, upon seven additional days' written notice to the Owner, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Design-Builder's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Design-Build Documents.

### § 9.8 Substantial Completion
§ **9.8.1** Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Design-Build Documents so that the Owner can occupy or utilize the Work for its intended use. The date of Substantial Completion is the date certified by the Owner in accordance with this Section 9.8.

§ **9.8.2** When the Design-Builder considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Design-Builder shall prepare and submit to the Owner a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Design-Builder to complete all Work in accordance with the Design-Build Documents.

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                          (1866936912)

**21**

**§ 9.8.3** Upon receipt of the Design-Builder's list, the Owner shall make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Owner's inspection discloses any item, whether or not included on the Design-Builder's list, which is not sufficiently complete in accordance with the Design-Build Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Design-Builder shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Owner. In such case, the Design-Builder shall then submit a request for another inspection by the Owner to determine Substantial Completion.

**§ 9.8.4** Prior to issuance of the Certificate of Substantial Completion under Section 9.8.5, the Owner and Design-Builder shall discuss and then determine the parties' obligations to obtain and maintain property insurance following issuance of the Certificate of Substantial Completion.

**§ 9.8.5** When the Work or designated portion thereof is substantially complete, the Design-Builder will prepare for the Owner's signature a Certificate of Substantial Completion that shall, upon the Owner's signature, establish the date of Substantial Completion; establish responsibilities of the Owner and Design-Builder for security, maintenance, heat, utilities, damage to the Work and insurance; and fix the time within which the Design-Builder shall finish all items on the list accompanying the Certificate. Warranties required by the Design-Build Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

**§ 9.8.6** The Certificate of Substantial Completion shall be submitted by the Design-Builder to the Owner for written acceptance of responsibilities assigned to it in the Certificate. Upon the Owner's acceptance, and consent of surety, if any, the Owner shall make payment of retainage applying to the Work or designated portion thereof. Payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Design-Build Documents.

### § 9.9 Partial Occupancy or Use
**§ 9.9.1** The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Design-Builder, provided such occupancy or use is consented to, by endorsement or otherwise, by the insurer providing property insurance and authorized by public authorities having jurisdiction over the Project. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Design-Builder have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Design-Build Documents. When the Design-Builder considers a portion substantially complete, the Design-Builder shall prepare and submit a list to the Owner as provided under Section 9.8.2. Consent of the Design-Builder to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Design-Builder.

**§ 9.9.2** Immediately prior to such partial occupancy or use, the Owner and Design-Builder shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

**§ 9.9.3** Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Design-Build Documents.

### § 9.10 Final Completion and Final Payment
**§ 9.10.1** Upon receipt of the Design-Builder's written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Owner will promptly make such inspection. When the Owner finds the Work acceptable under the Design-Build Documents and the Contract fully performed, the Owner will, subject to Section 9.10.2, promptly issue a final Certificate for Payment.

**§ 9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Design-Builder submits to the Owner (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work, for which the Owner or the Owner's property might be responsible or encumbered, (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Design-Build Documents to remain in force after final payment is currently in effect, (3) a written statement that the Design-Builder knows of no substantial reason that the insurance will not be renewable to cover the period required by the Design-Build Documents, (4) consent of surety, if any, to final payment, (5) as-constructed record

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                    (1866936912)

**22**

copy of the Construction Documents marked to indicate field changes and selections made during construction, (6) manufacturer's warranties, product data, and maintenance and operations manuals, and (7) if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, or releases and waivers of liens, claims, security interests, or encumbrances, arising out of the Contract, to the extent and in such form as may be designated by the Owner. If an Architect, a Consultant, or a Contractor, or other person or entity providing services or work for the Design-Builder, refuses to furnish a release or waiver required by the Owner, the Design-Builder may furnish a bond satisfactory to the Owner to indemnify the Owner against such liens, claims, security interests, or encumbrances. If such liens, claims, security interests, or encumbrances remains unsatisfied after payments are made, the Design-Builder shall refund to the Owner all money that the Owner may be compelled to pay in discharging such liens, claims, security interests, or encumbrances, including all costs and reasonable attorneys' fees.

**§ 9.10.3** If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Design-Builder or by issuance of Change Orders affecting final completion, the Owner shall, upon application by the Design-Builder, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Design-Build Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Design-Builder to the Owner prior to issuance of payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

**§ 9.10.4** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from

    **.1**    liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;
    **.2**    failure of the Work to comply with the requirements of the Design-Build Documents; or
    **.3**    terms of special warranties required by the Design-Build Documents.

**§ 9.10.5** Acceptance of final payment by the Design-Builder shall constitute a waiver of claims by the Design-Builder except those previously made in writing and identified by the Design-Builder as unsettled at the time of final Application for Payment.

*(Paragraph deleted)*
## ARTICLE 10   PROTECTION OF PERSONS AND PROPERTY
### § 10.1 Safety Precautions and Programs
The Design-Builder shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

### § 10.2 Safety of Persons and Property
**§ 10.2.1** The Design-Builder shall be responsible for precautions for the safety of, and reasonable protection to prevent damage, injury or loss to

    **.1**    employees on the Work and other persons who may be affected thereby;
    **.2**    the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Design-Builder or the Architect, Consultants, or Contractors, or other person or entity providing services or work for the Design-Builder; and
    **.3**    other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, or structures and utilities not designated for removal, relocation or replacement in the course of construction.

**§ 10.2.2** The Design-Builder shall comply with, and give notices required by, applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities, bearing on safety of persons or property, or their protection from damage, injury or loss.

**§ 10.2.3** The Design-Builder shall implement, erect, and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations, and notify owners and users of adjacent sites and utilities of the safeguards and protections.

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                          (1866936912)

**§ 10.2.4** When use or storage of explosives or other hazardous materials or equipment, or unusual methods, are necessary for execution of the Work, the Design-Builder shall exercise utmost care, and carry on such activities under supervision of properly qualified personnel.

**§ 10.2.5** The Design-Builder shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Design-Build Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3, caused in whole or in part by the Design-Builder, the Architect, a Consultant, a Contractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Design-Builder is responsible under Sections 10.2.1.2 and 10.2.1.3; except damage or loss attributable to acts or omissions of the Owner, or anyone directly or indirectly employed by the Owner, or by anyone for whose acts the Owner may be liable, and not attributable to the fault or negligence of the Design-Builder. The foregoing obligations of the Design-Builder are in addition to the Design-Builder's obligations under Section 3.1.14.

**§ 10.2.6** The Design-Builder shall designate a responsible member of the Design-Builder's organization, at the site, whose duty shall be the prevention of accidents. This person shall be the Design-Builder's superintendent unless otherwise designated by the Design-Builder in writing to the Owner.

**§ 10.2.7** The Design-Builder shall not permit any part of the construction or site to be loaded so as to cause damage or create an unsafe condition.

**§ 10.2.8 Injury or Damage to Person or Property.** If the Owner or Design-Builder suffers injury or damage to person or property because of an act or omission of the other, or of others for whose acts such party is legally responsible, written notice of the injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

**§ 10.3 Hazardous Materials**
**§ 10.3.1** The Design-Builder is responsible for compliance with any requirements included in the Design-Build Documents regarding hazardous materials. If the Design-Builder encounters a hazardous material or substance not addressed in the Design-Build Documents and if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Design-Builder, the Design-Builder shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner in writing.

**§ 10.3.2** Upon receipt of the Design-Builder's written notice, the Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Design-Builder and, in the event such material or substance is found to be present, to cause it to be rendered harmless. Unless otherwise required by the Design-Build Documents, the Owner shall furnish in writing to the Design-Builder the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Design-Builder will promptly reply to the Owner in writing stating whether or not the Design-Builder has reasonable objection to the persons or entities proposed by the Owner. If the Design-Builder has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Design-Builder has no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Design-Builder. By Change Order, the Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Design-Builder's reasonable additional costs of shut-down, delay and start-up.

**§ 10.3.3** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Design-Builder, the Architect, Consultants, and Contractors, and employees of any of them, from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area, if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to, or destruction of, tangible property (other than the Work itself), except to the extent that such damage, loss or expense is due to the fault or negligence of the party seeking indemnity.

---

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                     (1866936912)

**24**

**§ 10.3.4** The Owner shall not be responsible under this Section 10.3 for materials or substances the Design-Builder brings to the site unless such materials or substances are required by the Owner's Criteria. The Owner shall be responsible for materials or substances required by the Owner's Criteria, except to the extent of the Design-Builder's fault or negligence in the use and handling of such materials or substances.

**§ 10.3.5** The Design-Builder shall indemnify the Owner for the cost and expense the Owner incurs (1) for remediation of a material or substance the Design-Builder brings to the site and negligently handles, or (2) where the Design-Builder fails to perform its obligations under Section 10.3.1, except to the extent that the cost and expense are due to the Owner's fault or negligence.

**§ 10.3.6** If, without negligence on the part of the Design-Builder, the Design-Builder is held liable by a government agency for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Design-Build Documents, the Owner shall indemnify the Design-Builder for all cost and expense thereby incurred.

**§ 10.4 Emergencies**
In an emergency affecting safety of persons or property, the Design-Builder shall act, at the Design-Builder's discretion, to prevent threatened damage, injury or loss.

*(Paragraph deleted)*
**ARTICLE 11   UNCOVERING AND CORRECTION OF WORK**
**§ 11.1 Uncovering of Work**
The Owner may request to examine a portion of the Work that the Design-Builder has covered to determine if the Work has been performed in accordance with the Design-Build Documents. If such Work is in accordance with the Design-Build Documents, the Owner and Design-Builder shall execute a Change Order to adjust the Contract Time and Contract Sum, as appropriate. If such Work is not in accordance with the Design-Build Documents, the costs of uncovering and correcting the Work shall be at the Design-Builder's expense and the Design-Builder shall not be entitled to a change in the Contract Time unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs and the Contract Time will be adjusted as appropriate.

**§ 11.2 Correction of Work**
**§ 11.2.1 Before or After Substantial Completion.** The Design-Builder shall promptly correct Work rejected by the Owner or failing to conform to the requirements of the Design-Build Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections, the cost of uncovering and replacement, and compensation for any design consultant employed by the Owner whose expenses and compensation were made necessary thereby, shall be at the Design-Builder's expense.

**§ 11.2.2 After Substantial Completion**
**§ 11.2.2.1** In addition to the Design-Builder's obligations under Section 3.1.12, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Design-Build Documents, any of the Work is found not to be in accordance with the requirements of the Design-Build Documents, the Design-Builder shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Design-Builder a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of the Work, if the Owner fails to notify the Design-Builder and give the Design-Builder an opportunity to make the correction, the Owner waives the rights to require correction by the Design-Builder and to make a claim for breach of warranty. If the Design-Builder fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner, the Owner may correct it in accordance with Section 7.9.

**§ 11.2.2.2** The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual completion of that portion of the Work.

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                  (1866936912)

**25**

**§ 11.2.2.3** For corrective Work performed by the Design-Builder pursuant to this Section 11.2, the one-year period shall be the greater of one year after the date of Substantial Completion or three months from the date that the corrective work is performed.

**§ 11.2.3** The Design-Builder shall remove from the site portions of the Work that are not in accordance with the requirements of the Design-Build Documents and are neither corrected by the Design-Builder nor accepted by the Owner.

**§ 11.2.4** The Design-Builder shall bear the cost of correcting destroyed or damaged construction of the Owner or separate contractors, whether completed or partially completed, caused by the Design-Builder's correction or removal of Work that is not in accordance with the requirements of the Design-Build Documents.

**§ 11.2.5** Nothing contained in this Section 11.2 shall be construed to establish a period of limitation with respect to other obligations the Design-Builder has under the Design-Build Documents. Establishment of the one-year period for correction of Work as described in Section 11.2.2 relates only to the specific obligation of the Design-Builder to correct the Work, and has no relationship to the time within which the obligation to comply with the Design-Build Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Design-Builder's liability with respect to the Design-Builder's obligations other than specifically to correct the Work.

**§ 11.3 Acceptance of Nonconforming Work**
If the Owner prefers to accept Work that is not in accordance with the requirements of the Design-Build Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

*(Paragraph deleted)*
**ARTICLE 12   COPYRIGHTS AND LICENSES**
**§ 12.1** Drawings, specifications, and other documents furnished by the Design-Builder, including those in electronic form, are Instruments of Service. The Design-Builder, and the Architect, Consultants, Contractors, and any other person or entity providing services or work for any of them, shall be deemed the authors and owners of their respective Instruments of Service, including the Drawings and Specifications, and shall retain all common law, statutory and other reserved rights, including copyrights. Submission or distribution of Instruments of Service to meet official regulatory requirements, or for similar purposes in connection with the Project, is not to be construed as publication in derogation of the reserved rights of the Design-Builder and the Architect, Consultants, and Contractors, and any other person or entity providing services or work for any of them.

**§ 12.2** The Design-Builder and the Owner warrant that in transmitting Instruments of Service, or any other information, the transmitting party is the copyright owner of such information or has permission from the copyright owner to transmit such information for its use on the Project.

**§ 12.3** Upon execution of the Agreement, the Design-Builder grants to the Owner a limited, irrevocable and non-exclusive license to use the Instruments of Service solely and exclusively for purposes of constructing, using, maintaining, altering and adding to the Project, provided that the Owner substantially performs its obligations, including prompt payment of all sums when due, under the Design-Build Documents. The license granted under this section permits the Owner to authorize its consultants and separate contractors to reproduce applicable portions of the Instruments of Service solely and exclusively for use in performing services or construction for the Project. If the Design-Builder rightfully terminates this Agreement for cause as provided in Section 13.1.4 or 13.2.1 the license granted in this Section 12.3 shall terminate.

**§ 12.3.1** The Design-Builder shall obtain non-exclusive licenses from the Architect, Consultants, and Contractors, that will allow the Design-Builder to satisfy its obligations to the Owner under this Article 12. The Design-Builder's licenses from the Architect and its Consultants and Contractors shall also allow the Owner, in the event this Agreement is terminated for any reason other than the default of the Owner or in the event the Design-Builder's Architect, Consultants, or Contractors terminate their agreements with the Design-Builder for cause, to obtain a limited, irrevocable and non-exclusive license solely and exclusively for purposes of constructing, using, maintaining, altering and adding to the Project, provided that the Owner (1) agrees to pay to the Architect, Consultant or Contractor all amounts due, and (2) provide the Architect, Consultant or Contractor with the Owner's written agreement to

Init.

/

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                      (1866936912)

**26**

indemnify and hold harmless the Architect, Consultant or Contractor from all costs and expenses, including the cost of defense, related to claims and causes of action asserted by any third person or entity to the extent such costs and expenses arise from the Owner's alteration or use of the Instruments of Service.

**§ 12.3.2** In the event the Owner alters the Instruments of Service without the author's written authorization or uses the Instruments of Service without retaining the authors of the Instruments of Service, the Owner releases the Design-Builder, Architect, Consultants, Contractors and any other person or entity providing services or work for any of them, from all claims and causes of action arising from or related to such uses. The Owner, to the extent permitted by law, further agrees to indemnify and hold harmless the Design-Builder, Architect, Consultants, Contractors and any other person or entity providing services or work for any of them, from all costs and expenses, including the cost of defense, related to claims and causes of action asserted by any third person or entity to the extent such costs and expenses arise from the Owner's alteration or use of the Instruments of Service under this Section 12.3.2. The terms of this Section 12.3.2 shall not apply if the Owner rightfully terminates this Agreement for cause under Sections 13.1.4 or 13.2.2.

*(Paragraph deleted)*
## ARTICLE 13   TERMINATION OR SUSPENSION
### § 13.1 Termination or Suspension Prior to Execution of the Design-Build Amendment
**§ 13.1.1** If the Owner fails to make payments to the Design-Builder for Work prior to execution of the Design-Build Amendment in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Design-Builder's option, cause for suspension of performance of services under this Agreement. If the Design-Builder elects to suspend the Work, the Design-Builder shall give seven days' written notice to the Owner before suspending the Work. In the event of a suspension of the Work, the Design-Builder shall have no liability to the Owner for delay or damage caused by the suspension of the Work. Before resuming the Work, the Design-Builder shall be paid all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Design-Builder's Work. The Design-Builder's compensation for, and time to complete, the remaining Work shall be equitably adjusted.

**§ 13.1.2** If the Owner suspends the Project, the Design-Builder shall be compensated for the Work performed prior to notice of such suspension. When the Project is resumed, the Design-Builder shall be compensated for expenses incurred in the interruption and resumption of the Design-Builder's Work. The Design-Builder's compensation for, and time to complete, the remaining Work shall be equitably adjusted.

**§ 13.1.3** If the Owner suspends the Project for more than 90 cumulative days for reasons other than the fault of the Design-Builder, the Design-Builder may terminate this Agreement by giving not less than seven days' written notice.

**§ 13.1.4** Either party may terminate this Agreement upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

**§ 13.1.5** The Owner may terminate this Agreement upon not less than seven days' written notice to the Design-Builder for the Owner's convenience and without cause.

**§ 13.1.6** In the event of termination not the fault of the Design-Builder, the Design-Builder shall be compensated for Work performed prior to termination, together with Reimbursable Expenses then due and any other expenses directly attributable to termination for which the Design-Builder is not otherwise compensated. In no event shall the Design-Builder's compensation under this Section 13.1.6 be greater than the compensation set forth in Section 2.1.

### § 13.2 Termination or Suspension Following Execution of the Design-Build Amendment
### § 13.2.1 Termination by the Design-Builder
**§ 13.2.1.1** The Design-Builder may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Design-Builder, the Architect, a Consultant, or a Contractor, or their agents or employees, or any other persons or entities performing portions of the Work under direct or indirect contract with the Design-Builder, for any of the following reasons:
    **.1**    Issuance of an order of a court or other public authority having jurisdiction that requires all Work to be stopped;
    **.2**    An act of government, such as a declaration of national emergency that requires all Work to be stopped;

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**    (1866936912)

**27**

.3    Because the Owner has not issued a Certificate for Payment and has not notified the Design-Builder of the reason for withholding certification as provided in Section 9.5.1, or because the Owner has not made payment on a Certificate for Payment within the time stated in the Design-Build Documents; or

.4    The Owner has failed to furnish to the Design-Builder promptly, upon the Design-Builder's request, reasonable evidence as required by Section 7.2.7.

§ 13.2.1.2 The Design-Builder may terminate the Contract if, through no act or fault of the Design-Builder, the Architect, a Consultant, a Contractor, or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Design-Builder, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Section 13.2.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

§ 13.2.1.3 If one of the reasons described in Section 13.2.1.1 or 13.2.1.2 exists, the Design-Builder may, upon seven days' written notice to the Owner, terminate the Contract and recover from the Owner payment for Work executed, including reasonable overhead and profit, costs incurred by reason of such termination, and damages.

§ 13.2.1.4 If the Work is stopped for a period of 60 consecutive days through no act or fault of the Design-Builder or any other persons or entities performing portions of the Work under contract with the Design-Builder because the Owner has repeatedly failed to fulfill the Owner's obligations under the Design-Build Documents with respect to matters important to the progress of the Work, the Design-Builder may, upon seven additional days' written notice to the Owner, terminate the Contract and recover from the Owner as provided in Section 13.2.1.3.

### § 13.2.2 Termination by the Owner For Cause
§ 13.2.2.1 The Owner may terminate the Contract if the Design-Builder
.1    fails to submit the Proposal by the date required by this Agreement, or if no date is indicated, within a reasonable time consistent with the date of Substantial Completion;
.2    repeatedly refuses or fails to supply an Architect, or enough properly skilled Consultants, Contractors, or workers or proper materials;
.3    fails to make payment to the Architect, Consultants, or Contractors for services, materials or labor in accordance with their respective agreements with the Design-Builder;
.4    repeatedly disregards applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of a public authority; or
.5    is otherwise guilty of substantial breach of a provision of the Design-Build Documents.

§ 13.2.2.2 When any of the above reasons exist, the Owner may without prejudice to any other rights or remedies of the Owner and after giving the Design-Builder and the Design-Builder's surety, if any, seven days' written notice, terminate employment of the Design-Builder and may, subject to any prior rights of the surety:
.1    Exclude the Design-Builder from the site and take possession of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Design-Builder;
.2    Accept assignment of the Architect, Consultant and Contractor agreements pursuant to Section 3.1.15; and
.3    Finish the Work by whatever reasonable method the Owner may deem expedient. Upon written request of the Design-Builder, the Owner shall furnish to the Design-Builder a detailed accounting of the costs incurred by the Owner in finishing the Work.

§ 13.2.2.3 When the Owner terminates the Contract for one of the reasons stated in Section 13.2.2.1, the Design-Builder shall not be entitled to receive further payment until the Work is finished.

§ 13.2.2.4 If the unpaid balance of the Contract Sum exceeds costs of finishing the Work and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Design-Builder. If such costs and damages exceed the unpaid balance, the Design-Builder shall pay the difference to the Owner. The obligation for such payments shall survive termination of the Contract.

### § 13.2.3 Suspension by the Owner for Convenience
§ 13.2.3.1 The Owner may, without cause, order the Design-Builder in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

Init.

/

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                   (1866936912)

**28**

**§ 13.2.3.2** The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 13.2.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent

.1    that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Design-Builder is responsible; or

.2    that an equitable adjustment is made or denied under another provision of the Contract.

### § 13.2.4 Termination by the Owner for Convenience

**§ 13.2.4.1** The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

**§ 13.2.4.2** Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Design-Builder shall

.1    cease operations as directed by the Owner in the notice;

.2    take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and,

.3    except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing Project agreements, including agreements with the Architect, Consultants, Contractors, and purchase orders, and enter into no further Project agreements and purchase orders.

**§ 13.2.4.3** In case of such termination for the Owner's convenience, the Design-Builder shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

*(Paragraph deleted)*
## ARTICLE 14   CLAIMS AND DISPUTE RESOLUTION
### § 14.1 Claims
**§ 14.1.1 Definition.** A Claim is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Design-Builder arising out of or relating to the Contract. The responsibility to substantiate Claims shall rest with the party making the Claim.

**§ 14.1.2 Time Limits on Claims.** The Owner and Design-Builder shall commence all claims and causes of action, whether in contract, tort, breach of warranty or otherwise, against the other, arising out of or related to the Contract in accordance with the requirements of the binding dispute resolution method selected in Section 1.3, within the time period specified by applicable law, but in any case not more than 10 years after the date of Substantial Completion of the Work. The Owner and Design-Builder waive all claims and causes of action not commenced in accordance with this Section 14.1.2.

### § 14.1.3 Notice of Claims
**§ 14.1.3.1 Prior To Final Payment.** Prior to Final Payment, Claims by either the Owner or Design-Builder must be initiated by written notice to the other party within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later.

**§ 14.1.3.2 Claims Arising After Final Payment.** After Final Payment, Claims by either the Owner or Design-Builder that have not otherwise been waived pursuant to Sections 9.10.4 or 9.10.5, must be initiated by prompt written notice to the other party. The notice requirement in Section 14.1.3.1 and the Initial Decision requirement as a condition precedent to mediation in Section 14.2.1 shall not apply.

**§ 14.1.4 Continuing Contract Performance.** Pending final resolution of a Claim, except as otherwise agreed in writing or as provided in Section 9.7 and Article 13, the Design-Builder shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Design-Build Documents.

**§ 14.1.5 Claims for Additional Cost.** If the Design-Builder intends to make a Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the portion of the Work that relates to the Claim. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.4.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                           (1866936912)

Init.

/

29

### § 14.1.6 Claims for Additional Time

**§ 14.1.6.1** If the Design-Builder intends to make a Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Design-Builder's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay, only one Claim is necessary.

**§ 14.1.6.2** If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated, and had an adverse effect on the scheduled construction.

### § 14.1.7 Claims for Consequential Damages

The Design-Builder and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes

    **.1** damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

    **.2** damages incurred by the Design-Builder for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 13. Nothing contained in this Section 14.1.7 shall be deemed to preclude an award of liquidated damages, when applicable, in accordance with the requirements of the Design-Build Documents.

### § 14.2 Initial Decision

**§ 14.2.1** An initial decision shall be required as a condition precedent to mediation of all Claims between the Owner and Design-Builder initiated prior to the date final payment is due, excluding those arising under Sections 10.3 and 10.4 of the Agreement and Sections B.3.2.9 and B.3.2.10 of Exhibit B to this Agreement, unless 30 days have passed after the Claim has been initiated with no decision having been rendered. Unless otherwise mutually agreed in writing, the Owner shall render the initial decision on Claims.

### § 14.2.2 Procedure

**§ 14.2.2.1 Claims Initiated by the Owner.** If the Owner initiates a Claim, the Design-Builder shall provide a written response to Owner within ten days after receipt of the notice required under Section 14.1.3.1. Thereafter, the Owner shall render an initial decision within ten days of receiving the Design-Builder's response: (1) withdrawing the Claim in whole or in part, (2) approving the Claim in whole or in part, or (3) suggesting a compromise.

**§ 14.2.2.2 Claims Initiated by the Design-Builder.** If the Design-Builder initiates a Claim, the Owner will take one or more of the following actions within ten days after receipt of the notice required under Section 14.1.3.1: (1) request additional supporting data, (2) render an initial decision rejecting the Claim in whole or in part, (3) render an initial decision approving the Claim, (4) suggest a compromise or (5) indicate that it is unable to render an initial decision because the Owner lacks sufficient information to evaluate the merits of the Claim.

**§ 14.2.3** In evaluating Claims, the Owner may, but shall not be obligated to, consult with or seek information from persons with special knowledge or expertise who may assist the Owner in rendering a decision. The retention of such persons shall be at the Owner's expense.

**§ 14.2.4** If the Owner requests the Design-Builder to provide a response to a Claim or to furnish additional supporting data, the Design-Builder shall respond, within ten days after receipt of such request, and shall either (1) provide a response on the requested supporting data, (2) advise the Owner when the response or supporting data will be furnished or (3) advise the Owner that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Owner will either reject or approve the Claim in whole or in part.

**§ 14.2.5** The Owner's initial decision shall (1) be in writing; (2) state the reasons therefor; and (3) identify any change in the Contract Sum or Contract Time or both. The initial decision shall be final and binding on the parties but subject to mediation and, if the parties fail to resolve their dispute through mediation, to binding dispute resolution.

**§ 14.2.6** Either party may file for mediation of an initial decision at any time, subject to the terms of Section 14.2.6.1.

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                                  (1866936912)

**§ 14.2.6.1** Either party may, within 30 days from the date of an initial decision, demand in writing that the other party file for mediation within 60 days of the initial decision. If such a demand is made and the party receiving the demand fails to file for mediation within the time required, then both parties waive their rights to mediate or pursue binding dispute resolution proceedings with respect to the initial decision.

**§ 14.2.7** In the event of a Claim against the Design-Builder, the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Design-Builder's default, the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

**§ 14.2.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines.

### § 14.3 Mediation
**§ 14.3.1** Claims, disputes, or other matters in controversy arising out of or related to the Contract, except those waived as provided for in Sections 9.10.4, 9.10.5, and 14.1.7, shall be subject to mediation as a condition precedent to binding dispute resolution.

**§ 14.3.2** The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Mediation Procedures in effect on the date of the Agreement. A request for mediation shall be made in writing, delivered to the other party to the Contract, and filed with the person or entity administering the mediation. The request may be made concurrently with the filing of binding dispute resolution proceedings but, in such event, mediation shall proceed in advance of binding dispute resolution proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order. If an arbitration proceeding is stayed pursuant to this Section 14.3.2, the parties may nonetheless proceed to the selection of the arbitrator(s) and agree upon a schedule for later proceedings.

**§ 14.3.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction.

### § 14.4 Arbitration
**§ 14.4.1** If the parties have selected arbitration as the method for binding dispute resolution in Section 1.3, any Claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement. A demand for arbitration shall be made in writing, delivered to the other party to the Contract, and filed with the person or entity administering the arbitration. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

**§ 14.4.1.1** A demand for arbitration shall be made no earlier than concurrently with the filing of a request for mediation, but in no event shall it be made after the date when the institution of legal or equitable proceedings based on the Claim would be barred by the applicable statute of limitations or statute of repose. For statute of limitations or statute of repose purposes, receipt of a written demand for arbitration by the person or entity administering the arbitration shall constitute the institution of legal or equitable proceedings based on the Claim.

**§ 14.4.2** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction.

**§ 14.4.3** The foregoing agreement to arbitrate, and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement, shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

### § 14.4.4 Consolidation or Joinder
**§ 14.4.4.1** Either party, at its sole discretion, may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                        (1866936912)

Init.

/

**31**

permits consolidation, (2) the arbitrations to be consolidated substantially involve common questions of law or fact, and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).

**§ 14.4.4.2** Either party, at its sole discretion, may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration, provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent.

**§ 14.4.4.3** The Owner and Design-Builder grant to any person or entity made a party to an arbitration conducted under this Section 14.4, whether by joinder or consolidation, the same rights of joinder and consolidation as the Owner and Design-Builder under this Agreement.

*(Paragraph deleted)*
## ARTICLE 15   MISCELLANEOUS PROVISIONS
### § 15.1 Governing Law
The Contract shall be governed by the law of the place where the Project is located except that, if the parties have selected arbitration as the method of binding dispute resolution, the Federal Arbitration Act shall govern Section 14.4.

### § 15.2 Successors and Assigns
**§ 15.2.1** The Owner and Design-Builder, respectively, bind themselves, their partners, successors, assigns and legal representatives to the covenants, agreements and obligations contained in the Design-Build Documents. Except as provided in Section 15.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

**§ 15.2.2** The Owner may, without consent of the Design-Builder, assign the Contract to a lender providing construction financing for the Project, if the lender assumes the Owner's rights and obligations under the Design-Build Documents. The Design-Builder shall execute all consents reasonably required to facilitate such assignment.

**§ 15.2.3** If the Owner requests the Design-Builder, Architect, Consultants, or Contractors to execute certificates, other than those required by Section 3.1.10, the Owner shall submit the proposed language of such certificates for review at least 14 days prior to the requested dates of execution. If the Owner requests the Design-Builder, Architect, Consultants, or Contractors to execute consents reasonably required to facilitate assignment to a lender, the Design-Builder, Architect, Consultants, or Contractors shall execute all such consents that are consistent with this Agreement, provided the proposed consent is submitted to them for review at least 14 days prior to execution. The Design-Builder, Architect, Consultants, and Contractors shall not be required to execute certificates or consents that would require knowledge, services or responsibilities beyond the scope of their services.

### § 15.3 Written Notice
Written notice shall be deemed to have been duly served if delivered in person to the individual, to a member of the firm or entity, or to an officer of the corporation for which it was intended; or if delivered at, or sent by registered or certified mail or by courier service providing proof of delivery to, the last business address known to the party giving notice.

### § 15.4 Rights and Remedies
**§ 15.4.1** Duties and obligations imposed by the Design-Build Documents, and rights and remedies available thereunder, shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**§ 15.4.2** No action or failure to act by the Owner or Design-Builder shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

### § 15.5 Tests and Inspections
**§ 15.5.1** Tests, inspections and approvals of portions of the Work shall be made as required by the Design-Build Documents and by applicable laws, statutes, ordinances, codes, rules and regulations or lawful orders of public

**Init.**

**/**

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                                     (1866936912)

**32**

authorities. Unless otherwise provided, the Design-Builder shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Design-Builder shall give the Owner timely notice of when and where tests and inspections are to be made so that the Owner may be present for such procedures. The Owner shall bear costs of (1) tests, inspections or approvals that do not become requirements until after bids are received or negotiations concluded, and (2) tests, inspections or approvals where building codes or applicable laws or regulations prohibit the Owner from delegating their cost to the Design-Builder.

**§ 15.5.2** If the Owner determines that portions of the Work require additional testing, inspection or approval not included under Section 15.5.1, the Owner will instruct the Design-Builder to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Design-Builder shall give timely notice to the Owner of when and where tests and inspections are to be made so that the Owner may be present for such procedures. Such costs, except as provided in Section 15.5.3, shall be at the Owner's expense.

**§ 15.5.3** If such procedures for testing, inspection or approval under Sections 15.5.1 and 15.5.2 reveal failure of the portions of the Work to comply with requirements established by the Design-Build Documents, all costs made necessary by such failure shall be at the Design-Builder's expense.

**§ 15.5.4** Required certificates of testing, inspection or approval shall, unless otherwise required by the Design-Build Documents, be secured by the Design-Builder and promptly delivered to the Owner.

**§ 15.5.5** If the Owner is to observe tests, inspections or approvals required by the Design-Build Documents, the Owner will do so promptly and, where practicable, at the normal place of testing.

**§ 15.5.6** Tests or inspections conducted pursuant to the Design-Build Documents shall be made promptly to avoid unreasonable delay in the Work.

### § 15.6 Confidential Information
If the Owner or Design-Builder transmits Confidential Information, the transmission of such Confidential Information constitutes a warranty to the party receiving such Confidential Information that the transmitting party is authorized to transmit the Confidential Information. If a party receives Confidential Information, the receiving party shall keep the Confidential Information strictly confidential and shall not disclose it to any other person or entity except as set forth in Section 15.6.1.

**§ 15.6.1** A party receiving Confidential Information may disclose the Confidential Information as required by law or court order, including a subpoena or other form of compulsory legal process issued by a court or governmental entity. A party receiving Confidential Information may also disclose the Confidential Information to its employees, consultants or contractors in order to perform services or work solely and exclusively for the Project, provided those employees, consultants and contractors are subject to the restrictions on the disclosure and use of Confidential Information as set forth in this Contract.

### § 15.7 Capitalization
Terms capitalized in the Contract include those that are (1) specifically defined, (2) the titles of numbered articles or (3) the titles of other documents published by the American Institute of Architects.

### § 15.8 Interpretation
**§ 15.8.1** In the interest of brevity the Design-Build Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

**§ 15.8.2** Unless otherwise stated in the Design-Build Documents, words which have well-known technical or construction industry meanings are used in the Design-Build Documents in accordance with such recognized meanings.

*(Paragraph deleted)*
### ARTICLE 16   SCOPE OF THE AGREEMENT
**§ 16.1** This Agreement is comprised of the following documents listed below:

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                   (1866936912)

Init.

/

33

.1    AIA Document A141™–2014, Standard Form of Agreement Between Owner and Design-Builder
.2    AIA Document A141™–2014, Exhibit A, Design-Build Amendment, if executed
.3    AIA Document A141™–2014, Exhibit B, Insurance and Bonds
.4    AIA Document E203™–2013, Building Information Modeling and Digital Data Exhibit, if completed, or the following:

.5    Other:

Exhibit D, Owner's Program
Exhibit F, Preconstruction Services and Preliminary Design Proposal and Corresponding Notice to Proceed

This Agreement entered into as of the day and year first written above.

DocuSigned by:

*David Matthews*

**OWNER** *(Signature)*

David Matthews        Member

*(Printed name and title)*

DocuSigned by:

*Mike Kerr*

**DESIGN-BUILDER** *(Signature)*

Mike Kerr        Vice President & General Counsel

*(Printed name and title)*

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                 (1866936912)

**Init.**

**/**

**34**

## *Additions and Deletions Report for*

*AIA® Document A141™ – 2014*

This Additions and Deletions Report, as defined on page 1 of the associated document, reproduces below all text the author has added to the standard form AIA document in order to complete it, as well as any text the author may have added to or deleted from the original AIA text. Added text is shown underlined. Deleted text is indicated with a horizontal line through the original AIA text.

Note:  This Additions and Deletions Report is provided for information purposes only and is not incorporated into or constitute any part of the associated AIA document. This Additions and Deletions Report and its associated document were generated simultaneously by AIA software at 11:10:43 on 10/25/2018.

**PAGE 1**

**AGREEMENT** made as of the ~~day of   in the year~~
~~(In words, indicate day, month and year.)~~8th day of October in the year 2018

...

~~(Name, legal status, address and other information)~~
Matthews 350 E LaSalle, LLC
401 E Colfax Ave #277
South Bend, IN 46617

...

~~(Name, legal status, address and other information)~~
F.A. Wilhelm Construction Co., Inc.
3914 Prospect Street
Indianapolis, IN 46203

...

~~(Name, location and detailed description)~~
Commerce Center Mixed Use Development – Phase 1 Building Core and Shell
350 East LaSalle Avenue
South Bend IN 46617

**PAGE 2**

**C**       ~~SUSTAINABLE PROJECTS~~NOT APPLICABLE

**D**       **OWNER'S PROGRAM**

**E**       **NOT APPLICABLE**

**F**       **PRECONSTRUCTION SERVICES AND PRELIMINARY DESIGN PROPOSAL AND CORRESPONDING NOTICE TO PROCEED**

**G**       **CORE AND SHELL – GMP – R1 – COST BREAKDOWN**

**H**       **CLARIFICATIONS AND ASSUMPTIONS**

**PAGE 3**

*~~(Note the disposition for the following items by inserting the requested information or a statement such as "not~~*
*~~applicable" or "unknown at time of execution." If the Owner intends to provide a set of design documents, and the~~*

---

**Additions and Deletions Report for AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved.**
**WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                                (1866936912)

**1**

*requested information is contained in the design documents, identify the design documents and insert "see Owner's design documents" where appropriate.)*

...

*(Set forth the program, identify documentation in which the program is set forth, or state the manner in which the program will be developed.)*
See attached Exhibit D.

...

*(Identify below, or in an attached exhibit, the documentation that contains the Owner's design requirements, including any performance specifications for the Project.)*

See attached Exhibit D.

...

*(Identify or describe, if appropriate, size, location, dimensions, or other pertinent information, such as geotechnical reports; site, boundary and topographic surveys; traffic and utility studies; availability of public and private utilities and services; legal description of the site; etc.)*
See attached Exhibit D.

...

*(Identify the Owner's Sustainable Objective for the Project such as Sustainability Certification, benefit to the environment, enhancement to the health and well-being of building occupants, or improvement of energy efficiency. If the Owner identifies a Sustainable Objective, incorporate AIA Document A141™–2014, Exhibit C, Sustainable Projects, into this Agreement to define the terms, conditions and Work related to the Owner's Sustainable Objective.)*
Not applicable.

...

*(Identify incentive programs the Owner intends to pursue for the Project and deadlines for submitting or applying for the incentive programs.)*

$20,000,000.00 of Work under this Agreement must be completed and spent by the Owner prior to April 1, 2020 in order to qualify for certain state credits and/or tax abatements.

...

*(Provide total for Owner's budget, and if known, a line item breakdown of costs.)*
Thirty-Three Million Dollars ($33,000,000.00)

...

       a)    Phase I Preliminary design complete by July 16, 2018;

...

       a)    Phase I Guaranteed Maximum Price Proposal submission on August 1, 2018.
       b)    Revised Phase I Guaranteed Maximum Price Proposal submission on September 26, 2018.

...

**Additions and Deletions Report for AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved.**
**WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                     (1866936912)

**2**

.4    ~~Substantial Completion date:~~

.5    ~~Other milestone dates:~~

a)    Phase I substantially complete by April 1, 2020.  Meeting this Substantial Completion Date is contingent upon the Owner providing proof of financing per §7.2.7 of the AIA A141-2014 by October 29, 2018 and a Notice to Proceed by October 29, 2018.

...

~~(List name, legal status, address and other information.)~~.1    Architect:
5G Studio Collaborative
117 NE 1st Avenue
Miami, FL 33132

.2    Consultants:
Structural Engineer:
American Structurepoint
~~.1 Architect~~7260 Shadeland Station
Indianapolis, IN 46256

Civil Engineer:
~~.2 Consultants~~Civil & Environmental Consultants, Inc.
530 E. Ohio St. Suite G
Indianapolis, IN 46204

.3    ~~Contractors~~Contractors:
DEEM
6831 East 32nd Street, Suite 200
Indianapolis, IN 46226

**PAGE 4**

~~(Identify special characteristics or needs of the Project not identified elsewhere, such as historic preservation requirements.)~~
Not applicable.

...

~~(List name, address and other information.)~~
David Matthews
Matthews 350 E LaSalle, LLC
401 E Colfax Ave #277
South Bend, IN 46617
765-409-3841

...

~~(List name, address and other information.)~~
 Unknown at time of execution.

...

**Additions and Deletions Report for AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                                    (1866936912)

**3**

*(List discipline, scope of work, and, if known, identify by name and address.)*

All design services and contractors necessary for work not associated with the building core and shell.

...

~~(List name, address and other information.)~~
Michael R. Kerr, Vice President
F.A. Wilhelm Construction Co., Inc.
3914 Prospect Street Indianapolis, IN 46203
317-359-5411
**PAGE 5**

*(Check the appropriate box. If the Owner and Design-Builder do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

...

[ **X** ]     Litigation in a court of competent jurisdiction

[  ]     Other: *(Specify)*

**PAGE 6**

**ARTICLE 2   COMPENSATION AND PROGRESS PAYMENTS**
**ARTICLE 2   COMPENSATION AND PROGRESS PAYMENTS**

...

*(Insert amount of, or basis for, compensation, including compensation for any Sustainability Services, or indicate the exhibit in which the information is provided. If there will be a limit on the total amount of compensation for Work performed prior to the execution of the Design-Build Amendment, state the amount of the limit.)*

Per the June 20, 2018 Preconstruction Services and Preliminary Design Proposal and corresponding June 20, 2018 Notice to Proceed email from David Matthews to Dan Fetz – See attached Exhibit F.

...

*(If applicable, attach an exhibit of hourly billing rates or insert them below.)*
See attached Exhibit F.
~~Individual or Position~~                                                  ~~Rate~~

...

See attached Exhibit F.

**§ 2.1.3.1** ~~Reimbursable Expenses are in addition to compensation set forth in Section 2.1.1 and 2.1.2 and include expenses, directly related to the Project, incurred by the Design-Builder and the Design-Builder's Architect, Consultants, and Contractors, as follows:~~
      ~~.1     Transportation and authorized out-of-town travel and subsistence;~~

**Additions and Deletions Report for AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved.**
**WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.**
This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                          (1866936912)

**4**

 .2  Dedicated data and communication services, teleconferences, Project web sites, and extranets;
 .3  Fees paid for securing approval of authorities having jurisdiction over the Project;
 .4  Printing, reproductions, plots, standard form documents;
 .5  Postage, handling and delivery;
 .6  Expense of overtime work requiring higher than regular rates, if authorized in advance by the Owner;
 .7  Renderings, physical models, mock-ups, professional photography, and presentation materials requested by the Owner;
 .8  All taxes levied on professional services and on reimbursable expenses; and
 .9  Other Project-related expenditures, if authorized in advance by the Owner.

**§ 2.1.3.2** For Reimbursable Expenses, the compensation shall be the expenses the Design-Builder and the Design-Builder's Architect, Consultants and Contractors incurred, plus an administrative fee of ___ percent ( __%) of the expenses incurred.

**§ 2.1.4.1** Payments are due and payable upon presentation of the Design-Builder's invoice. Amounts unpaid ( ___ ) thirty (30) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Design-Builder.
*(Insert rate of monthly or annual interest agreed upon.)*

___%
**PAGE 7**

**ARTICLE 3   GENERAL REQUIREMENTS OF THE WORK OF THE DESIGN-BUILD CONTRACT**
**ARTICLE 3   GENERAL REQUIREMENTS OF THE WORK OF THE DESIGN-BUILD CONTRACT**
**PAGE 10**

**ARTICLE 4   WORK PRIOR TO EXECUTION OF THE DESIGN-BUILD AMENDMENT**
**ARTICLE 4   WORK PRIOR TO EXECUTION OF THE DESIGN-BUILD AMENDMENT**

…

*(List additional information, if any, to be included in the Design-Builder's written report.)*

**PAGE 11**

**ARTICLE 5   WORK FOLLOWING EXECUTION OF THE DESIGN-BUILD AMENDMENT**
**ARTICLE 5   WORK FOLLOWING EXECUTION OF THE DESIGN-BUILD AMENDMENT**
**PAGE 12**

**§ 5.5.1** Unless otherwise provided in the Design-Build ~~Documents,~~ Documents or the August 1, 2018 Matthews, LLC Commerce Center Mixed Use Development Phase 1 (Core & Shell) – GMP Proposal, the Design-Builder shall secure and pay for the building permit as well as any other permits, fees, licenses, and inspections by government agencies, necessary for proper execution of the Work and Substantial Completion of the Project.
**PAGE 15**

**ARTICLE 6   CHANGES IN THE WORK**
**ARTICLE 6   CHANGES IN THE WORK**
**PAGE 16**

**ARTICLE 7   OWNER'S RESPONSIBILITIES**
**ARTICLE 7   OWNER'S RESPONSIBILITIES**
**PAGE 17**

**§ 7.2.7** Prior to the execution of the Design-Build Amendment, the ~~Design-Builder may request in writing that the Owner provide reasonable evidence~~ Owner shall provide evidence, satisfactory to the Design-Builder, that the Owner

**Additions and Deletions Report for AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                  (1866936912)

**5**

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD55-265524A634B0

has made financial arrangements ~~sufficient~~ to fulfill the Owner's obligations under the Design-Build Documents and the Design-Builder's ~~Proposal. Thereafter, the Design-Builder may only request such evidence~~ Proposal and that the financing arrangements are fully in effect and funded ("Evidence of Financing"). The Design-Builder shall have no obligation to the Owner to commence the Work, or if the Work has been commenced, no obligation to continue the Work, until the Design-Builder shall have notified the Owner in writing that the Design-Builder is satisfied with the Evidence of Financing.

Thereafter, the Design-Builder may request further Evidence of Financing if (1) the Owner fails to make payments to the Design-Builder as the Design-Build Documents require; (2) a change in the Work materially changes the Contract Sum; or (3) the Design-Builder identifies in writing a reasonable concern regarding the Owner's ability to make payment when ~~due.~~ due for the Work. The Design-Builder may from time to time have those entities that are providing financing for the Work to confirm that there have been no changes to their financing arrangements and that the Owner is not in default under their financing arrangements. The Owner shall furnish such evidence as a condition precedent to commencement or continuation of the Work or the portion of the Work affected by a material change. After the Owner furnishes the evidence, the Owner shall not materially vary such financial arrangements without prior notice to the Design-Builder.

**PAGE 19**

~~ARTICLE 9   PAYMENT APPLICATIONS AND PROJECT COMPLETION~~
ARTICLE 9   PAYMENT APPLICATIONS AND PROJECT COMPLETION
**PAGE 20**

**§ 9.3.3** The Design-Builder warrants that title to all Work, other than Instruments of Service, covered by an Application for Payment will pass to the Owner no later than the time of payment. The Design-Builder further warrants that, upon submittal of an Application for Payment, all Work for which Certificates for Payment have been previously issued and payments received from the Owner ~~shall, to the best of the Design-Builder's knowledge, information and belief,~~ shall be free and clear of liens, claims, security interests or encumbrances in favor of the Design-Builder, Architect, Consultants, Contractors, material suppliers, or other persons or entities entitled to make a claim by reason of having provided labor, materials and equipment relating to the Work.

**PAGE 23**

~~ARTICLE 10   PROTECTION OF PERSONS AND PROPERTY~~
ARTICLE 10   PROTECTION OF PERSONS AND PROPERTY
**PAGE 25**

~~ARTICLE 11   UNCOVERING AND CORRECTION OF WORK~~
ARTICLE 11   UNCOVERING AND CORRECTION OF WORK
**PAGE 26**

**§ 11.2.2.3** ~~The one-year period for correction of Work shall not be extended by~~ For corrective Work performed by the Design-Builder pursuant to this ~~Section 11.2.~~ Section 11.2, the one-year period shall be the greater of one year after the date of Substantial Completion or three months from the date that the corrective work is performed.

...

~~ARTICLE 12   COPYRIGHTS AND LICENSES~~
ARTICLE 12   COPYRIGHTS AND LICENSES
**PAGE 27**

~~ARTICLE 13   TERMINATION OR SUSPENSION~~
ARTICLE 13   TERMINATION OR SUSPENSION
**PAGE 29**

~~ARTICLE 14   CLAIMS AND DISPUTE RESOLUTION~~
ARTICLE 14   CLAIMS AND DISPUTE RESOLUTION
**PAGE 32**

**Additions and Deletions Report for AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                    (1866936912)

**6**

**ARTICLE 15   MISCELLANEOUS PROVISIONS**
**ARTICLE 15   MISCELLANEOUS PROVISIONS**
**PAGE 33**

**ARTICLE 16   SCOPE OF THE AGREEMENT**
**ARTICLE 16   SCOPE OF THE AGREEMENT**
**PAGE 34**

   .4  AIA Document ~~A141™ 2014, Exhibit C, Sustainable Projects, if completed~~

   ~~.5~~  ~~AIA Document~~ E203™ 2013, Building Information Modeling and Digital Data Exhibit, if completed, or the following:

   .5  Other:

    ~~.6   Other:~~Exhibit D, Owner's Program
    Exhibit F, Preconstruction Services and Preliminary Design Proposal and Corresponding Notice to Proceed

**Additions and Deletions Report for AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. **All rights reserved.**
**WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.**
This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                   (1866936912)

## *Certification of Document's Authenticity*
*AIA® Document D401™ – 2003*

I, Michael R. Kerr, hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with its associated Additions and Deletions Report and this certification at 11:10:43 on 10/25/2018 under Order No. 8562017676 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document A141™ – 2014, Standard Form of Agreement Between Owner and Design-Builder , as published by the AIA in its software, other than those additions and deletions shown in the associated Additions and Deletions Report.

DocuSigned by:

*Mike Kerr*

*(Signed)* 7C1B0B2E40483...

Vice President & General Counsel

*(Title)*

10/25/2018 | 11:54 AM EDT

*(Dated)*

**AIA Document D401™ – 2003.** Copyright © 1992 and 2003 by The American Institute of Architects**. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 11:10:43 on 10/25/2018 under Order No.8562017676 which expires on 03/09/2019, and is not for resale.
**User Notes:**                                                                                      (1866936912)

**1**

# DRAFT AIA® Document G701™ – 2017

## Change Order

| PROJECT: *(Name and address)* | CONTRACT INFORMATION: | CHANGE ORDER INFORMATION: |
|---|---|---|
| Commerce Center Project - South Bend - Phase 1 - Core & Shell | Contract For: Core & Shell<br>Date: October 8, 2018 | Change Order Number: 002<br>Date: October 18, 2019 |
| OWNER: *(Name and address)*<br>Matthews 350 E. LaSalle, LLC<br>401 E. Colfax Avenue, #277<br>South Bend, IN 46617 | ARCHITECT: *(Name and address)*<br>N/A | CONTRACTOR: *(Name and address)*<br>F.A. Wilhelm Construction Co., Inc.<br>3914 Prospect Street<br>Indianapolis, IN 46203 |

**THE CONTRACT IS CHANGED AS FOLLOWS:**
*(Insert a detailed description of the change and, if applicable, attach or reference specific exhibits. Also include agreed upon adjustments attributable to executed Construction Change Directives.)*

CE-008 - Facade Changes = $1,017,170

CE-009 - Financing Delay Claim based on bank closing and proof of financng by October 18, 2019 and Remobilization on October 21, 2019 = $694,738

CE-011 - Remove Performance & Payment Bond = ($214,211)

Owner Contingency reduced to zero = ($714,699)

Total Change Order Amount. . . $782,998

There shall be no retainage held by Owner on Applications for Payment submitted to Owner by Contractor as of the date of this Change Order.  Retainage shall be held going forward starting with the October 2019 Application for Payment as set forth in Section A.1.5.4.2 Exhibit "A" to the Agreement.

| | |
|---|---|
| The original Contract Sum was | $ 32,988,000.00 |
| The net change by previously authorized Change Orders | $ 0.00 |
| The Contract Sum prior to this Change Order was | $ 32,988,000.00 |
| The Contract Sum will be increased by this Change Order in the amount of | $ 782,998.00 |
| The new Contract Sum including this Change Order will be | $ 33,770,998.00 |

The Contract Time will be increased by One Hundred and Eighty-One (181) days.
The new date of Substantial Completion will be  January 12, 2021

**NOTE:** This Change Order does not include adjustments to the Contract Sum or Guaranteed Maximum Price, or the Contract Time, that have been authorized by Construction Change Directive until the cost and time have been agreed upon by both the Owner and Contractor, in which case a Change Order is executed to supersede the Construction Change Directive.

**NOT VALID UNTIL SIGNED BY THE ARCHITECT, CONTRACTOR AND OWNER.**

| N/A | F.A. Wilhelm Construction Co., Inc. | Matthews 350 E. LaSalle, LLC |
|---|---|---|
| **ARCHITECT** *(Firm name)* | **CONTRACTOR** *(Firm name)* | **OWNER** *(Firm name)* |
| | | |
| **SIGNATURE** | **SIGNATURE** | **SIGNATURE** |
| | Michael R. Kerr, Vice President | David Matthews, Member |
| **PRINTED NAME AND TITLE** | **PRINTED NAME AND TITLE** | **PRINTED NAME AND TITLE** |
| | | |
| **DATE** | **DATE** | **DATE** |

AIA Document G701™ – 2017. Copyright © 1979, 1987, 2000 , 2001 and 2017 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 10:09:09 ET on 10/18/2019 under Order No. 5747907828 which expires on 03/08/2020, and is not for resale.
User Notes:                                                                                                  (3B9ADA63)

1



## Document G701™ – 2017

### *Change Order*

| PROJECT: *(Name and address)* | CONTRACT INFORMATION: | CHANGE ORDER INFORMATION: |
|---|---|---|
| Commerce Center Project - South Bend - Phase 1 - Core & Shell | Contract For: Core & Shell<br><br>Date: October 8, 2018 | Change Order Number: 003<br><br>Date: October 21, 2019 |
| OWNER: *(Name and address)*<br>Matthews 350 E. LaSalle, LLC<br>401 E. Colfax Avenue, #277<br>South Bend, IN  46617 | ARCHITECT: *(Name and address)*<br>N/A | CONTRACTOR: *(Name and address)*<br>F.A. Wilhelm Construction Co., Inc.<br>3914 Prospect Street<br>Indianapolis, IN  46203 |

**THE CONTRACT IS CHANGED AS FOLLOWS:**
*(Insert a detailed description of the change and, if applicable, attach or reference specific exhibits. Also include agreed upon adjustments attributable to executed Construction Change Directives.)*

Pursuant to Section A.1.4.2.1 of the Agreement Between Owner and Contractor, the parties have agreed that the Cast-in-Place Concrete scope of work will be performed and accounted for on a lump sum basis.

Cast-in-Place Concrete price through Addendum No. 3 - $11,063,626
CE-009 Delay Escalation for Cast-in-Place Concrete - $85,000
_____

Lump Sum Cast-in-Place Concrete Price - $11,148,626

This is a Zero Dollar change to the GMP and the purpose of this Change Order is to confirm that the Cast-in-Place Concrete scope of work is to be performed in a lump sum basis.

| | |
|---|---:|
| The original Contract Sum was | $ 32,988,000.00 |
| The net change by previously authorized Change Orders | $ 782,998.00 |
| The Contract Sum prior to this Change Order was | $ 33,770,998.00 |
| The Contract Sum will be unchanged by this Change Order in the amount of | $ 0.00 |
| The new Contract Sum including this Change Order will be | $ 33,770,998.00 |

The Contract Time will be increased by Zero (0) days.
The new date of Substantial Completion will be  January 15, 2021

**NOTE:** This Change Order does not include adjustments to the Contract Sum or Guaranteed Maximum Price, or the Contract Time, that have been authorized by Construction Change Directive until the cost and time have been agreed upon by both the Owner and Contractor, in which case a Change Order is executed to supersede the Construction Change Directive.

**NOT VALID UNTIL SIGNED BY THE ARCHITECT, CONTRACTOR AND OWNER.**

| N/A | F.A. Wilhelm Construction Co., Inc. | Matthews 350 E. LaSalle, LLC |
|---|---|---|
| **ARCHITECT** *(Firm name)* | **CONTRACTOR** *(Firm name)* | **OWNER** *(Firm name)* |
| | *Mike Kerr* | *David Matthews* |
| **SIGNATURE** | **SIGNATURE** GGTG1B6B2E40483... | **SIGNATURE** FEEW464421834F6... |
| | Michael R. Kerr, Vice President | David Matthews, Member |
| **PRINTED NAME AND TITLE** | **PRINTED NAME AND TITLE**<br>10/21/2019 \| 9:47 AM EDT | **PRINTED NAME AND TITLE**<br>10/21/2019 \| 11:53 AM EDT |
| **DATE** | **DATE** | **DATE** |

**AIA Document G701™ – 2017.** Copyright © 1979, 1987, 2000 , 2001 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 09:24:06 ET on 10/21/2019 under Order No. 5747907828 which expires on 03/08/2020, and is not for resale.
**User Notes:**                                                                              (3B9ADA5F)

**1**



## Document G701™ – 2017

### Change Order

| | | |
|---|---|---|
| **PROJECT:** *(Name and address)* Commerce Center Project - South Bend - Phase 1 - Core & Shell | **CONTRACT INFORMATION:** Contract For: Core & Shell<br><br>Date: October 8, 2018 | **CHANGE ORDER INFORMATION:** Change Order Number: 004<br><br>Date: October 22, 2019 |
| **OWNER:** *(Name and address)* Matthews 350 E. LaSalle, LLC 401 E. Colfax Avenue, #277 South Bend, IN  46617 | **ARCHITECT:** *(Name and address)* N/A | **CONTRACTOR:** *(Name and address)* F.A. Wilhelm Construction Co., Inc. 3914 Prospect Street Indianapolis, IN  46203 |

**THE CONTRACT IS CHANGED AS FOLLOWS:**

*(Insert a detailed description of the change and, if applicable, attach or reference specific exhibits. Also include agreed upon adjustments attributable to executed Construction Change Directives.)*

CE-012 - Deduct Precast Material and Fabrication and Caulking being paid for by the City.
- Precast Base Bid to City:  $4,074,400
- Alternate 02 Parapet Height 42":  $25,500
- Alterante 06 Joint Sealants:  $235,300
- VE - Eliminate Balcony In and Under Pieces (139):  ($224,000)
- VE - Eliminate Balcony Caulking:  ($6,400)
- VE - Replace Overlap Panels with 5" Bumpouts:  ($30,300)
- VE - Eliminate need for In and Under Pices on East Elevation:  ($10,800)
**Remove Precast Panel Material & Caulking Costs. . .  ($4,063,700)**

_____

**Add CE-009 Contingency. . .  $26,612**

_____

- Design/Build Contingency:  ($161,484)
- Builder's Risk Insurance:  ($9,689)
- General Liability Insurance:  ($21,800)
**Remove from Precast Panel Material & Caulking Costs. . .  ($192,973)**

_____

**TOTAL DEDUCT. . .  ($4,230,061)**

| | |
|---|---:|
| The original Contract Sum was | $ 32,988,000.00 |
| The net change by previously authorized Change Orders | $ 782,998.00 |
| The Contract Sum prior to this Change Order was | $ 33,770,998.00 |
| The Contract Sum will be increased by this Change Order in the amount of | $ -4,230,061.00 |
| The new Contract Sum including this Change Order will be | $ 29,540,937.00 |

The Contract Time will be increased by Zero (0) days.
The new date of Substantial Completion will be  January 15, 2021

**NOTE:** This Change Order does not include adjustments to the Contract Sum or Guaranteed Maximum Price, or the Contract Time, that have been authorized by Construction Change Directive until the cost and time have been agreed upon by both the Owner and Contractor, in which case a Change Order is executed to supersede the Construction Change Directive.

**AIA Document G701™ – 2017.** Copyright © 1979, 1987, 2000 , 2001 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 16:34:12 ET on 10/23/2019 under Order No. 5747907828 which expires on 03/08/2020, and is not for resale.
**User Notes:**                                                                                                     (3B9ADA5D)

**1**

**NOT VALID UNTIL SIGNED BY THE ARCHITECT, CONTRACTOR AND OWNER.**

| N/A | F.A. Wilhelm Construction Co., Inc. | Matthews 350 E. LaSalle, LLC |
|---|---|---|
| **ARCHITECT** *(Firm name)* | **CONTRACTOR** *(Firm name)* | **OWNER** *(Firm name)* |
| | *Mike Kerr* | *(signature)* |
| **SIGNATURE** | **SIGNATURE** 9C7C1B0B2E40483... | **SIGNATURE** FEE1A0421834F6... |
| | Michael R. Kerr, Vice President | David Matthews, Member |
| **PRINTED NAME AND TITLE** | **PRINTED NAME AND TITLE** | **PRINTED NAME AND TITLE** |
| | 10/23/2019 \| 5:28 PM EDT | 10/23/2019 \| 5:56 PM EDT |
| **DATE** | **DATE** | **DATE** |

**AIA Document G701™ – 2017.** Copyright © 1979, 1987, 2000 , 2001 and 2017 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 16:34:12 ET on 10/23/2019 under Order No. 5747907828 which expires on 03/08/2020, and is not for resale.
**User Notes:** (3B9ADA5D)

**2**



## WILHELM
### CONSTRUCTION

## Commerce Center Phase I - Approved Change Estimates
FAW #10281

| CE | Description | CE Proposal Submitted | CE Proposal Approved | Submitted Amount | Approved Amount | Status | Owner OCO # | Comments |
|---|---|---|---|---|---|---|---|---|
| CE-001 | B2 Basement Increase | 11/2/2018 | 11/2/2018 | $ 113,000 | $ 113,000 | Approved | 1 | |
| CE-002 | Deduct Performance & Payment Bond | 11/2/2018 | 11/2/2018 | $ (204,000) | $ (204,000) | Approved | 1 | |
| CE-003 | Add Performance & Payment Bond | 1/30/2019 | 2/13/2019 | $ 204,000 | $ 204,000 | Approved | 1 | |
| CE-004 | Extend General Conditions (July 15, 2020 SC Date) | 2/13/2019 | 2/13/2019 | $ 55,500 | $ 55,500 | Approved | 1 | |
| CE-005 | Residential Piping under Level 5 | 3/21/2019 | Void | Void | Void | Void | 1 | By Owner - FAW Price $44,949 |
| CE-006 | 4th Floor Parking Garage Ventilation | 3/21/2019 | 4/23/2019 | $ 8,123 | $ 8,123 | Approved | 1 | |
| CE-007 | Eliminate B2 Parking Level - Revised | 4/23/2019 | 4/23/2019 | $ (891,322) | $ (891,322) | Approved | 1 | |
| CE-008 | Façade Redesign Budget | | | $ 1,017,170 | $ 1,017,170 | | | |
| CE-009 | Financing Delay Cost Claim | | | $ 694,738 | $ 694,738 | | | |
| CE-011 | Remove Payment and Performance Bond | | | $ (214,211) | $ (214,211) | | | |

| | |
|---|---|
| Original GMP Contract Value | $ 32,988,000 |
| Total Change Directives | $ 782,998 |
| Revised GMP Contract Value | $ 33,770,998 |

## Commerce Center Phase I - Change Estimates Submitted for Approval
FAW #10281

| CE | Description | CE Proposal Submitted | CE Proposal Approved | Submitted Amount | Approved Amount | Status | Comments |
|---|---|---|---|---|---|---|---|
| CE-010 | 7 Stone Columns and Stone Entablatures at Entrances | | | $ 355,000 | | | |
| CE-012 | Remove Precast Material and Caulking from Contract | | | $ (4,230,061) | | | |
| | | | TOTAL | $ (3,875,061) | | | |

## Commerce Center Phase I - Owner Change Order #004

| CE | Description | | | | | | |
|---|---|---|---|---|---|---|---|
| CE-012 | Remove Precast Material and Caulking from Contract | | | $ (4,230,061) | | | |
| | | | OCO #004 Total | $ (4,230,061) | | | |

| | |
|---|---|
| Contract Thru OCO #003 | $33,770,998 |
| OCO #004 | $ (4,230,061) |
| Contract Thru OCO #004 | $29,540,937 |

DocuSign Envelope ID: B5980806-4447-4C97-8925-C276F20540A9



**CE-012 Remove Precast Panel Material from Contract - Dated 10/23/19**

| Precast Material & Caulking Costs | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| High Base Precast Bid | 1 | ls | $ 4,074,400 | $4,074,400 |
| Bid Alternate No. 02 - Parapet Height | 1 | ls | $ 25,500 | $25,500 |
| Bid Alternate No. 06 - Precast Joint Sealants | 1 | ls | $ 235,300 | $235,300 |
| High - Delete Balcony 'in-and-unders" | 1 | ls | $ (224,000) | -$224,000 |
| High - Delete Balcony 'in-and-unders" Sealant | 1 | ls | $ (6,400) | -$6,400 |
| High - Change Overlaps to 5" Bumpouts | 1 | ls | $ (30,300) | -$30,300 |
| High - Delete East Elevation 'in-and-unders' | 1 | ls | $ (10,800) | -$10,800 |
| Add Design / Build Contingency for CE-009 | 1 | ls | | |
| Subtotal | | | | $4,063,700 |

| Remove Precast & Caulking from Contract | | | | |
|---|---|---|---|---|
| Precast Material and Caulking Costs | 1 | ls | $ (4,063,700) | -$4,063,700 |
| Subtotal | | | | -$4,063,700 |

| Add CE-009 Contingency | | | | |
|---|---|---|---|---|
| Design / Build Contingency for CE-009 | 1 | ls | $ 26,200.00 | $26,612 |
| Subtotal | | | | $26,612 |

| SUBTOTAL | | | | -$4,037,088 |
|---|---|---|---|---|
| Sales Tax | | | | |
| General Conditions | | LS | | $0 |
| Preconstruction Services | | LS | - | $0 |
| Continual Design Services | | LS | - | $0 |
| Design/Builder Contingency | | 4.00% | | -$161,484 |
| Builder's Risk Insurance | | 0.24% | | -$9,689 |
| General Liability Insurance | | 0.54% | | -$21,800 |
| Design/Builder Fee (LS) | | 0.00% | | $0 |
| Payment & Performance Bond | | 0.00% | | $0 |
| **TOTAL DEDUCT** | | | | **-$4,230,061** |

**BUILDING TOGETHER**

## EXHIBIT D- OWNER'S PROGRAM

# List of Preliminary Design Documents

- Subsurface Investigation & Geotechnical Recommendations prepared by Alt & Witzig dated December 2, 2016

- Civil & Environmental Consultants drawings dated July 16, 2018

- 5G Studio Miami drawings dated July 16, 2018

- American Structurepoint structural mark-ups dated July 26, 2018

- DEEM mechanical and electrical mark-ups dated July 3, 2018



June 20, 2018

Mr. David Matthews
Matthews, LLC
401 East. Colfax Avenue, Ste#206
South Bend, IN 46617

Re:     Commerce Center Mixed Use Development
        Preconstruction Services and Preliminary Design Proposal

Dear David:

Contained herein, please find F. A. Wilhelm Construction Co., Inc.'s Preconstruction Services and Preliminary Design proposal for the Commerce Center Mixed Use Development project consistent with Article 4 of AIA 141-2014 *Standard Form of Agreement Between Owner and Design-Builder*.

This proposal is inclusive of all preconstruction and design costs required to develop the Preliminary Design for the building core and shell and to subsequently establish a Guaranteed Maximum Price (GMP) for the project by August 1, 2018. Specifically excluded from this proposal is any work associated with the future buildout and MEP distribution for the project.

Outlined below is a description of the services that will be provided to develop the Preliminary Design which will be utilized to establish a GMP for the project. Additionally, attached to this proposal is a breakdown of costs associated with this proposal.

*Architectural Design:*
- Program Development
- Phase I & II- 100% Schematic Design Level Drawings
- Phase I & II- 50% Design Development Level Drawings
  - Inclusive of the following:
    - Floor Plans
    - Roof Plan
    - Building Elevation with Façade Material Selection
    - Balcony Details
    - Wall Sections
    - Design Narrative for the following items
      - Vertical Transportation
      - Egress Stairs
      - Enclosure (Building Façade and Roofing)
      - Windows

*Structural Engineering:*
- Foundation Plan
- Column Schedule
- Slab on Grade Plan
- Preliminary Reinforcing Information for Rebar and Post-Tensioned Concrete
- Preliminary Shear Wall Details and Design (if required)
- Beam Schedule (if required)



*Civil Engineering:*
- Topographic Survey
- Site Plan
- Grading Plan
- Drainage Plan
- Utility Plan
- Site Details
- Landscaping Plan
- Erosion Control Plans

*Mechanical, Electrical, and Plumbing Design:*
- MEP Design Narrative
- Electrical One Line
- Electrical Site Plan
- Riser Locations
- Sample Room Layout for all Trades
- HVAC Equipment Selection and Layout

*Preconstruction Services:*
- Constructability Review
- Cost Analysis
- Schedule Development
- GMP Development

*Schedule of Deliverables:*
- Preliminary Design Issuance - Monday July 16, 2018
- GMP Submission to Matthews, LLC- Wednesday August 1, 2018

*Clarifications:*
- This proposal accounts for the design of the core and shell only for the retail and residential tower.
- All future buildout and MEP distribution is not included as part of this proposal.
- Due to the accelerated design schedule for this project, included within this proposal is a budgeted amount of $131,250 to allow for anticipated design costs which will occur from July 15, 2018 through September 28, 2018. This will allow the design process to continue while the GMP is being developed by Wilhelm and reviewed by Matthews.

**Proposal for Preconstruction Services and Preliminary Design………………………………………$367,305.00**

Should you find this proposal acceptable, please respond with a written Notice to Proceed as this will allow us to release our consultants to begin their respective work. Should you have any questions or concerns, please do not hesitate to contact myself or Mr. Dan Fetz who is very engaged with this project.

Regards,

F.A. Wilhelm Construction Co., Inc.

Andy Lock
Vice President of Preconstruction Services

Page 2 of 2



# PRECONSTRUCTION AND DESIGN SERVICES - 7/2/18 THRU 9/28/18

| PRECONSTRUCTION | HOURS | | RATE | | TOTAL |
|---|---|---|---|---|---|
| Project Executive - Mike Kerr | - | $ | 90.00 | | included |
| Sr. Preconstruction Manager - Andy Lock | - | $ | 90.00 | | included |
| Preconstruction Manager - Dan Fetz | 480 | $ | 75.00 | $ | 36,000 |
| Contract Manager - Mitch Davison | 240 | $ | 90.00 | $ | 21,600 |
| Travel & Misc Expenses | 1 | $ | 5,000 | $ | 5,000 |
| | | | | | |
| **DESIGN COSTS TO DD BY 7/15/18 TO ESTABLISH GMP** | | | | | |
| American Structurepoint | 1 | $ | 58,500 | $ | 58,500 |
| 5G Studio Collaborative | 1 | $ | 61,700 | $ | 61,700 |
| Civil & Environmental Consultants Inc. | 1 | $ | 27,250 | $ | 27,250 |
| DEEM | 1 | $ | 15,000 | $ | 15,000 |
| | | | | | |
| **DESIGN COSTS CONTINUE FROM 7/15/18 THROUGH 9/28/18** | | | | | |
| *American Structurepoint (See Note 1)* | *1* | *$* | *50,000* | *$* | *50,000* |
| *5G Studio Collaborative (See Note 2)* | *1* | *$* | *50,000* | *$* | *50,000* |
| Civil & Environmental Consultants Inc. | 1 | $ | 31,250 | $ | 31,250 |
| DEEM | 1 | $ | - | $ | - |
| | | | | | |
| **MARK-UP** | | | | | |
| Construction Management Fees (3.00%) | | | | $ | 8,811 |
| General Liability Insurance (0.48%) | | | | $ | 1,753 |
| Builder's Risk (0.12%) | | | | $ | 441 |
| | | | | | |
| **TOTAL PRECONSTRUCTION BUDGET** | | | | $ | **367,305** |

Note 1 - FAW budget for Structural Engineering for this time period
Note 2 - FAW budget for Architectural Design for this time period

## Hermesch, Scott

| | |
|---|---|
| **From:** | David Matthews <david@matthewsllc.com> |
| **Sent:** | Wednesday, June 20, 2018 2:22 PM |
| **To:** | Fetz, Daniel |
| **Cc:** | Velvet Canada; Lock, Andy; Kerr, Mike; Davison, Mitch; Hermesch, Scott |
| **Subject:** | Re: Commerce Center- Preconstruction Services & Preliminary Design Proposal |

Hi Dan,

This looks good.  I approve this proposal, please proceed.  Thank you,


David Matthews
(765) 409 - 3841
www.MatthewsLLC.com

On Wed, Jun 20, 2018 at 9:43 AM, Fetz, Daniel <DanielFetz@fawilhelm.com> wrote:

> David,
>
>
> Attached please find our fee proposal to provide preconstruction services and develop the preliminary design for the Commerce Center project. Please feel free to reach out to me with any questions you may have. If this proposal is acceptable please respond with a written Notice to Proceed this will allow us to release the rest of the design team.
>
>
> Thank you,
>
>
> **Daniel Fetz**
>
> Preconstruction Manager
>
>
> **F.A. Wilhelm Construction**
>
> 3914 Prospect Street
>
> Indianapolis, IN 46203
>
> 317.359.5411
>
> fawilhelm.com

1

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD55-265524A634B0

95 Years of Building Together

2

Commerce Center Mixed Use Development- GMP Revision 1
Matthews, LLC.
EXHIBIT G



| DESCRIPTION | | |
|---|---|---|
| **DIRECT CONSTRUCTION COSTS** | | |
| | | |
| DIVISION 01- GENERAL REQUIREMENTS | | |
| Allowances | | $555,000 |
| | | |
| DIVISION 02- DEMOLTIION | | |
| Site Demolition | | $95,000 |
| | | |
| DIVISION 03- CONCRETE | | |
| Cast-In-Place Concrete | | $11,607,572 |
| Architectural Precast Concrete Panels | | $4,971,724 |
| | | |
| DIVISION 04- MASONRY | | |
| Unit Masonry | | $768,345 |
| | | |
| DIVISION 05- METALS | | |
| Structural & Misc. Steel | | $495,236 |
| Prefabricated Balconies & Railings | | $428,560 |
| Cold Formed Stud Framing | | $235,076 |
| | | |
| DIVISION 06- WOODS, PLASTICS, & COMPOSITES | | |
| Rough Carpentry | | $19,199 |
| | | |
| DIVISION 07- THERMAL AND MOSITURE PROTECTION | | |
| Joint Sealants | | $102,893 |
| Waterproofing | | $62,375 |
| Rigid Insulation | | $25,920 |
| Membrane Roofing | | $517,300 |
| Fire Safing | | $74,400 |
| Foamed In Place Insulation | | $141,850 |
| Liquid Sealers | | $27,227 |
| Traffic Coating Membrane | | $58,140 |
| | | |
| DIVISION 08- OPENINGS | | |
| Hollow Metal Doors & Frames | | $62,400 |
| Terrace Doors | | $399,000 |
| Aluminum Entrance Doors | | $17,500 |
| Storefront Glass | | $179,200 |
| Punched Openings | | $360,000 |
| | | |
| DIVISION 09- FINISHES | | |
| Gypsum Board Shaft Wall Assemblies | | $168,150 |
| Panel Ceilings | | $156,035 |
| Painting | | $42,425 |
| Elastomeric Coatings (Garage Striping) | | $7,500 |
| Floor Finishes | | $9,410 |
| | | |
| DIVISION 10- SPECIALITES | | |
| Fire Extinguishers & Cabinets | | $8,250 |
| Signage | | $14,107 |
| | | |
| DIVISION 11- EQUIPMENT | | |
| Parking Control Equipment | | $30,000 |
| | | |
| DIVISION 14- CONVEYING EQUIPMENT | | |
| Electrical Traction Elevators | | $493,750 |

10/9/2018 11:42 AM

| | | |
|---|---|---|
| DIVISION 21- FIRE SUPPRESSION | | |
| Fire Suppression Piping | | $485,709 |
| | | |
| DIVISION 22- PLUMBING | | |
| Plumbing Piping, Equipment | | $579,800 |
| | | |
| DIVISIOn 23- HEATING, VENTILATING, AND A/C | | |
| HVAC | | $476,825 |
| | | |
| DIVISION 26- ELECTRICAL | | |
| Electrical | | $1,477,520 |
| | | |
| DIVISION 31- EARTHWORK | | |
| Mass Earthwork, Site Grading | | $916,114 |
| Earth Retention Systems | | $811,400 |
| Drilled Concrete Piers and Shafts | | $892,294 |
| | | |
| DIVISION 32- EXTERIOR IMPROVEMENTS | | |
| Asphalt Pavement | | $181,201 |
| Concrete Pavement and Curbs | | $54,531 |
| | | |
| DIVISION 33- SITE UTILITIES | | |
| Site Utility Infrastructure | | $149,000 |
| | | $0 |
| DIVISION 00- MISCELLANEOUS | | $0 |
| Site Requirements & Services | | $749,587 |
| General Conditions | | $997,650 |
| | | |
| | | |
| **DIRECT CONSTRUCTION COSTS SUBTOTAL** | | |
| $29,905,175 | | |
| | | |
| | | |
| **INDIRECT CONSTRUCTION COSTS** | | |
| | | |
| Preconstruction Services | LS | $367,305 |
| Continual Design Services | LS | $150,680 |
| Tax | in above | |
| Design/Builder Contingency | 4% | $1,216,926 |
| Builder's Risk Insurance | 0.24% | $72,115 |
| General Liabilty Insurance | 0.54% | $165,723 |
| Design/Builder Fee- 3% | 3% | $912,695 |
| Payment & Performance Bond | 0.60% | $197,928 |
| | | |
| | | |
| **TOTAL CONSTRUCTION COST- DIRECT & INDIRECT** | | **$32,988,547** |

BUILDING TOGETHER

## GMP PROPOSAL

# CLARIFICATIONS & ASSUMPTIONS

# EXHIBIT H

The Guaranteed Maximum Price (GMP) is based on Clarifications and Assumptions as follows:

The following are excluded from the GMP:

1. Special structural inspection and/or testing (Not required by Code)
2. Site Security Services (Not a Wilhelm requirement to have security services)
3. Any and all public bidding process requirements or schedule impacts.
4. Any and all Leadership in Energy & Environmental Design (LEED) accreditation.

The following are clarifications:

**Value Engineering Options Approved Per Guaranteed Maximum Price Revision 1- Dated 09/26/2018**

1. Pricing is based upon the GMP documents prepared by 5G Studio, American Structurepoint, Civil and Environmental (CEC), and DEEM Inc. dated 7/16/18 with modifications as listed below
2. Pricing is based upon the acceptance of the following value engineering options
   a. Delete 13th Floor Elevator Overrun
   b. Delete Mechanical Penthouse
   c. Reduction of Interior CMU partitions on floors B2-L4
   d. Delete "Pergola" feature on west side of building
   e. Reduce floor to floor heights as follows:
      i. 6" reduction on B2 & B1
      ii. 2' reduction on L1
      iii. 10" reduction on L5-L10
      iv. 2" reduction in slab thickness on B1-L10
   f. Prefabricated "bolt on" balconies in lieu of cast-in-place. All cantilevered balconies will include decking and powder coat finish on all exposed metal. Balconies are priced aluminum with a load capacity of 60 lbs/sf.
   g. Eliminate 3' between column lines D-3 which results in elimination of approximately 6,700 sf of area
   h. Perimeter columns in basement areas would be eliminated- wall would increase in thickness by 1"
   i. Utilizing an insulated architectural precast façade in lieu of traditional field set masonry
   j. B2 Parking Option 4, provided by Matthews LLC
   k. West elevator would service the 10th floor, and the South elevator would service the 11th floor
   l. Remove all façade from the East face of the parking garage
   m. Utilizing precast would eliminate most exterior stud framing from the core & shell scope of work- Matthews LLC. will need to account for interior furring/framing to hang drywall

---

## GMP PROPOSAL

    n.   The clarifications provided above represent only those specifically related to the revised GMP proposal- all clarifications, and exclusion previously provided in the original GMP remain valid

3. We have assumed that a buck hoist, if required for interior construction, will be provided by the owner. Wilhelm has not included cost associated with temporary use of the elevators during construction for the owner's interior construction contract.
4. Based upon conversations with the owner we have assumed that the tenant buildout portion of the project will be immediately following core & shell construction.
5. We exclude any costs associated with the removal and disposal of hazardous, contaminated, or any material not defined as 'clean fill'.
6. Landscaping is not included in this proposal.
7. This GMP proposal includes design costs and services for Phase 1 of this project only.
8. Soil & compaction testing, materials testing, reinforcing inspection & post tension elongation inspection is typically a third party independent service contracted direct by the Owner.  An Allowance has been included for these costs.
9. Utility consumption costs have been included until the tower crane has been removed from the job site or until the owner provides temporary temperature control equipment, whichever where to occur first.
10. Excludes seismic bracing for Mechanical ,Electrical & Fire Protection Systems (Unnecessary)
11. One-year standard warranty unless stated otherwise.
12. Includes Permits.
13. Includes Sales & Use Taxes.
14. Includes Performance & Payment Bonds.
15. Includes General Liability Insurance.
16. Includes Builder's Risk Insurance.
17. We will include (1) 10' x 10' mockup of the façade.

**Demolition & Excavation**

1. Includes Storm Water Pollution Prevention Plan (SWPPP) design and permitting.
2. Handling underground obstructions, relocation of unknown underground utilities, or handling and disposal of contaminated soils is not included however an Allowance is included to use for these purposes if encountered.
3. Excavation shall be shored with a yet to be determined earth retention syste where required. Earth retention components (piles and lagging or driven sheets) may be left in place 4' below 1st floor elevation. Location of the soldier piles, lagging, or sheets left on-site will be included on the as-built documents.

**Civil & Utilities**

1. We have included an allowance to mill, resurface, and seal the construction laydown parking lot prior to owner turnover.
2. Our pricing includes a perforated storm detention pipe and associated piping and structures per the plans.
3. We have not accounted for any changes in scope or design based upon feedback from the City of South Bend Office of Engineering.

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD55-265524A634B0

## GMP PROPOSAL

4. Any costs associated with relocating or supporting existing utilities is not included in this revised GMP proposal.
5. We have assumed that connection or "tap" fees for new utility services is by the owner.
6. We have assumed that 3 phase, 480 volt power is available on-site for tower crane operations. Wilhelm has included the cost for electrical hookups to the tower crane.

**Structural**

1. Our revised GMP price is based upon a typical 8" flat post tensioned deck for all parking and residential levels (except the roof). This design does not accommodate a future change in occupancy type of the parking garage to office, retail, or other non-parking uses.
2. We have included an 18" "transfer slab" at the roof level that will accommodate a future vertical expansion of 2 floors.
3. Based upon the geotechnical report we have included an auger cast pile deep foundation system.
4. Due to the reduction in load by eliminating 2" from all elevated decks we have accounted for a 15% reduction augercast grout piles.
5. Our intent is to form and place the perimeter basement walls against the earth retention system. The foundations will be designed to accommodate this method.
6. We have included Element 5 concrete admixture in all garage deck pours.
7. This design includes structural elements to tie in phase 2 structure at each floor level. The basement wall will need to be sawn out and removed during phase 2 construction for openings between garage levels.
8. We have not included Class A or B concrete finishes (we do not believe this to be necessary) for any of the exposed concrete elements. Exposed concrete shall be pointed and patched as needed per American Concrete Institute standards but form-liners, rubbing or coating is excluded.

**Architectural Façade**

1. The typical façade detail will include an architectural insulated precast concrete panel.
2. We have assumed cold formed stud framing, sheathing, insulation, and air/water barrier at inset balcony location only.
3. All inset balconies walls are assumed to be hand laid masonry.
4. Typical residential windows, and storefront have been included per the plans and elevations.
5. Roofing System
   a. Includes a 3.5" R-20 minimum thick insulation(R-20) mechanically fastened to the structure with a .060 white TPO membrane with a 20-year system warranty.
   b. Includes 24 gauge pre-finished copings, downspouts, collector boxes, & scuppers.
   c. Includes 2 roof hatches.
   d. Excludes green roof, and pedestal pavers.
6. Excludes exterior signage.
7. Steel angle façade at garage openings.
8. Exterior crash barriers in the parking garage will be comprised of architectural precast concrete panels in most locations. Interior barriers have been priced as barrier cable.

**BUILDING TOGETHER**

# GMP PROPOSAL

**Parking Garage Interior**

1. Traffic coating has been included above the occupied space on the 1st floor- all other parking decks would receive a silane sealer.
2. Excludes painting concrete columns, bumper walls and/or underside of parking decks.
3. Traffic control equipment to include motorized gate arm, and point of service console at 2 locations inside of the garage. We have not accounted for the cost of a parking management system.
4. Wayfinding signage is included.
5. 4th parking level to include lay-in ceiling over garage space only.

**Apartment Interior**

1. See attached typical residential floor plan markup for shaft/chase locations provided in core & shell. Wilhelm will provide the shaft for the trash chute but the chute material is not included.
2. We are assuming the T/I construction will follow immediately behind the pace of the construction of the core & shell therefore we have not included any provisions for permanent lighting, or code minimum unit heaters.
3. Access controls at stairwells and elevators have not been included.

**Elevator**

1. Two (2) Schindler Elevator series 5500 with 3500 lbs capacity and 350fpm speed.
2. Standard Schindler 5500 offerings, features, & finishes.  Finishes include SS4 downlit LED ceiling, plastic laminate cab walls with SS4 reveal, SS4 door, SS4 front & return, SS4 handrails on rear and sides of cab.
3. Includes a hall lantern/position indicator at main landing.  All other landings a car riding lantern to be provided in lieu of hall lanterns.
4. Excludes temporary use of the elevator for construction use.  Any permitting, use, or protection costs for use during construction prior to Certificate of occupancy for interior build-out shall be by Owner.
5. Elevator cabs are designed to be equipped with resident access controls but this cost has not been included in this proposal.
6. Elevator service has been revised to the following- the west elevator will service the lower levels up to the 10th residential floor. The south elevator will do the same but have an overrun with access to the current rooftop. The west stair shaft will be equipped with a roof hatch.

**Fire Protection**

1. Includes backflow preventer with a wet pipe riser with butterfly type control valve, main drain, pressure gauge, electric bell, and flow switch.
2. Includes outside fire department (Storz) connection. To meet local fire department requirements.
3. Includes a dry pipe fire protection system from garage- classified as Ordinary Hazard 1 and shall comply with NFPA 13

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD55-265524A634B0

**BUILDING TOGETHER**

## GMP PROPOSAL

4. Includes a wet pipe fire protection system for floors 4-10 classified as Light Hazard and shall comply with NFPA 13.  Sprinklers heads in exposed ceiling will be left up-right- heads will be placed in finished ceiling by the interior build out.
5. Includes a 125hp/1,000 gpm/130 psi horizontal split case fire pump per NFPA 20 and a 5 gpm/140 psi jockey pump.
6. Includes two (2) Class 1 standpipes and install ten (10) floor control assemblies per 675 IAC22-2.4-10.
7. All pipes and fittings shall comply with NFPA 13.
8. Excludes painting of fire protection piping.
9. Excludes Certified Fire Protection Engineer (FPE) stamp review and approval fees. (Not required per code)
10. Excludes protection of exterior canopies and patios.
11. Excludes and heat tracing of fire protection piping.


### Plumbing

1. Includes PVC sanitary waste/vent piping risers throughout apartment units.
2. Includes PVC grease waste piping stubbed in to future grocery area for future connection of food service equipment by Owner.
3. Includes domestic cold water/sanitary/gas stub-ins to future office and grocery spaces.
4. Includes CPVC domestic cold-water piping to include risers at each mechanical room location and terminate at valves in each mechanical room.
5. Includes SCH40 black natural gas piping to include one (1) main riser and terminate at one (1) valve on each floor
6. Includes one (1) domestic water booster pump in basement area water room.
7. Includes backflow preventers as required for one (1) incoming domestic water system.
8. Includes area drains and required PVC piping for garage level drainage.
9. Includes one (1) sump pump with associated pit as required to discharge lower level garage drainage.
10. Includes heat trace and insulation on domestic water and sanitary riser piping through the garage level to above the 4th floor ceiling – Piping above the 4th floor ceiling will not be insulated or heat traced.
11. Includes Interior underslab drainage system. We have included one (1) duplex sump pump utilizing 1HP motors.  We have also included of 4" corrugated tile buried at approximately 36" below finished floor.  Pump discharge to exit through sidewall of building and be connected to site storm.
12. Excludes Water heaters.  These shall be provided as part of the interior build-out.
13. Excludes Water softeners
14. Excludes interior storm drains.  All storm drains are routed to the exterior wall and down spouted down the building as part of the roofing system.
15. Excludes water submeters


### Mechanical & HVAC

1. Includes two (2) 12.5 Ton DX cooling/gas heating rooftop units to condition the corridors of each residential floor (5-12).

## GMP PROPOSAL

2. Includes two (2) roof mounted 10,000 CFM stairwell pressurization fans to serve both of the two stairwells.  Also includes roof mounted ductwork, branch ducts, smoke dampers, and supply grilles for each stair.
3. Includes two (2) roof mounted 12,600 CFM elevator pressurization fans to serve both elevator shafts.  Also includes roof mounted ductwork, smoke dampers, and supply grilles for each shaft.
4. Includes one (1) 40,450 CFM exhaust fan, one (1) 2,700 CFM exhaust fan, and one (1) 7-0 SF intake louver and one (1) 47 SF exhaust louver for the lower level garage ventilation.  Includes approximately twelve (12) CO & NO2 sensors to monitor the garage and control the fans accordingly.
5. Electric heat will be provided at stairwells, elevator lobbies at each floor within the garage, retail shell space, lower level water room, trash room, 4th floor office shell space, and above the highest garage level lay-in ceiling.  These will either be wall-mounted, recessed, or wall-hung as appropriate for the space.
6. Excludes heating/cooling equipment for individual apartments.  These will be provided under the interior build-out contract.

**Electrical & Low Voltage**

1. Includes one (1) 3,000 amp 120/208 volt 3 phase 4 wire main apartment service located in the electrical room.
2. Includes a 3,000 amp 120/208 volt busway up through the facility to serve the main electrical rooms on each apartment floor.
3. Includes one (1) 600 amp bus plug at each apartment floor electrical room for future distribution to the apartments.  No other electrical work is included for the apartments.
4. Includes one (1) 800 amp 480/277 volt 3 phase 4 wire main house service located in the electrical room.
5. Includes one (1) 1,200 amp 480/277 volt 3 phase 4 wire main grocery service located in the electrical room.
6. Includes one (1) 800 amp 480/277 volt 3 phase 4 wire main 4th floor tenant service located in the electrical room.  We will install an 800 amp feed to the 4th floor and install a 42 circuit distribution panel in the space. Excludes sub-metering for future apartments.
7. Includes one (1) 400 amp 480/277 volt 3 phase 4 wire emergency service fed from a 350 Kw diesel generator.  Main service located in the electrical room.  Includes fuel for commissioning.
8. Includes dry type transformers as required for the garage, core shell and the emergency circuits as required.
9. Includes elevator wiring as required.
10. Includes primary conduit from the proposed transformer locations to the easement.
11. Includes two (2) 4" PVC conduits for phone entrance; main phone board to be located in the electrical room.
12. Includes three (3) 4" sleeves per floor for future telecom wiring.
13. Local utility company to provide primary conductors and the transformer concrete pads.
14. Install secondary conduits and conductors from the utility transformers to the new services.
15. Install egress and emergency lighting as required by code.  Install LED lighting per the listed average levels(Foot Candles FC) - Garage 2FC, Stair towers 5FC bottom to top, Lobby Areas 30 FC, Install stumble light at 1FC for the grocery and the 4th floor tenant area, & 4th floor corridor 30 FC.
16. Excludes stumble lighting on the apartment floors.

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD5F-265524A634B0

**BUILDING TOGETHER**

## GMP PROPOSAL

17. Includes one (1) conduit sleeve and box at each apartment balcony for future lighting.
18. Includes convenience receptacles.
19. Includes wiring controls for HVAC and Plumbing scopes but excludes an overall Building Management System.
20. Aluminum bussing will be used on all distribution equipment and transformers.
21. Aluminum cable will be used per code on circuits 100 amps and greater or where due to voltage drop the wire size is 100 amps or larger.
22. Includes the use of MC cable as allowed by code.
23. Excludes telephone and data systems wiring and devices.
24. Excludes lightning protection and ground loop for the building (Not required by code).
25. Install the voice evacuation fire alarm panel in the Main electrical room; monitoring fees by Owner.
26. The fire alarm panel will be of adequate size to accommodate the future apartment devices.
27. Includes fire alarm devices as needed for code minimum for the garage, core shell building.
28. Includes emergency call boxes; one (1) per stair landing at each level.
29. Includes cameras and a DVR.  Cameras will be located one (1) at each elevator lobby and two (2) at the main garage entrance and exit for a total of thirty (30) cameras.
30. Excludes any cogen and/or solar power equipment of wiring or any kind.



**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

# COMMERCE CENTER DEVELOPMENT

### 400 EAST LASALLE AVE
### SOUTH BEND, INDIANA 46617

GMP QUANTITIES DIAGRAM
JULY 16, 2018



| Sheet List | |
|---|---|
| Sheet Number | Sheet Name |
| A000 | COVER |
| A002 | GENERAL NOTES |
| A100 | SITE PLAN |
| A101 | LEVEL B2 OVERALL |
| A102 | LEVEL B1 OVERALL |
| A111 | LEVEL 1 OVERALL |
| A112 | LEVEL 2-3 OVERALL |
| A113 | LEVEL 4 OVERALL |
| A114 | LEVEL 5 OVERALL |
| A115 | LEVEL 6-10 OVERALL |
| A116 | MECHANICAL P.H. 1 |
| A117 | MECHANICAL P.H. 2 |
| A118 | ROOF PLAN |
| A201 | BUILDING ELEVATIONS |
| A202 | BUILDING ELEVATIONS |
| A203 | PERSPECTIVE VIEWS |
| A301 | BUILDING SECTIONS |
| A401 | STAIR 1 PLANS/SECTIONS |
| A402 | STAIR 2/ELEV2 PLANS/SECTION |
| A700 | WALL ASSEMBLIES |

## GMP QUANTITIES DIAGRAM

| REV. | DATE | ISSUE TITLE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

## COVER

07/16/2018
MIA024
PROJECT NUMBER

# A000
SHEET NUMBER





## APPLICABLE CODES

2012 INTERNATIONAL BUILDING CODE WITH INDIANA AMENDMENTS
2012 INTERNATIONAL FIRE CODE WITH INDIANA AMENDMENTS
2006 INTERNATIONAL PLUMBING CODE WITH INDIANA AMENDMENTS
2008 NFPA 70 WITH INDIANA AMENDMENTS
2012 MECHANICAL CODE WITH INDIANA AMENDMENTS
675 IAC 13-2.6-12 CHAPTER 11 WITH INDIANA AMENDMENTS
ASHRAE 90.1 2007 WITH INDIANA AMENDMENTS
2012 INTERNATIONAL FUEL GAS CODE WITH INDIANA AMENDMENTS

## GENERAL REQUIREMENTS

1. ALL WORK PERFORMED UNDER THIS CONTRACT SHALL COMPLY WITH THE FOLLOWING:
1.1. THESE GENERAL NOTES UNLESS OTHERWISE NOTED ON PLANS OR ANY SPECIFICATIONS.
1.2. NOT USED
1.3. ALL APPLICABLE FEDERAL, STATE AND LOCAL ORDINANCES, AND REGULATIONS.
1.4. ALL CODES WILL BE SUBJECT TO INTERPRETATION BY THE AUTHORITY HAVING JURISDICTION
2. CONTRACTOR TO FIELD VERIFY ALL DIMENSIONS PRIOR TO FABRICATION OR INSTALLATION OF ANY COMPONENT OF THE WORK THE CONTRACTOR SHALL NOTIFY THE ARCHITECT OF ANY DISCREPANCIES BEFORE ERECTING OR FABRICATING ANY COMPONENT OF THE WORK.
3. PRIOR TO THE START OF ANY WORK THE CONTRACTOR AND ALL SUBCONTRACTORS SHALL BECOME FAMILIAR WITH THE SITE AND ALL EXISTING CONDITIONS AND NOTIFY THE ARCHITECT OF ANY ITEMS THAT REQUIRE CLARIFICATION.
4. ALL WORK AND INSTALLATIONS SHALL BE PERFORMED IN ACCORDANCE WITH QUALITY STANDARDS ESTABLISHED FOR THE INDUSTRY AND/OR TRADE AND SHALL BE SQUARE, LEVEL AND PLUMB. ALL FINISH SURFACES SHALL BE CLEANED AND HAVE A NEAT APPEARANCE.
5. THE CONTRACTOR SHALL KEEP THE JOB SITE CLEAN AND CLEAR OF ALL DEBRIS. ALL DEBRIS SHALL BE PROPERLY DISPOSED IN A DUMPSTER WHICH SHALL BE EMPTIED WHEN FULL. THE CONTRACTOR SHALL BE RESPONSIBLE FOR KEEPING THE SITE SAFE AND HAZARD FREE.
6. CONTRACTOR TO COORDINATE ALL STRUCTURAL WORK WITH ARCHITECTURAL, MECHANICAL AND ELECTRICAL DRAWINGS FOR VERIFICATION OF LOCATIONS AND DIMENSIONS OF ALL PROJECT REQUIREMENTS. ANY DISCREPANCIES SHALL BE CALLED TO THE ATTENTION OF THE ARCHITECT BEFORE PROCEEDING WITH WORK.
7. THE GENERAL CONTRACTOR IS TO LOCATE ALL M.E.P. EQUIPMENT AND FIXTURES  BY ARCHITECTURAL DRAWINGS ONLY. ANY DISCREPANCIES OR ITEMS NOT SHOWN, ARE TO BE BROUGHT TO THE ARCHITECTS ATTENTION PRIOR TO CONSTRUCTION.
8. THE CONTRACTOR SHALL COMPARE AND COORDINATE ALL DRAWINGS, WHEN IN THE OPINION OF THE CONTRACTOR A DISCREPANCY EXISTS HE SHALL PROMPTLY REPORT IT TO IN WRITING TO THE ARCHITECT FOR PROPER ADJUSTMENT BEFORE PROCEEDING WITH THE WORK.
9. IF THERE IS A DISCREPANCY BETWEEN  THE DRAWINGS OR SPECIFICATIONS, THE STRICTER OF THE TWO SHALL GOVERN.
10. IF THERE IS A DISCREPANCY BETWEEN THE OWNER/ CONTRACTOR AGREEMENT AND THE DRAWINGS OR SPECIFICATIONS, THEN THE OWNER/ CONTRACTOR AGREEMENT SHALL GOVERN.
11. THE CONTRACTOR SHALL BE RESPONSIBLE FOR OBTAINING ALL REQ'D PERMITS AND/ OR APPROVALS TO CARRY OUT THE WORK DESCRIBED IN THE CONSTRUCTION DOCUMENTS.
12. PRIOR TO SUBMITTING BID, IT SHALL BE RESPONSIBILITY OF THE CONTRACTOR(S) TO FAMILIARIZE THEMSELVES WITH ALL THE CONDITIONS AT THE SITE RELATIVE TO EXISTING WORK, MATERIALS HANDLING, STORAGE AND DELIVERY, WORKING SPACE AVAILABLE, SAFETY PRECAUTIONS REQUIRED, AND ALL OTHER CONDITIONS NECESSARY TO THE MAKING OF AN ACCURATE AND COMPLETE PROJECT BID, NO INCREASE IN PROJECT COST WILL BE ALLOWED FOR FAILURE OF THE CONTRACTOR TO KNOW EXISTING SITE CONDITIONS.
13. THE GENERAL CONTRACTOR GUARANTEES AND WARRANTS THAT ALL WORK PERFORMED SHALL BE FREE FROM DEFECTS IN MATERIALS AND WORKMANSHIP FOR A PERIOD OF ONE YEAR AFTER THE ISSUANCE OF THE CERTIFICATE OF FINAL COMPLETION.  ANY DEFECTS OR DAMAGE DISCOVERED DURING SAID PERIOD SHALL BE REPAIRED OR REPLACED AS DIRECTED IN WRITING BY THE ARCHITECT WITH NO COST TO THE OWNER OR ARCHITECT.
14. CONTRACTORS SHALL INCLUDE IN THEIR BID ALL COSTS ASSOCIATED WITH MATERIAL HANDLING, STORAGE AND DELIVERY.
15. DO NOT SCALE DRAWINGS TO OBTAIN DIMENSIONS. ANY DIMENSIONS NOT INDICATED ON DRAWINGS TO BE CONFIRMED WITH ARCHITECT PRIOR TO CONSTRUCTION. NOTE, DIMENSIONS TAKE PRECEDENT OVER SCALE.
16. NO WORK SHALL BE PERFORMED OUTSIDE THE PROJECT LIMITS WITHOUT PRIOR WRITTEN APPROVAL FROM THE BUILDING OWNER.
17. THE GENERAL CONTRACTOR SHALL BE RESPONSIBLE FOR COORDINATING THE WORK OF ALL TRADES AS REQUIRED FOR COMPLETION OF WORK.
18. UPON COMPLETION OF THE PROJECT, CONTRACTOR SHALL PROVIDE TWO (2) SETS OF AS-BUILT DRAWINGS TO THE ARCHITECT.
19. MATERIALS SHALL BE NEW, OF QUALITY SPECIFIED, DELIVERED IN A TIMELY FASHION AND AMPLE QUANTITY TO PREVENT DELAY OF WORK. SUBSTITUTIONS REQUIRE PRIOR APPROVAL OF THE ARCHITECT.
20. THE GENERAL CONTRACTOR AND EACH SUBCONTRACTOR SHALL HAVE WORKMANS COMPENSATION AS REQUIRED BY THE GENERAL CONDITIONS OR OWNER/BUILDER AGREEMENT AND SUFFICIENT PROTECTION FOR CLAIMS FOR PERSONAL INJURY, INCLUDING DEATH, SHOULD THEY ARISE FROM OPERATIONS UNDER CONTRACT.
21. IT IS THE GENERAL CONTRACTORS RESPONSIBILITY TO SECURE THE PREMISES THROUGHOUT THE DURATION OF THE PROJECT.
22. THE GENERAL CONTRACTOR SHALL TAKE THE APPROPRIATE MEASURES TO PROVIDE THE NECESSARY PROTECTION TO THE GENERAL PUBLIC FROM ACCESSING THE SITE AT ALL TIMES.
23. THE GENERAL CONTRACTOR SHALL PROVIDE A SAFE WORKING ENVIRONMENT AS WELL AS REQ. MEANS OF EGRESS FOR ALL PERSONNEL ON THE PROJECT SITE.
24. THE GENERAL CONTRACTOR SHALL SUBMIT SHOP DRAWINGS, PRODUCT DATA AND SAMPLES TO THE ARCHITECT FOR APPROVAL PRIOR TO FABRICATION.   SUBCONTRACTORS SHALL VISIT THE PROJECT SITE TO VERIFY CONDITIONS, DIMENSIONS, ETC.  THE GENERAL CONTRACTOR SHALL ALLOW A MINIMUM OF 14 DAYS TURNAROUND FOR THE ARCHITECT TO PROCESS SHOP DRAWINGS.  THE GENERAL CONTRACTOR SHALL SUBMIT 10 COPIES OF ALL SUBMITTALS.   THE GENERAL CONTRACTOR SHALL REVIEW ALL SUBMISSIONS PRIOR TO SUBMITTING FOR THE ARCHITECTS APPROVAL.
25. THE GENERAL CONTRACTOR SHALL INSTALL ALL MATERIALS ACCORDING TO MANUFACTURER'S RECOMMENDED SPECIFICATIONS. THE GENERAL CONTRACTOR SHALL SUBMIT IN WRITING TO THE ARCHITECT IF, ANY MATERIAL CANNOT BE INSTALLED ACCORDING TO SPECIFICATIONS PRIOR TO INSTALLATION.
26. ALL EXISTING STRUCTURES, WALLS, LANDSCAPING AND IMPROVEMENTS ARE TO BE PROTECTED DURING CONSTRUCTION. ANY DAMAGE TO THE ABOVE, THE CONTRACTOR SHALL REPLACE TO MATCH ORIGINAL OR ADJACENT AT NO ADDITIONAL COST TO THE OWNER.
27. THE CONTRACTOR SHALL PROVIDE 48 HOUR NOTICE TO OWNER PRIOR TO DISCONNECTING OR DISRUPTING ANY UTILITIES.
28. ALL FACILITIES SHALL COMPLY WITH SEC. 800. [42 U.S.C. 3601 NOTE] "FAIR HOUSING ACT", THE FINAL RULES FOR TITLE II (28 CFR PART 35) AND TITLE III (28 CFR PART 36) KNOWN AS THE 2010 ADA STANDARDS FOR ACCESSIBLE DESIGN, "2010 STANDARDS" AND  THE AMERICAN WITH DISABILITIES ACT, PUBLIC LAW 101-336 (ADA), WHICHEVER IS MOST STRINGENT.
29. DISCONNECT, CAP & REROUTE ANY UNDERGROUND LINES AFFECTED BY THE EXCAVATION AND/OR DEMOLITION WORK. SEE CIVIL DRAWINGS.
30. IN THE EVENT THAT CERTAIN FEATURES OF THE CONSTRUCTION ARE NOT FULLY SHOWN ON THE DRAWINGS, THEN THEIR CONSTRUCTION SHALL BE THE SAME CHARACTER AS FOR SIMILAR CONDITIONS THAT ARE SHOWN OR NOTED.
31. PROVIDE OPENINGS AND OTHER COMPLEMENTARY WORK FOR STRUCTURAL, ELECTRICAL AND MECHANICAL WORK INDICATED IN CONTRACT DOCUMENTS SAW CUT OPENING TO THE REQUIRED DIMENSIONS.
32. THE CONTRACTOR SHALL SUPPLY AT HIS/HER OWN EXPENSE ALL LABOR, MATERIAL, EQUIPMENT ETC. TO ACCOMPLISH THE WORK DESCRIBED IN THE CONTRACT DOCUMENTS WORK.
33. THE CONTRACTOR SHALL VERIFY THE LOCATION OF ALL UNDERGROUND AND ABOVE GROUND UTILITIES PRIOR TO STARTING THE CONTRACTOR SHALL CAREFULLY CONTROL STORAGE AND STOCKPILING OF MATERIALS TO AVOID UNNECESSARY DAMAGE.
34. THE CONTRACTOR SHALL PROVIDE POLLUTION AND DUST CONTROL AS REQUIRED.  WATER IS TO BE USED MINIMALLY TO PROHIBIT ANY FLOODING OR UNSAFE CONDITIONS.  THE CONTRACTOR MUST PROVIDE A CLEAR PATH FOR PEDESTRIANS AT ALL TIMES.
35. THE CONTRACTOR SHALL MAINTAIN CLEAR EXTERIOR PEDESTRIAN PATH TO ADJACENT BUILDING DURING CONSTRUCTION.
36. ALL PLAN DETAILS AND WALL SECTIONS ARE ASSUMED TO BE TYPICAL CONDITIONS UNLESS DETAILED OR NOTED OTHERWISE.
37. CONTRACTOR TO PROVIDE ITEMIZED BREAKDOWN OF ALL COST, WHEN THE BID IS SUBMITTED.
38. USE ONLY GALVANIZED FASTENERS AND BOLTS (INCLUDING NAILS) FOR ALL EXTERIOR WORK.
39. ALL COLORS AND FINISHES SHALL BE SELECTED BY THE ARCHITECT.
40. THE GENERAL CONTRACTOR SHALL SUBMIT ALL REQUIRED GUARANTEES,WARRANTIES AND MAINTENANCE CONTRACTS EXECUTED BY EACH OF THE RESPECTIVE MANUFACTURERS, SUPPLIERS AND SUBCONTRACTORS TO THE ARCHITECT.
41. THE GENERAL CONTRACTOR SHALL PROVIDE FOR WEATHER PROTECTION DURING CONSTRUCTION.
42. EXPOSED CMU JOINTS TO BE STRUCK, CLEANED AND PAINTED.

## THERMAL/MOISTURE

1. FIRE STOPS SHALL BE PROVIDED AROUND TOP, BOTTOM, AND SIDES OF ALL FIRE RATED PARTITION WALLS.
2. FIRE SAFING SHALL BE PROVIDED ON ALL SLAB/FLOOR EDGES AND SLAB/FLOOR PENETRATIONS.
3. CLOSE ALL OPENINGS JOINTS OR GAPS ON FIRE RATED ASSEMBLES SUCH AS AT DUCT, PIPE AND CONDUIT PENETRATIONS WITH FIRE MATERIAL AND FIRE SEAL AS REQ'D.
4. PROVIDE ACOUSTICAL CAULKING TOP, BOTTOM AND BOTH SIDES OF ALL INTERIOR STUD/ GYPSUM BOARD WALLS (TYPICAL).

## DOORS AND WINDOWS

1. GLASS AT OR ADJACENT TO SHOWERS, TUBS OR DOORS SHALL BE TEMPERED AS PER IBC 2406.
2. ALL HOLLOW METAL DOOR FRAMES IN CONCRETE OR CMU WALLS ARE TO BE GROUT FILLED.
3. ALL HOLLOW METAL DOOR FRAMES SHALL BE 14 GAUGE, FULLY WELDED, GALVANIZED ASTM 123 SPECIFICATION AND G90 MINIMUM THICKNESS.
4. ALL HOLLOW METAL DOOR SHALL BE 18 GAUGE, GALVANIZED ASTM 123 SPECIFICATION AND G90 MINIMUM THICKNESS.
5. ALL WINDOW AND DOOR HARDWARE TO COMPLY WITH THE FORCED ENTRY CHAPTER OF THE INTERNATIONAL BUILDING CODE
6. ALL WINDOWS SHALL HAVE BLINDS PROVIDED AS WINDOW TREATMENT.
7. PROVIDE TEMPERED GLASS WHERE REQUIRED BY CODE, AND WHERE NOTED ON WINDOW TYPES
8. TYPICAL WINDOW HEAD VARIES, VERIFY IN ELEVATION AND SECTION
9. EACH BEDROOM SHALL HAVE AT LEAST ONE WINDOW TO MEET 2015 IBC CODE EGRESS REQUIREMENTS
10. NOT USED
11. ALL WINDOWS TO HAVE A .25 SOLAR HEAT GAIN COEFFICIENT.
12. COORDINATE ALL ROUGH OPENING SIZES WITH WINDOW MANUFACTURER.
13. U-VALUE TO BE 0.34 OR PER MODEL ENERGY CODE ANALYSIS. COORDINATE WITH MEP ENGINEER.
14. NOT USED
15. VISIBLE LIGHT TRANSMITTANCE TO BE 0.51
16. DIMENSIONS ON WINDOW TYPES ARE NOT ROUGH OPENING SIZES.
17. OPERABLE WINDOWS TO HAVE SCREENS.

---

### 5G STUDIO COLLABORATIVE

**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

## GMP QUANTITIES DIAGRAM

| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

## GENERAL NOTES

07/16/2018
MIA024
PROJECT NUMBER

# A002
SHEET NUMBER

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD5F-265524A634B0



EAST LASALLE AVENUE

SYCAMORE STREET

VENTILATION SHAFT

FIRE
COMMAND
CENTER

GARAGE
ENTRY

GARAGE
ENTRY

GARAGE
ENTRY

VENTILATION SHAFT

A B C D E F G H J

1 2 3 4 5 6 7 8 9 10

A201
2

A202
2

A301
1

A202
1

A301
2

A201
1

Site
1/16" = 1'-0"

ARCHITECT
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

INTERIOR DESIGNER
TBD

CIVIL ENGINEER
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

STRUCTURAL ENGINEER
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

MEP ENGINEER
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

OWNER/DEVELOPER
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

GMP QUANTITIES
DIAGRAM

| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

SITE PLAN

07/16/2018
MIA024
PROJECT NUMBER

A100
SHEET NUMBER



ARCHITECT
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

INTERIOR DESIGNER
TBD

CIVIL ENGINEER
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

STRUCTURAL ENGINEER
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

MEP ENGINEER
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

OWNER/DEVELOPER
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

VE31- B2 Phase
Option , Dated 8/6/18,
Provided by
Matthews, LLC.

VENT. SHAFT

FLOOR DRAIN TO
CONNECT TO
STORM WATER

ELEV 1

STAIR 1

Sim
7
A401

TANDEM SPACES

42" CONCRETE CRASH BARRIERS

UP TO B1

1
A301

42" CONCRETE CRASH BARRIER

Sim
1
A402

ELEV 2

VENT. SHAFT

FLOOR DRAIN TO
CONNECT TO
STORM WATER

STAIR 2

2
A301

# GMP QUANTITIES
# DIAGRAM



| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM
REVIEW ONLY. NOT FOR REGULATORY APPROVAL,
PERMIT OR CONSTRUCTION**

1  Level B2
   1/16" = 1'-0"

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

LEVEL B2 OVERALL

07/16/2018
MIA024
PROJECT NUMBER

# A101
SHEET NUMBER



**5G STUDIO COLLABORATIVE®**

ARCHITECT
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

INTERIOR DESIGNER
TBD

CIVIL ENGINEER
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

STRUCTURAL ENGINEER
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

MEP ENGINEER
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

OWNER/DEVELOPER
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)



GMP QUANTITIES
DIAGRAM

Note: Interior Barriers
Are Priced as Barrier
Cable

VE22- Eliminate 3'
Between Column
Lines D & E- 6,700
SF Reduction

TANDEM SPACES

42" CONCRETE CRASH BARRIER

UP TO L1          DN TO B2



| REV. | DATE | ISSUE TITLE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM
REVIEW ONLY. NOT FOR REGULATORY APPROVAL,
PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

LEVEL B1 OVERALL

07/16/2018
MIA024
PROJECT NUMBER

**A102**
SHEET NUMBER

1 — Level B1
1/16" = 1'-0"

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD5F-265524A634B0



**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

## GMP QUANTITIES DIAGRAM

VE06- Reduce Interior CMU Scope- Replace w/ Stud Framing

VE22- Eliminate 3' Between Column Lines D & E- 6,700 SF Reduction

42" CONCRETE CRASH BARRIER

Note- Interior Barriers Are Priced as Barrier Cable

FIRE COMMAND CENTER

VENT SHAFT

ELEV 1

STAIR 1

UP TO L2

DN TO B1

ELEV

ELEV 2

LOBBY

DOM PUMP AND GAS

STAIR 2

ELECTRICAL

TRASH

VENT SHAFT



| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

LEVEL 1 OVERALL

07/16/2018
MIA024
PROJECT NUMBER

A111
SHEET NUMBER

Level 1
1/16" = 1'-0"



**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

# GMP QUANTITIES DIAGRAM



| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

LEVEL 2-3 OVERALL

07/16/2018
MIA024
PROJECT NUMBER

A112
SHEET NUMBER

Note: Interior Barriers Are Priced as Barrier Cable

VE22- Eliminate 3' Between Column Lines D & E- 6,700 SF Reduction

42" CONCRETE CRASH BARRIER

UP TO L3        DN TO L1

ELEV 1
STAIR 1
UP
DN

ELEV 2
STAIR 2

Level 2
1/16" = 1'-0"



ARCHITECT
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

INTERIOR DESIGNER
TBD

CIVIL ENGINEER
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

STRUCTURAL ENGINEER
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

MEP ENGINEER
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

OWNER/DEVELOPER
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

## GMP QUANTITIES DIAGRAM

ELEV 1

STAIR 1

42" CONCRETE CRASH BARRIER

42" CONCRETE CRASH BARRIER

DN TO L3

VE22- Eliminate 3'
Between Column
Lines D & E- 6,700
SF Reduction

VE06- Reduce
Interior CMU Scope-
Replace w/ Stud
Framing



| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

LEVEL 4 OVERALL

1  Level 4
   1/16" = 1'-0"

07/16/2018
MIA024
PROJECT NUMBER

# A113
SHEET NUMBER



5G STUDIO COLLABORATIVE

ARCHITECT
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

INTERIOR DESIGNER
TBD

CIVIL ENGINEER
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

STRUCTURAL ENGINEER
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

MEP ENGINEER
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

OWNER/DEVELOPER
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

Note: 5th Floor Roof
Does Not Have
Railing/Pavers
Included in Pricing

VE15- Reduce PT
Slab Thickness 2", 8"
Slab Depth Floors
5-10

VE22- Eliminate 3'
Between Column
Lines D & E- 6,700
SF Reduction

VE19- Prefabricated
Balconies in lieu of
Cast-In-Place

ELEV 1

STAIR 1

ELEV 2
STAIR 2
TRASH CHUTE

1 Level 5
  1/16" = 1'-0"

**GMP QUANTITIES DIAGRAM**



| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

INCOMPLETE DOCUMENTS ARE FOR INTERIM
REVIEW ONLY. NOT FOR REGULATORY APPROVAL,
PERMIT OR CONSTRUCTION

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

LEVEL 5 OVERALL

07/16/2018
MIA024
PROJECT NUMBER


A114
SHEET NUMBER



ARCHITECT
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

INTERIOR DESIGNER
TBD

CIVIL ENGINEER
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

STRUCTURAL ENGINEER
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

MEP ENGINEER
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

OWNER/DEVELOPER
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

VE15- Reduce PT Slab Thickness 2", 8" Slab Depth Floors 5-10

VE22- Eliminate 3' Between Column Lines D & E- 6,700 SF Reduction- Typical Floors 6-10

VE19- Prefabricated Balconies in lieu of Cast-In-Place- Typical Floors 6-10

# GMP QUANTITIES DIAGRAM



| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

LEVEL 6-10 OVERALL

07/16/2018
MIA024
PROJECT NUMBER

A115
SHEET NUMBER

1   Level 6
    1/16" = 1'-0"



**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

# GMP QUANTITIES DIAGRAM



| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

MECHANICAL P.H. 1

07/16/2018
MIA024
PROJECT NUMBER

A116
SHEET NUMBER

STEEL COLUMN, 2HR FIRE RATED

ELEV 1
STAIR 1

SLOPE
TPO ROOF OVER SLOPED INSULATION
4"X6" DOWNSPOUT, TYP.

VE22- Eliminate 3' Between Column Lines D & E- 6,700 SF Reduction

4"X6" DOWNSPOUT, TYP.

TPO ROOF OVER SLOPED INSULATION

ELEV 2
STAIR 2
EXHAUST VENT FOR TRASH CHUTE

Level 11
1/16" = 1'-0"



**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

VE04- Eliminate Mechanical
Penthouse (shaft would remain)

STEEL COLUMN, 2HR
FIRE RATED

ELEV 1

STAIR 1

SLOPE / SLOPE / SLOPE / SLOPE

TPO ROOF OVER
SLOPED INSULATION

4"X6" DOWNSPOUT, TYP.

4"X6" DOWNSPOUT, TYP.

TPO ROOF OVER
SLOPED INSULATION

ELEV 2

STAIR 2

EXHAUST VENT
FOR TRASH CHUTE

VE03- Eliminate 13th
Floor Elevator
Overrun

**Mech P.H. 2**
1/16" = 1'-0"

# GMP QUANTITIES DIAGRAM



| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

INCOMPLETE DOCUMENTS ARE FOR INTERIM
REVIEW ONLY. NOT FOR REGULATORY APPROVAL,
PERMIT OR CONSTRUCTION

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

MECHANICAL P.H. 2

07/16/2018
MIA024
PROJECT NUMBER

# A117
SHEET NUMBER





**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

# GMP QUANTITIES DIAGRAM



| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

INCOMPLETE DOCUMENTS ARE FOR INTERIM
REVIEW ONLY. NOT FOR REGULATORY APPROVAL,
PERMIT OR CONSTRUCTION

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

ROOF PLAN

07/16/2018
MIA024
PROJECT NUMBER

**A118**
SHEET NUMBER

---

VE04- Eliminate
Mechanical Penthouse
(shaft would remain)

VE13- Eliminate
Pergula

TPO ROOF OVER
SLOPED INSULATION

TPO ROOF OVER
SLOPED INSULATION

TPO ROOF OVER
SLOPED INSULATION

HVAC VENT SHAFT

HVAC VENT
SHAFT

EXHAUST VENT
FOR TRASH CHUTE

4"X6" DOWNSPOUT, TYP.

4"X6" DOWNSPOUT, TYP.

SLOPE

Roof Plan
1/16" = 1'-0"



**5G STUDIO COLLABORATIVE**

**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

# GMP QUANTITIES DIAGRAM

**MATERIAL KEY**

BRICK COLOR 1   Precast Color 1

BRICK COLOR 2   Precast Color 2

1. LIMESTONE   Precast Finished to Look Like Limestone
2. ALUMINUM
3. METAL SIDING (ALTERNATE MATERIAL)
4. CONCRETE
5. STOREFRONT
6. OPEN PANEL STOREFRONT
7. METAL RAILING
8. FIBERGLASS WINDOW
9. SLIDING GLASS DOOR
10. DOWNSPOUT WITH COLLECTION SCUPPER

Note- The Interior Buildout Contractor Will Need to Install Furring Strips to Hang Interior Drywall

VE13- Eliminate Pergula

VE32- West Elevator Service to 10th Floor, South Elevator Service to 11th Floor

VE04- Eliminate Mechanical Penthouse (shaft would remain)

VE03- Eliminate 13th Floor Elevator Overrun

VE29- Insulated Precast Panel Facade in lieu of Framing, Sheathing, Masonry

VE33- Delete East Garage Facade, Leave Exposed Concrete Structure

GARAGE ENTRANCE

Mech Roof 1   121' - 8"
Level 10   109' - 8"
Level 9   97' - 8"
Level 8   85' - 8"
Level 7   73' - 8"
Level 6   61' - 8"
Level 5   49' - 8"
Level 4   38' - 8"
Level 3   27' - 8"
Level 2   16' - 8"
Level 1   0' - 0"

1  East
1/16" = 1'-0"

VE03- Eliminate 13th Floor Elevator Overrun

VE32- West Elevator Service to 10th Floor, South Elevator Service to 11th Floor

VE04- Eliminate Mechanical Penthouse (shaft would remain)

P1 - Roof   145' - 8"
Mech P.H. 2   133' - 8"
Mech P.H. 1   121' - 8"
Roof 1   121' - 8"
Level 10   109' - 8"
Level 9   97' - 8"
Level 8   85' - 8"
Level 7   73' - 8"
Level 6   61' - 8"
Level 5   49' - 8"
Level 4   38' - 8"
Level 3   27' - 8"
Level 2   16' - 8"
Level 1   0' - 0"

2  North
1/16" = 1'-0"

Mech Roof 1   121' - 8"
Level 10   109' - 8"
Level 9   97' - 8"
Level 8   85' - 8"
Level 7   73' - 8"
Level 6   61' - 8"
Level 5   49' - 8"

4  N. Courtyard West
1/16" = 1'-0"

Mech P.H. 1   121' - 8"
Level 10   109' - 8"
Level 9   97' - 8"
Level 8   85' - 8"
Level 7   73' - 8"
Level 6   61' - 8"
Level 5   49' - 8"

3  N. Courtyard East
1/16" = 1'-0"

| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |

INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

**BUILDING ELEVATIONS**

07/16/2018
MIA024
PROJECT NUMBER

**A201**
SHEET NUMBER

5G STUDIO COLLABORATIVE

**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305)-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317)-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317)-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317)-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

## GMP QUANTITIES DIAGRAM

**MATERIAL KEY**

BRICK COLOR 1   Precast Color 1

BRICK COLOR 2   Precast Color 2

1. LIMESTONE   Precast Finished to Look Like Limestone
2. ALUMINUM
3. METAL SIDING (ALTERNATE MATERIAL)
4. CONCRETE
5. STOREFRONT
6. OPEN PANEL STOREFRONT
7. METAL RAILING
8. FIBERGLASS WINDOW
9. SLIDING GLASS DOOR
10. DOWNSPOUT WITH COLLECTION SCUPPER

VE04- Eliminate Mechanical Penthouse (shaft would remain)

VE29- Insulated Precast Panel Facade in lieu of Framing, Sheathing, Masonry

VE13- Eliminate Pergula

VE03- Eliminate 13th Floor Elevator Overrun

VE32- West Elevator Service to 10th Floor, P1 - Rooftop Elevator Service to 11th Floor

Note: Pricing Based on Storefront, Not Curtainwall

Mech P.H. 2 — 133' - 8"
Mech P.H. 1 — 121' - 8"
Roof 1 — 121' - 8"
Level 10 — 109' - 8"
Level 9 — 97' - 8"
Level 8 — 85' - 8"
Level 7 — 73' - 8"
Level 6 — 61' - 8"
Level 5 — 49' - 8"
Level 4 — 38' - 8"
Level 3 — 27' - 8"
Level 2 — 16' - 8"
Level 1 — 0' - 0"

2  West
1/16" = 1'-0"

VE13- Eliminate Pergula

VE04- Eliminate Mechanical Penthouse (shaft would remain)kk

VE03- Eliminate 13th Floor Elevator Overrun

VE32- West Elevator Service to 10th Floor, South Elevator Service to 11th Floor

Mech P.H. 2 — 133' - 8"
Mech P.H. 1 — 121' - 8"
Roof 1 — 121' - 8"
Level 10 — 109' - 8"
Level 9 — 97' - 8"
Level 8 — 85' - 8"
Level 7 — 73' - 8"
Level 6 — 61' - 8"
Level 5 — 49' - 8"
Level 4 — 38' - 8"
Level 3 — 27' - 8"
Level 2 — 16' - 8"
Level 1 — 0' - 0"

1  South
1/16" = 1'-0"

Mech Roof 1 — 121' - 8"
Level 10 — 109' - 8"
Level 9 — 97' - 8"
Level 8 — 85' - 8"
Level 7 — 73' - 8"
Level 6 — 61' - 8"
Level 5 — 49' - 8"

4  S. Courtyard West
1/16" = 1'-0"

Mech Roof 1 — 121' - 8"
Level 10 — 109' - 8"
Level 9 — 97' - 8"
Level 8 — 85' - 8"
Level 7 — 73' - 8"
Level 6 — 61' - 8"
Level 5 — 49' - 8"

3  S. Courtyard East
1/16" = 1'-0"

Note: Pricing Based on Framing/Stucco, Not Limestone

| REV. | DATE | ISSUE TITLE |
| --- | --- | --- |
|  |  |  |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

**BUILDING ELEVATIONS**

07/16/2018
MIA024
PROJECT NUMBER

A202
SHEET NUMBER



⑤ SOUTH TERRACE VIEW



④ NORTH TERRACE VIEW



① NORTHEAST VIEW



② NORTHWEST VIEW



③ SOUTHWEST VIEW

## 5G STUDIO COLLABORATIVE

**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

## GMP QUANTITIES DIAGRAM

| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

## PERSPECTIVE VIEWS

07/16/2018
MIA024
PROJECT NUMBER

# A203
SHEET NUMBER



**5G STUDIO COLLABORATIVE**

ARCHITECT
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

INTERIOR DESIGNER
TBD

CIVIL ENGINEER
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

STRUCTURAL ENGINEER
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

MEP ENGINEER
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

OWNER/DEVELOPER
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

**VE04- Eliminate Mechanical Penthouse (shaft would remain)**

CONCRETE AND METAL DECKING OVER STEEL JOIST AND GIRDER

P1 - Roof
145' - 8"

Mech P.H. 2
133' - 8"

Mech Roof 1
121' - 8"

Level 10
109' - 8"

Level 9
97' - 8"

Level 8
85' - 8"

Level 7
73' - 8"

Level 6
61' - 8"

Level 5
49' - 8"

Building Section 3
1/16" = 1'-0"

**VE14- Reduce Building Height Residential Floors -10"**
Level1 -2'
B1/B2 -6"

Mech Roof 1
121' - 8"

Level 10
109' - 8"

Level 9
97' - 8"

Level 8
85' - 8"

Level 7
73' - 8"

Level 6
61' - 8"

Level 5
49' - 8"

Level 4
38' - 8"

Level 3
27' - 8"

Level 2
16' - 8"

Level 1
0' - 0"

Level B1
-9' - 0"

Level B2
-18' - 0"

Building Section 2
1/16" = 1'-0"

Building Section 1
1/16" = 1'-0"

**GMP QUANTITIES DIAGRAM**

| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

**BUILDING SECTIONS**

07/16/2018
MIA024
PROJECT NUMBER

**A301**
SHEET NUMBER

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD5F-265524A634B0



**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

# GMP QUANTITIES DIAGRAM

| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

## STAIR 1 PLANS/SECTIONS

07/16/2018
MIA024
PROJECT NUMBER

# A401
SHEET NUMBER

## Elevation markers (left section)
- P1 - Roof 145' - 8"
- Mech P.H. 2 133' - 8"
- Mech Roof 1 121' - 8"
- Level 10 109' - 8"
- Level 9 97' - 8"
- Level 8 85' - 8"
- Level 7 73' - 8"
- Level 6 61' - 8"
- Level B2 -18' - 0"

## Elevation markers (center section)
- Level 6 61' - 8"
- Level 5 49' - 8"
- Level 4 38' - 8"
- Level 3 27' - 8"
- Level 2 16' - 8"
- Level 1 0' - 0"
- Level B1 -9' - 0"
- Level B2 -18' - 0"

8 Stair 1 - level 6-p.h.2
3/16" = 1'-0"

9 Stair 1 - Level b2-6
3/16" = 1'-0"

4 Stair 1 - level 10
3/16" = 1'-0"

3 Stair 1 - Level 5-9
3/16" = 1'-0"

2 Stair 1 - Level 2-4
3/16" = 1'-0"

1 Stair 1 - Level 1
3/16" = 1'-0"

6 Stair 1 - LEvel P.H. 2
3/16" = 1'-0"

5 Stair 1 - level P.H. 1
3/16" = 1'-0"

7 Stair 1 - level b1-b2
3/16" = 1'-0"

HVAC SHAFT

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD5F-265524A634B0



**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

## GMP QUANTITIES DIAGRAM

| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

INCOMPLETE DOCUMENTS ARE FOR INTERIM
REVIEW ONLY. NOT FOR REGULATORY APPROVAL,
PERMIT OR CONSTRUCTION

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

STAIR 2/ELEV2
PLANS/SECTION

07/16/2018
MIA024
PROJECT NUMBER

**A402**
SHEET NUMBER

---

P1 - Roof
145' - 8"

Mech P.H. 2
133' - 8"

Mech Roof 1
121' - 8"

Level 10
109' - 8"

Level 9
97' - 8"

Level 8
85' - 8"

Level 7
73' - 8"

Level 6
61' - 8"

5  Stair 2/Elev 2 - level 6-P.H. 2
3/16" = 1'-0"

Level 6
61' - 8"

Level 5
49' - 8"

Level 4
38' - 8"

Level 3
27' - 8"

Level 2
16' - 8"

Level 1
0' - 0"

Level B1
-9' - 0"

Level B2
-18' - 0"

6  stair 2/elev 2 - level b2-6
3/16" = 1'-0"

3  Stair 2/Elev 2 - level 2-4
3/16" = 1'-0"

HVAC SHAFT
ELEV 2
TRASH CHUTE

2  Stair 2/Elev 2 - Level 1
3/16" = 1'-0"

HVAC SHAFT
ELEV 2
TRASH CHUTE ABOVE

4  Stair 2/elev 2 - level 5-10
3/16" = 1'-0"

HVAC SHAFT
ELEV 2
TRASH CHUTE

1  stair 2/elev 2 - level b1-b2
3/16" = 1'-0"

HVAC SHAFT
ELEV 2

DocuSign Envelope ID: 25EA4D48-B267-44B7-BD5F-265524A634B0



# 5G STUDIO COLLABORATIVE

**ARCHITECT**
5G Studio Miami, LLC.
117 NE 1st Avenue
Miami, FL 33132
(305-403-9166 Stephen Park)

**INTERIOR DESIGNER**
TBD

**CIVIL ENGINEER**
Civil & Environmental Consultants, Inc.
530 E. Ohio Street G
Indianapolis, IN 46204
(317-655-7777 Aaron Hurt)

**STRUCTURAL ENGINEER**
American Structurepoint Inc.
7260 Shadeland Station
Indianapolis, IN 46256
(317-547-5580 Jared Plank)

**MEP ENGINEER**
DEEM
6831 East 32nd Street, Suite. 200
Indianapolis, IN 46226
(317-860-2990 Roger Jarrett)

**OWNER/DEVELOPER**
Matthews, LLC
401 E. Colfax Avenue, Suite 206
South Bend, IN 46617
(574-607-8008 Velvet Canada)

## GMP QUANTITIES DIAGRAM

**20**  **15**  **10**  **05**

**19**  **14**  **09**  **04**

- BRICK
- VAPOR BARRIER
- C.I.P. CONCRETE

**03** EXTERIOR WALL TYPE - E2
1-1/2"=1'0"

**18**  **13**  **08**

**17** FLOOR-CEILING - FC2  —  3 HOUR RATED FLOOR-CEILING PER IBC TABLE 721.1(3)
1-1/2"=1'0"
- CAST IN PLACE CONCRETE SLAB
- UNIT/CORRIDOR
- 8" MIN
- GARAGE
- R-10, 2" MIN SPRAY FOAM INSULATION, CLOSED CELL

**12** SHAFT WALL - SW1  —  2 HOUR RATED SHAFT WALL PER UL #U336
1-1/2"=1'0"
- METAL STUD
- 2 LAYERS OF 1" GYPSUM BOARD LINER PANEL
- METAL STUD
- 5/8" GYPSUM BOARD
- 0' - 7 5/8"

**07** FIRE BARRIER - FB1  —  2 HOUR RATED WALL PER UL #906
1-1/2"=1'0"
- CMU
- 0' - 7 5/8"

**02** EXTERIOR WALL TYPE - E2
1-1/2"=1'0"
- BRICK
- VAPOR BARRIER
- CMU

**16** FLOOR-CEILING - FC1  —  2 HOUR RATED FLOOR-CEILING PER UL #L521
1-1/2"=1'0"
- CAST IN PLACE CONCRETE SLAB
- GARAGE
- 8" MIN
- GARAGE

**11** FIRE PARTITION - FP1  —  1 HOUR RATED WALL PER UL #U356
1-1/2"=1'0"
- 5/8" GYPSUM BOARD
- MINERAL WOOL BATT INSULATION
- METAL STUD

**06** STAIR/ELEV ENCLOSURE - S1  —  2 HOUR RATED WALL PER UL #906
1-1/2"=1'0"
- CMU
- 0' - 7 5/8"

**01** EXTERIOR WALL TYPE - E1
1-1/2"=1'0"
- 7/8" STUCCO OVER METAL LATHE
- MOISTURE BARRIER
- 1/2" PLYWOOD
- 2X6 FRT WOOD STUD
- R-19 BATT INSULATION
- 5/8" GYPSUM BOARD, 2 LAYERS

| REV. | DATE | ISSUE TITLE |
|------|------|-------------|
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |
|      |      |             |

**INCOMPLETE DOCUMENTS ARE FOR INTERIM REVIEW ONLY. NOT FOR REGULATORY APPROVAL, PERMIT OR CONSTRUCTION**

COMMERCE CENTER DEVELOPMENT
SOUTH BEND, IN

## WALL ASSEMBLIES

07/16/2018
MIA024
PROJECT NUMBER

# A700
SHEET NUMBER

# B2 - PHASE 1 option 3



# B2 - PHASE 1 option 4





MATTHEWS, LLC
SOUTH BEND, IN

CCD - E FLATS
400 E. LaSalle Ave. South Bend, IN 46617

Project Number:
Date:                8/6/2018
Drawn by:            Cassidy
Check by:            Todd



| Activity ID | Activity Name | Duration | Start | Finish |
|---|---|---|---|---|
| **Commerce Center - Schedule - w/o B2 Level and** | | 602 | 28-Sep-18 A | 08-Feb-21 |
| **Milestone Dates** | | 602 | 28-Sep-18 A | 08-Feb-21 |
| A1790 | GMP Proposal Approved | 0 | 28-Sep-18 A | |
| A1800 | Contract Issued for Review | 4 | 22-Oct-18 A | 26-Oct-18 A |
| A1810 | Contract Executed | 0 | | 29-Oct-18 A |
| A3270 | Groundbreak Ceremony | 0 | 17-Dec-18 A | |
| A1830 | Limited Notice to Proceed | 0 | 18-Dec-18 A | |
| A1890 | Notice to Proceed | 0 | 03-Jan-19 A | |
| A1820 | Proof of Financing - Bank Closing | 0 | 10-Oct-19* | |
| A1980 | Confirmation of Financing - Bank Letter to Wilhelm | 0 | | 11-Oct-19* |
| A1930 | Building Dried In | 0 | | 10-Dec-20 |
| A1880 | Substantial Completion | 0 | | 05-Jan-21 |
| A1920 | Project Completion | 0 | | 08-Feb-21 |
| **Delays** | | 107 | 20-May-19 A | 18-Oct-19 |
| A1940 | Financing Delay | 101 | 20-May-19 A | 10-Oct-19 |
| A1990 | Remobilization | 5 | 14-Oct-19* | 18-Oct-19 |
| **Contract** | | 242 | 17-Oct-18 A | 26-Sep-19 |
| **Bid Packages** | | 242 | 17-Oct-18 A | 26-Sep-19 |
| A1840 | Bid Package - Demo, Utilities, Mass Excavation | 13 | 17-Oct-18 A | 02-Nov-18 A |
| A1850 | Bid Package - Piles, Foundations, & MEP | 9 | 11-Dec-18 A | 21-Dec-18 A |
| A3290 | Generate Precast Bid Package 01 for the City of SB | 99 | 21-Dec-18 A | 10-May-19 A |
| A1860 | Bid Package - Interiors | 136 | 15-Mar-19 A | 26-Sep-19 |
| A1870 | Bid Package - Precast Panels REV 01 | 11 | 10-May-19 A | 28-May-19 A |
| A1970 | Generate Precast Bid Package 02 for the City of SB | 5 | 18-Jul-19 A | 25-Jul-19 A |
| A1960 | Bid Package - Precast Panels REV 02 | 12 | 26-Jul-19 A | 13-Aug-19 A |
| A1950 | City Awards Precast Bid | 0 | 27-Aug-19 A | 27-Aug-19 A |
| **Design** | | 56 | 12-Feb-19 A | 01-May-19 A |
| **General Submittals** | | 56 | 12-Feb-19 A | 01-May-19 A |
| **Concrete** | | 13 | 12-Feb-19 A | 01-Mar-19 A |
| A5010 | Footers and Foundation Pour Mix Design & Approval | 5 | 12-Feb-19 A | 19-Feb-19 A |
| A5000 | ROW and Curb Pour Mix Design & Approval | 5 | 12-Feb-19 A | 19-Feb-19 A |
| A4990 | Sidewalks Pour Mix Design & Approval | 5 | 12-Feb-19 A | 19-Feb-19 A |
| A4710 | Perimeter Walls Pour Mix Design & Approval | 5 | 12-Feb-19 A | 19-Feb-19 A |
| A4700 | Columns Pour Mix Design & Approval | 5 | 12-Feb-19 A | 19-Feb-19 A |
| A4690 | Shear Wall Pour Mix Design & Approval | 5 | 12-Feb-19 A | 19-Feb-19 A |
| A4680 | SOG Pour Mix Design & Approval | 5 | 12-Feb-19 A | 19-Feb-19 A |
| A4880 | Five Foot Pour Strip Mix Design & Approval | 13 | 12-Feb-19 A | 01-Mar-19* |
| A4720 | Piles Pour Mix Design & Approval | 6 | 14-Feb-19 A | 22-Feb-19 A |
| **ReSteel** | | 54 | 14-Feb-19 A | 01-May-19 A |
| A4730 | Piles and Caps Shops & Approval | 11 | 14-Feb-19 A | 01-Mar-19 A |
| A4740 | Footers and Foundations Shops & Approval | 4 | 28-Feb-19 A | 06-Mar-19 A |
| A4760 | B1 Shops & Approval | 44 | 28-Feb-19 A | 01-May-19 A |
| **Procurement** | | 120 | 11-Oct-19 | 01-Apr-20 |
| A5360 | Precast Panel Submittal & Fabrication | 90 | 11-Oct-19 | 19-Feb-20 |
| A5240 | Elevator Fabrication & Lead Time | 115 | 18-Oct-19 | 01-Apr-20 |
| A5400 | Stair Towers (1 & 2) Fabrication & Lead Time | 60 | 25-Oct-19 | 22-Jan-20 |
| A5410 | Doors and Hardware Fabrication & Lead Time | 90 | 01-Nov-19 | 11-Mar-20 |
| A7370 | Level 1 Storefront/Curtain Wall Fabrication & Lead Time | 60 | 08-Nov-19 | 05-Feb-20 |
| A5430 | Roofing Material Fabrication & Lead Time | 50 | 15-Nov-19 | 29-Jan-20 |

| Legend | |
|---|---|
| Remaining Level of Effort | Remaining Work |
| Actual Level of Effort | Critical Remaining Work |
| Actual Work | ◆ ◆ Milestone |

Data Date = 26-Sep-19
Schedule Printed on 26-Sep-19, at 09:08
Page 1 of 8

**Commerce Center - Schedule - w/o B2 Level and w/ Owner Delay -
10/10/19**

WILHELM
CONSTRUCTION



| Activity ID | Activity Name | Duration | Start | Finish |
|---|---|---|---|---|
| A5600 | Windows Fabrication & Lead Time | 50 | 22-Nov-19 | 05-Feb-20 |
| **Site Prep & Earthwork** | | **57** | **07-Jan-19 A** | **27-Mar-19 A** |
| A1900 | Install SWPP | 2 | 07-Jan-19 A | 09-Jan-19 A |
| A1910 | Install Maintenance of Traffic (Phase 1 - Perimeter & Sycamore) | 5 | 07-Jan-19 A | 11-Jan-19 A |
| A1000 | Demo Site | 3 | 08-Jan-19 A | 11-Jan-19 A |
| A1040 | Demo Asphalt & Sidewalks | 4 | 08-Jan-19 A | 11-Jan-19 A |
| A1060 | Refresh locates | 1 | 10-Jan-19 A | 11-Jan-19 A |
| A1030 | Submit ERS design & approval | 2 | 01-Feb-19 A | 04-Feb-19 A |
| A1010 | Install Earth Retention Piles at B1 Elevation | 10 | 04-Feb-19 A | 15-Feb-19 A |
| A1020 | Mass Excavation & Lagging to B1 Elevation | 9 | 18-Feb-19 A | 01-Mar-19 A |
| A3280 | Install Maintenance of Traffic (Phase 2 - Lasalle) | 3 | 01-Mar-19 A | 05-Mar-19 A |
| A1090 | Install Test Piles at B1 | 8 | 04-Mar-19 A | 14-Mar-19 A |
| A1070 | Complete NW Corner Earth Retention (Under Ramp at B1) | 13 | 08-Mar-19 A | 27-Mar-19 A |
| **Structure** | | **386** | **12-Mar-19 A** | **15-Sep-20** |
| **Basement Mat Footings** | | **178** | **13-Mar-19 A** | **20-Nov-19** |
| A5230 | Install Augercast Piles at B1 Elevation | 35 | 13-Mar-19 A | 30-Apr-19 A |
| A5040 | F/R/P Shear Wall #2 Mat Footing | 7 | 08-May-19 A | 16-May-19 A |
| A5470 | Place Sumps at Mat Footing #2 | 2 | 09-May-19 A | 13-May-19 A |
| A5480 | F/R/P Shear Wall #1 Mat Footing | 5 | 14-Nov-19 | 20-Nov-19 |
| **B1 Foundations and SOG** | | **178** | **22-Apr-19 A** | **03-Jan-20** |
| A5250 | F/R/P Pile Cap Foundations and Wall Footings at B1 | 32 | 22-Apr-19 A | 06-Nov-19 |
| A5070 | F/R/P - Wall Pour #1 | 4 | 26-Apr-19 A | 01-May-19 A |
| A5080 | F/R/P - Wall Pour #2 | 4 | 30-Apr-19 A | 06-May-19 A |
| A5090 | F/R/P - Wall Pour #3 | 4 | 03-May-19 A | 09-May-19 A |
| A5190 | F/R/P - Shear Wall #2 | 4 | 21-Oct-19 | 24-Oct-19 |
| A5100 | F/R/P - Wall Pour #4 | 4 | 25-Oct-19 | 30-Oct-19 |
| A5110 | F/R/P - Wall Pour #5 | 4 | 29-Oct-19 | 01-Nov-19 |
| A5450 | F/R/P - Wall Pour #6 | 4 | 01-Nov-19 | 06-Nov-19 |
| A5460 | F/R/P - Wall Pour #7 | 4 | 06-Nov-19 | 11-Nov-19 |
| A5180 | Install South Side Drainage Board | 1 | 07-Nov-19 | 07-Nov-19 |
| A5270 | F/R/P - Wall Pour #8 | 4 | 08-Nov-19 | 13-Nov-19 |
| A5280 | F/R/P - Wall Pour #9 | 4 | 12-Nov-19 | 15-Nov-19 |
| A5320 | Columns Pour B1-1 | 3 | 14-Nov-19 | 18-Nov-19 |
| A5290 | F/R/P - Wall Pour #10 | 4 | 14-Nov-19 | 19-Nov-19 |
| A5210 | Install Perimeter Drain | 2 | 18-Nov-19 | 19-Nov-19 |
| A5300 | F/R/P - Wall Pour #11 | 4 | 18-Nov-19 | 21-Nov-19 |
| A5340 | Columns Pour B1-2 | 3 | 19-Nov-19 | 21-Nov-19 |
| A5200 | B1 Underslab Backfill | 8 | 19-Nov-19 | 02-Dec-19 |
| A5310 | F/R/P - Wall Pour #12 | 4 | 20-Nov-19 | 25-Nov-19 |
| A5260 | F/R/P Shear Wall #1 | 4 | 21-Nov-19 | 26-Nov-19 |
| A5370 | Install Underground MEP | 15 | 22-Nov-19 | 16-Dec-19 |
| A5380 | Prep & Pour SOG #1 | 3 | 05-Dec-19 | 09-Dec-19 |
| A5390 | Prep & Pour SOG #2 | 4 | 10-Dec-19 | 13-Dec-19 |
| A5170 | Prep & Pour SOG #3 (Ramp) | 6 | 10-Dec-19 | 17-Dec-19 |
| A5440 | Prep & Pour SOG #4 | 4 | 16-Dec-19 | 19-Dec-19 |
| A5160 | Prep & Pour SOG #5 | 5 | 20-Dec-19 | 27-Dec-19 |
| A5420 | Backfill Walls | 9 | 20-Dec-19 | 03-Jan-20 |
| **Tower Crane** | | **360** | **17-Apr-19 A** | **15-Sep-20** |
| A5490 | F/R/P - Tower Crane Pad | 3 | 17-Apr-19 A | 22-Apr-19 A |
| A5530 | Build Tower Crane | 4 | 17-Oct-19 | 22-Oct-19 |

Legend:
- Remaining Level of Effort
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone

Data Date = 26-Sep-19
Schedule Printed on 26-Sep-19, at 09:08
Page 2 of 8

**Commerce Center - Schedule - w/o B2 Level and w/ Owner Delay - 10/10/19**

WILHELM CONSTRUCTION

| Activity ID | Activity Name | Duration | Start | Finish |
|---|---|---|---|---|
| A5540 | Disassemble Tower Crane | 2 | 14-Sep-20 | 15-Sep-20 |
| **Elevated Decks** | | 374 | 12-Mar-19 A | 27-Aug-20 |
| **Level 1 Deck** | | 218 | 12-Mar-19 A | 20-Jan-20 |
| A5730 | Install Auger Cast Piles at First Floor | 4 | 12-Mar-19 A | 18-Mar-19 A |
| A5680 | F/R/P - 1-1 Pour | 12 | 12-Dec-19 | 30-Dec-19 |
| A5710 | F/R/P - 1-2 Pour | 13 | 19-Dec-19 | 08-Jan-20 |
| A6230 | Remove ERS on South Side | 5 | 24-Dec-19 | 31-Dec-19 |
| A5720 | F/R/P - 1-3 Pour | 13 | 27-Dec-19 | 15-Jan-20 |
| A6260 | F/R/P - Shear Wall #2 at lvl 1 | 4 | 30-Dec-19 | 03-Jan-20 |
| A5660 | Columns 1at lvl 1 | 5 | 30-Dec-19 | 06-Jan-20 |
| A5650 | Caps and Strips at lvl 1 | 2 | 06-Jan-20 | 07-Jan-20 |
| A5690 | Underslab Backfill at Level 1 | 1 | 07-Jan-20 | 07-Jan-20 |
| A6270 | Short Walls at lvl 1 | 2 | 07-Jan-20 | 08-Jan-20 |
| A6330 | Underslab MEP at Level 1 | 3 | 07-Jan-20 | 09-Jan-20 |
| A6240 | Columns 2 at lvl 1 | 4 | 08-Jan-20 | 13-Jan-20 |
| A6250 | Columns 3 at lvl 1 | 4 | 15-Jan-20 | 20-Jan-20 |
| A5670 | F/R/P - Shear Wall #1 at lvl 1 | 4 | 15-Jan-20 | 20-Jan-20 |
| **Level 2 Deck** | | 25 | 06-Jan-20 | 07-Feb-20 |
| A5760 | F/R/P - 2-1 Pour | 12 | 06-Jan-20 | 21-Jan-20 |
| A5770 | F/R/P - 2-2 Pour | 12 | 14-Jan-20 | 29-Jan-20 |
| A5750 | F/R/P - Shear Wall #2 at lvl 2 | 4 | 21-Jan-20 | 24-Jan-20 |
| A6280 | Columns 1 at lvl 2 | 5 | 21-Jan-20 | 27-Jan-20 |
| A5780 | F/R/P - 2-3 Pour | 11 | 21-Jan-20 | 04-Feb-20 |
| A6290 | Columns 2 at lvl 2 | 3 | 29-Jan-20 | 31-Jan-20 |
| A6300 | Columns 3 at lvl 2 | 4 | 04-Feb-20 | 07-Feb-20 |
| A5740 | F/R/P - Shear Wall #1 at lvl 2 | 4 | 04-Feb-20 | 07-Feb-20 |
| **Level 3 Deck** | | 25 | 27-Jan-20 | 28-Feb-20 |
| A5810 | F/R/P - 3-1 Pour | 11 | 27-Jan-20 | 10-Feb-20 |
| A5820 | F/R/P - 3-2 Pour | 12 | 03-Feb-20 | 18-Feb-20 |
| A5800 | F/R/P - Shear Wall #2 at lvl 3 | 4 | 10-Feb-20 | 13-Feb-20 |
| A6310 | Columns 1 at lvl 3 | 5 | 10-Feb-20 | 14-Feb-20 |
| A5830 | F/R/P - 3-3 Pour | 12 | 10-Feb-20 | 25-Feb-20 |
| A6320 | Columns 2 at lvl 3 | 4 | 18-Feb-20 | 21-Feb-20 |
| A7510 | Columns 3 at lvl 3 | 4 | 25-Feb-20 | 28-Feb-20 |
| A5790 | F/R/P - Shear Wall #1 at lvl 3 | 4 | 25-Feb-20 | 28-Feb-20 |
| **Level 4 Deck** | | 26 | 14-Feb-20 | 20-Mar-20 |
| A5860 | F/R/P - 4-1 Pour | 12 | 14-Feb-20 | 02-Mar-20 |
| A5870 | F/R/P - 4-2 Pour | 12 | 24-Feb-20 | 10-Mar-20 |
| A5850 | F/R/P - Shear Wall #2 at lvl 4 | 4 | 02-Mar-20 | 05-Mar-20 |
| A7520 | Columns 1 at lvl 4 | 5 | 02-Mar-20 | 06-Mar-20 |
| A5880 | F/R/P - 4-3 Pour | 12 | 02-Mar-20 | 17-Mar-20 |
| A7530 | Columns 2 at lvl 4 | 4 | 10-Mar-20 | 13-Mar-20 |
| A7540 | Columns 3 at lvl 4 | 4 | 17-Mar-20 | 20-Mar-20 |
| A5840 | F/R/P - Shear Wall #1 at lvl 4 | 4 | 17-Mar-20 | 20-Mar-20 |
| **Level 5 Deck** | | 26 | 06-Mar-20 | 10-Apr-20 |
| A5910 | F/R/P - 5-1 Pour | 12 | 06-Mar-20 | 23-Mar-20 |
| A5920 | F/R/P - 5-2 Pour | 12 | 16-Mar-20 | 31-Mar-20 |
| A5900 | F/R/P - Shear Wall #2 at lvl 5 | 4 | 23-Mar-20 | 26-Mar-20 |
| A7550 | Columns 1 at lvl 5 | 5 | 23-Mar-20 | 27-Mar-20 |
| A5930 | F/R/P - 5-3 Pour | 12 | 23-Mar-20 | 07-Apr-20 |

| Remaining Level of Effort | Remaining Work |
|---|---|
| Actual Level of Effort | Critical Remaining Work |
| Actual Work | ◆ Milestone |

Data Date = 26-Sep-19
Schedule Printed on 26-Sep-19, at 09:08
Page 3 of 8

**Commerce Center - Schedule - w/o B2 Level and w/ Owner Delay - 10/10/19**



WILHELM CONSTRUCTION

| Activity ID | Activity Name | Duration | Start | Finish |
|---|---|---|---|---|
| A7560 | Columns 2 at lvl 5 | 4 | 31-Mar-20 | 03-Apr-20 |
| A7570 | Columns 3 at lvl 5 | 4 | 07-Apr-20 | 10-Apr-20 |
| A5890 | F/R/P - Shear Wall #1 at lvl 5 | 4 | 07-Apr-20 | 10-Apr-20 |
| **Level 6 Deck** | | **26** | **27-Mar-20** | **01-May-20** |
| A5960 | F/R/P - 6-1 Pour | 12 | 27-Mar-20 | 13-Apr-20 |
| A5970 | F/R/P - 6-2 Pour | 12 | 06-Apr-20 | 21-Apr-20 |
| A5950 | F/R/P - Shear Wall #2 at lvl 6 | 4 | 13-Apr-20 | 16-Apr-20 |
| A7580 | Columns 1 at lvl 6 | 5 | 13-Apr-20 | 17-Apr-20 |
| A5980 | F/R/P - 6-3 Pour | 12 | 13-Apr-20 | 28-Apr-20 |
| A7590 | Columns 2 at lvl 6 | 4 | 21-Apr-20 | 24-Apr-20 |
| A7600 | Columns 3 at lvl 6 | 4 | 28-Apr-20 | 01-May-20 |
| A5940 | F/R/P - Shear Wall #1 at lvl 6 | 4 | 28-Apr-20 | 01-May-20 |
| **Level 7 Deck** | | **26** | **17-Apr-20** | **22-May-20** |
| A6010 | F/R/P - 7-1 Pour | 12 | 17-Apr-20 | 04-May-20 |
| A6020 | F/R/P - 7-2 Pour | 12 | 27-Apr-20 | 12-May-20 |
| A6000 | F/R/P - Shear Wall #2 at lvl 7 | 4 | 04-May-20 | 07-May-20 |
| A7610 | Columns 1 at lvl 7 | 5 | 04-May-20 | 08-May-20 |
| A6030 | F/R/P - 7-3 Pour | 12 | 04-May-20 | 19-May-20 |
| A7620 | Columns 2 at lvl 7 | 4 | 12-May-20 | 15-May-20 |
| A7630 | Columns 3 at lvl 7 | 4 | 19-May-20 | 22-May-20 |
| A5990 | F/R/P - Shear Wall #1 at lvl 7 | 4 | 19-May-20 | 22-May-20 |
| **Level 8 Deck** | | **26** | **08-May-20** | **15-Jun-20** |
| A6060 | F/R/P - 8-1 Pour | 12 | 08-May-20 | 26-May-20 |
| A6070 | F/R/P - 8-2 Pour | 12 | 18-May-20 | 03-Jun-20 |
| A6050 | F/R/P - Shear Wall #2 at lvl 8 | 4 | 26-May-20 | 29-May-20 |
| A7640 | Columns 1 at lvl 8 | 5 | 26-May-20 | 01-Jun-20 |
| A6080 | F/R/P - 8-3 Pour | 12 | 26-May-20 | 10-Jun-20 |
| A7650 | Columns 2 at lvl 8 | 3 | 03-Jun-20 | 05-Jun-20 |
| A7660 | Columns 3 at lvl 8 | 4 | 10-Jun-20 | 15-Jun-20 |
| A6040 | F/R/P - Shear Wall #1 at lvl 8 | 4 | 10-Jun-20 | 15-Jun-20 |
| **Level 9 Deck** | | **26** | **08-Jun-20** | **14-Jul-20** |
| A6110 | F/R/P - 9-1 Pour | 12 | 08-Jun-20 | 23-Jun-20 |
| A6120 | F/R/P - 9-2 Pour | 11 | 15-Jun-20 | 29-Jun-20 |
| A6100 | F/R/P - Shear Wall #2 at lvl 9 | 4 | 23-Jun-20 | 26-Jun-20 |
| A7670 | Columns 1 at lvl 9 | 5 | 23-Jun-20 | 29-Jun-20 |
| A6130 | F/R/P - 9-3 Pour | 12 | 23-Jun-20 | 09-Jul-20 |
| A7680 | Columns 2 at lvl 9 | 4 | 30-Jun-20 | 06-Jul-20 |
| A7690 | Columns 3 at lvl 9 | 4 | 09-Jul-20 | 14-Jul-20 |
| A6090 | F/R/P - Shear Wall #1 at lvl 9 | 4 | 09-Jul-20 | 14-Jul-20 |
| **Level 10 Deck** | | **26** | **29-Jun-20** | **04-Aug-20** |
| A6160 | F/R/P - 10-1 Pour | 12 | 29-Jun-20 | 15-Jul-20 |
| A6170 | F/R/P - 10-2 Pour | 12 | 07-Jul-20 | 22-Jul-20 |
| A6150 | F/R/P - Shear Wall #2 at lvl 10 | 4 | 15-Jul-20 | 20-Jul-20 |
| A7700 | Columns 1 at lvl 10 | 5 | 15-Jul-20 | 21-Jul-20 |
| A6180 | F/R/P - 10-3 Pour | 12 | 15-Jul-20 | 30-Jul-20 |
| A7710 | Columns 2 at lvl 10 | 4 | 22-Jul-20 | 27-Jul-20 |
| A7720 | Columns 3 at lvl 10 | 4 | 30-Jul-20 | 04-Aug-20 |
| A6140 | F/R/P - Shear Wall #1 at lvl 10 | 4 | 30-Jul-20 | 04-Aug-20 |
| **Roof Deck** | | **28** | **21-Jul-20** | **27-Aug-20** |
| A6190 | F/R/P - 11-1 Pour | 12 | 21-Jul-20 | 05-Aug-20 |

Remaining Level of Effort   Remaining Work
Actual Level of Effort   Critical Remaining Work
Actual Work   ◆ Milestone

Data Date = 26-Sep-19
Schedule Printed on 26-Sep-19, at 09:08
Page 4 of 8

**Commerce Center - Schedule - w/o B2 Level and w/ Owner Delay - 10/10/19**

WILHELM CONSTRUCTION

| Activity ID | Activity Name | Duration | Start | Finish |
|---|---|---|---|---|
| A6200 | F/R/P - 11-2 Pour | 12 | 28-Jul-20 | 12-Aug-20 |
| A6220 | F/R/P - Shear Wall #2 at roof | 3 | 05-Aug-20 | 07-Aug-20 |
| A6210 | F/R/P - 11-3 Pour | 12 | 05-Aug-20 | 20-Aug-20 |
| A7500 | F/R/P - Shaft Concrete Roof #2 at roof | 3 | 10-Aug-20 | 12-Aug-20 |
| A7480 | F/R/P - Shear Wall #1 | 3 | 20-Aug-20 | 24-Aug-20 |
| A7490 | F/R/P - Shaft Concrete Roof #1 | 3 | 25-Aug-20 | 27-Aug-20 |
| **Building Enclosure** | | **130** | **08-Jun-20** | **10-Dec-20** |
| Roofing | | 86 | 10-Aug-20 | 10-Dec-20 |
| A7770 | Set Roof Curbs | 15 | 10-Aug-20 | 28-Aug-20 |
| A7470 | Elevator Shaft Roof #2 | 4 | 13-Aug-20 | 18-Aug-20 |
| A6650 | High Roof | 43 | 21-Aug-20 | 21-Oct-20 |
| A7460 | Elevator Shaft Roof #1 | 5 | 28-Aug-20 | 03-Sep-20 |
| A6640 | Level 5 Roof - North | 10 | 08-Oct-20 | 21-Oct-20 |
| A6630 | Level 5 Roof - South | 10 | 09-Nov-20 | 20-Nov-20 |
| A7730 | High Roof Detailing/Coping | 22 | 09-Nov-20 | 10-Dec-20 |
| Facade Finishes | | 126 | 08-Jun-20 | 04-Dec-20 |
| A7760 | Masonry Exterior Base Veneer at Level 1 | 15 | 24-Jul-20 | 13-Aug-20 |
| A7780 | Elevator Vestibule (Frame/Hang/Finishes) | 10 | 13-Aug-20 | 26-Aug-20 |
| A7820 | Curtain Walls/Storefront - East Alley | 10 | 23-Sep-20 | 06-Oct-20 |
| A7800 | Curtain Walls/Storefront - Lasalle | 10 | 08-Oct-20 | 21-Oct-20 |
| A7810 | Curtain Walls/Storefront - Sycamore | 10 | 23-Oct-20 | 05-Nov-20 |
| A7750 | Miscellaneous Detailing for Precast | 15 | 09-Nov-20 | 01-Dec-20 |
| **Elevation #1** | | **82** | **08-Jun-20** | **01-Oct-20** |
| A6340 | Precast Panels - Lift 1 - Elevation #1 | 11 | 08-Jun-20 | 22-Jun-20 |
| A6360 | Precast Panels - Lift 2 - Elevation #1 | 11 | 21-Aug-20 | 04-Sep-20 |
| A6380 | Windows & Doors - Elevation #1 | 10 | 08-Sep-20 | 21-Sep-20 |
| A6370 | Balconies - Elevation #1 | 10 | 18-Sep-20 | 01-Oct-20 |
| **Elevation #2** | | **82** | **23-Jun-20** | **16-Oct-20** |
| A6580 | Precast Panels - Lift 1 - Elevation #2 | 11 | 23-Jun-20 | 08-Jul-20 |
| A6600 | Precast Panels - Lift 2 - Elevation #2 | 11 | 08-Sep-20 | 22-Sep-20 |
| A6620 | Windows & Doors - Elevation #2 | 10 | 23-Sep-20 | 06-Oct-20 |
| A6610 | Balconies - Elevation #2 | 10 | 05-Oct-20 | 16-Oct-20 |
| **Elevation #3** | | **82** | **09-Jul-20** | **02-Nov-20** |
| A6520 | Precast Panels - Lift 1 - Elevation #3 | 11 | 09-Jul-20 | 23-Jul-20 |
| A6540 | Precast Panels - Lift 2 - Elevation #3 | 11 | 23-Sep-20 | 07-Oct-20 |
| A6560 | Windows & Doors - Elevation #3 | 10 | 08-Oct-20 | 21-Oct-20 |
| A6550 | Balconies - Elevation #3 | 10 | 20-Oct-20 | 02-Nov-20 |
| **Elevation #4** | | **82** | **24-Jul-20** | **17-Nov-20** |
| A6460 | Precast Panels - Lift 1 - Elevation #4 | 10 | 24-Jul-20 | 06-Aug-20 |
| A6480 | Precast Panels - Lift 2 - Elevation #4 | 11 | 08-Oct-20 | 22-Oct-20 |
| A6500 | Windows & Doors - Elevation #4 | 10 | 23-Oct-20 | 05-Nov-20 |
| A6490 | Balconies - Elevation #4 | 10 | 04-Nov-20 | 17-Nov-20 |
| **Elevation #5** | | **83** | **07-Aug-20** | **04-Dec-20** |
| A6400 | Precast Panels - Lift 1 - Elevation #5 | 10 | 07-Aug-20 | 20-Aug-20 |
| A6420 | Precast Panels - Lift 2 - Elevation #5 | 11 | 23-Oct-20 | 06-Nov-20 |
| A6440 | Windows & Doors - Elevation #5 | 10 | 09-Nov-20 | 20-Nov-20 |
| A6430 | Balconies - Elevation #5 | 10 | 19-Nov-20 | 04-Dec-20 |
| **Vertical Circulation** | | **143** | **04-Jun-20** | **28-Dec-20** |
| A6660 | Erect Stair #1 | 25 | 04-Jun-20 | 09-Jul-20 |
| A6670 | Erect Stair #2 | 25 | 10-Jul-20 | 13-Aug-20 |

Remaining Level of Effort
Actual Level of Effort
Actual Work
Remaining Work
Critical Remaining Work
Milestone

Data Date = 26-Sep-19
Schedule Printed on 26-Sep-19, at 09:08
Page 5 of 8

**Commerce Center - Schedule - w/o B2 Level and w/ Owner Delay - 10/10/19**

WILHELM CONSTRUCTION

| Activity ID | Activity Name | Duration | Start | Finish |
|---|---|---|---|---|
| A6700 | Install Elevator #2 | 90 | 19-Aug-20 | 28-Dec-20 |
| A6690 | Install Elevator #1 | 78 | 04-Sep-20 | 28-Dec-20 |
| **MEP Rough-ins** | | **195** | **03-Feb-20** | **04-Nov-20** |
| **Fire Protection** | | 164 | 10-Feb-20 | 29-Sep-20 |
| A6720 | Piping & Heads - B1 | 20 | 10-Feb-20 | 06-Mar-20 |
| A6730 | Piping & Heads - Level 1 | 20 | 02-Mar-20 | 27-Mar-20 |
| A6740 | Piping & Heads - Level 2 | 20 | 20-Mar-20 | 16-Apr-20 |
| A6750 | Piping & Heads - Level 3 | 20 | 10-Apr-20 | 07-May-20 |
| A6760 | Piping & Heads - Level 4 | 20 | 01-May-20 | 29-May-20 |
| A6770 | Piping & Heads - Level 5 | 20 | 22-May-20 | 19-Jun-20 |
| A6780 | Piping & Heads - Level 6 | 20 | 22-Jun-20 | 20-Jul-20 |
| A6790 | Piping & Heads - Level 7 | 20 | 14-Jul-20 | 10-Aug-20 |
| A6800 | Piping & Heads - Level 8 | 20 | 04-Aug-20 | 31-Aug-20 |
| A6810 | Piping & Heads - Level 9 | 20 | 18-Aug-20 | 15-Sep-20 |
| A6820 | Piping & Heads - Level 10 | 20 | 01-Sep-20 | 29-Sep-20 |
| **Plumbing - Water/Gas/Sanitary Risers** | | 79 | 03-Feb-20 | 21-May-20 |
| A6840 | Piping - B1 | 20 | 03-Feb-20 | 28-Feb-20 |
| A6850 | Piping - Level 1 | 20 | 21-Feb-20 | 19-Mar-20 |
| A6860 | Piping - Level 2 | 20 | 13-Mar-20 | 09-Apr-20 |
| A6870 | Piping - Level 3 | 20 | 03-Apr-20 | 30-Apr-20 |
| A6880 | Piping - Level 4 | 20 | 24-Apr-20 | 21-May-20 |
| **Electrical** | | 154 | 12-Mar-20 | 16-Oct-20 |
| **Main Switchgear** | | **92** | **12-Mar-20** | **21-Jul-20** |
| A6960 | Install Switchgear | 20 | 12-Mar-20 | 08-Apr-20 |
| A6970 | Install Generator & ATS | 20 | 23-Jun-20 | 21-Jul-20 |
| A6950 | Install Transformers/Feeders | 20 | 23-Jun-20 | 21-Jul-20 |
| **Miscellaneous Power** | | **20** | **21-Aug-20** | **18-Sep-20** |
| A6980 | Install Miscellaneous Convenience Power | 20 | 21-Aug-20 | 18-Sep-20 |
| **Lighting** | | **137** | **23-Mar-20** | **02-Oct-20** |
| A7110 | Install Lighting - B1 | 15 | 23-Mar-20 | 10-Apr-20 |
| A7120 | Install Lighting - Level 1 | 15 | 06-Apr-20 | 24-Apr-20 |
| A7130 | Install Lighting - Level 2 | 15 | 20-Apr-20 | 08-May-20 |
| A7140 | Install Lighting - Level 3 | 15 | 04-May-20 | 22-May-20 |
| A7150 | Install Lighting - Level 4 | 15 | 18-May-20 | 08-Jun-20 |
| A7160 | Install Stairwell / Miscellaneous Lighting - Levels 5-10 | 20 | 14-Aug-20 | 11-Sep-20 |
| A7170 | Install Low Voltage Services (Life Safety Items) | 30 | 21-Aug-20 | 02-Oct-20 |
| **Specialty Equipment** | | **10** | **05-Oct-20** | **16-Oct-20** |
| A7930 | Install Parking Gates/Equipment | 10 | 05-Oct-20 | 16-Oct-20 |
| **HVAC** | | 118 | 20-May-20 | 04-Nov-20 |
| A7290 | Install Ductwork - Level 4 | 3 | 20-May-20 | 22-May-20 |
| A7220 | Install Ductwork - Level 5 | 3 | 11-Jun-20 | 15-Jun-20 |
| A7230 | Install Ductwork - Level 6 | 3 | 10-Jul-20 | 14-Jul-20 |
| A7240 | Install Ductwork - Level 7 | 3 | 31-Jul-20 | 04-Aug-20 |
| A7250 | Install Ductwork - Level 8 | 3 | 21-Aug-20 | 25-Aug-20 |
| A7260 | Install Ductwork - Level 9 | 3 | 04-Sep-20 | 09-Sep-20 |
| A7270 | Install Ductwork - Level 10 | 3 | 21-Sep-20 | 23-Sep-20 |
| A7280 | Install Roof Top Unit | 10 | 22-Oct-20 | 04-Nov-20 |
| **Interior Finishes** | | **191** | **26-Feb-20** | **23-Nov-20** |
| **Concrete Masonry Units** | | 140 | 26-Feb-20 | 11-Sep-20 |
| A5500 | Install CMU Walls at lvl B1 | 5 | 26-Feb-20 | 03-Mar-20 |

| | Legend | | |
|---|---|---|---|
| ▬▬ | Remaining Level of Effort | ▬▬ | Remaining Work |
| ▬▬ | Actual Level of Effort | ▬▬ | Critical Remaining Work |
| ▬▬ | Actual Work | ◆ | Milestone |

Data Date = 26-Sep-19
Schedule Printed on 26-Sep-19, at 09:08
Page 6 of 8

**Commerce Center - Schedule - w/o B2 Level and w/ Owner Delay - 10/10/19**

WILHELM CONSTRUCTION

| Activity ID | Activity Name | Duration | Start | Finish |
|---|---|---|---|---|
| A5700 | Install CMU Walls at lvl 1 | 5 | 18-Mar-20 | 24-Mar-20 |
| A6350 | Install CMU Walls at lvl 2 | 5 | 08-Apr-20 | 14-Apr-20 |
| A6390 | Install CMU Walls at lvl 3 | 5 | 29-Apr-20 | 05-May-20 |
| A6410 | Install CMU Walls at lvl 4 | 5 | 20-May-20 | 27-May-20 |
| A6450 | Install CMU Walls at lvl 5 | 5 | 11-Jun-20 | 17-Jun-20 |
| A6470 | Install CMU Walls at lvl 6 | 5 | 10-Jul-20 | 16-Jul-20 |
| A6510 | Install CMU Walls at lvl 7 | 5 | 31-Jul-20 | 06-Aug-20 |
| A6530 | Install CMU Walls at lvl 8 | 5 | 21-Aug-20 | 27-Aug-20 |
| A6570 | Install CMU Walls at lvl 9 | 5 | 28-Aug-20 | 03-Sep-20 |
| A6590 | Install CMU Walls at lvl 10 | 5 | 04-Sep-20 | 11-Sep-20 |
| **Studs, Drywall, Paint & Plaster** | | 30 | 29-Apr-20 | 10-Jun-20 |
| **Level 1** | | 15 | 29-Apr-20 | 19-May-20 |
| A7350 | Partition Walls for Retail (Drywall/Plaster) - Level 1 | 15 | 29-Apr-20 | 19-May-20 |
| **Level 4** | | 15 | 20-May-20 | 10-Jun-20 |
| A7360 | Partition Walls for Retail (Drywall/Plaster) - Level 4 | 15 | 20-May-20 | 10-Jun-20 |
| A7910 | Frame and Hang L4 Ceiling | 15 | 20-May-20 | 10-Jun-20 |
| **Doors and Frames** | | 55 | 11-Jun-20 | 27-Aug-20 |
| A6710 | Install Hollow Metal Frames | 25 | 11-Jun-20 | 16-Jul-20 |
| A6830 | Hang Hollow Metal Slabs and Hardware | 15 | 17-Jul-20 | 06-Aug-20 |
| A7900 | Paint HMF and HMD | 15 | 07-Aug-20 | 27-Aug-20 |
| **Decks - Sealing, Coating & Striping** | | 176 | 18-Mar-20 | 23-Nov-20 |
| A7830 | Traffic Coatings (B1 through L4) -- L2 | 1 | 18-Mar-20 | 18-Mar-20 |
| A7300 | Striping - Level B1 | 2 | 25-Jun-20 | 26-Jun-20 |
| A7310 | Striping - Level 1 | 2 | 29-Jun-20 | 30-Jun-20 |
| A7320 | Striping - Level 2 | 2 | 01-Jul-20 | 02-Jul-20 |
| A7330 | Striping - Level 3 | 2 | 06-Jul-20 | 07-Jul-20 |
| A7340 | Striping - Level 4 | 2 | 08-Jul-20 | 09-Jul-20 |
| A7920 | Joint Sealants - All Interiors | 1 | 17-Jul-20 | 17-Jul-20 |
| A7790 | Spray Foam Ceilings (B1 through L10) | 1 | 21-Aug-20 | 21-Aug-20 |
| A7840 | Deck Sealing | 1 | 21-Aug-20 | 21-Aug-20 |
| A7890 | Install Firestopping at Building Perimeter (L1 through L10) | 1 | 09-Nov-20 | 09-Nov-20 |
| A7850 | Joint Sealants - All Exteriors | 1 | 23-Nov-20 | 23-Nov-20 |
| **Civil & Sitework** | | 306 | 21-Oct-19 | 05-Jan-21 |
| **Parking Lot/Building Perimeter** | | 45 | 21-Oct-19 | 24-Dec-19 |
| A3560 | Demo Asphalt Pavement | 5 | 21-Oct-19 | 25-Oct-19 |
| A3550 | Demo Sanitary line | 5 | 28-Oct-19 | 01-Nov-19 |
| A3570 | Install Aquaswirl | 15 | 04-Nov-19 | 22-Nov-19 |
| A3580 | Install Storm Structures & Piping around Phase 1 | 15 | 25-Nov-19 | 17-Dec-19 |
| A3590 | Repave Parking Lot | 5 | 18-Dec-19 | 24-Dec-19 |
| **Colfax Avenue** | | 25 | 26-Dec-19 | 30-Jan-20 |
| A3500 | Demo Pavement & Install Sanitary Line | 15 | 26-Dec-19 | 16-Jan-20 |
| A3540 | Install Concrete Approach/Curbs on Colfax | 5 | 17-Jan-20 | 23-Jan-20 |
| A3600 | Repave Colfax ROW Pavement | 5 | 24-Jan-20 | 30-Jan-20 |
| **Lasalle Avenue/Sycamore Street** | | 25 | 26-Dec-19 | 30-Jan-20 |
| A3610 | Demo Sanitary Line | 5 | 26-Dec-19 | 02-Jan-20 |
| A3620 | Install Water line | 5 | 03-Jan-20 | 09-Jan-20 |
| A3630 | Install Curb along Lasalle and Sycamore | 10 | 10-Jan-20 | 23-Jan-20 |
| A3510 | Repave Lasalle/Sycamore ROW Pavement | 5 | 24-Jan-20 | 30-Jan-20 |
| **Sidewalk & Landscaping** | | 32 | 17-Nov-20 | 05-Jan-21 |
| A3530 | Install Sidewalks & Landscaping | 32 | 17-Nov-20 | 05-Jan-21 |

Legend:
- ▬ Remaining Level of Effort
- ▬ Actual Level of Effort
- ▬ Actual Work
- ▭ Remaining Work
- ▬ Critical Remaining Work
- ◆ ◆ Milestone

Data Date = 26-Sep-19
Schedule Printed on 26-Sep-19, at 09:08
Page 7 of 8

**Commerce Center - Schedule - w/o B2 Level and w/ Owner Delay - 10/10/19**

WILHELM CONSTRUCTION

| Activity ID | Activity Name | Duration | Start | Finish |
|---|---|---|---|---|
| **Project Completion** | | **24** | **06-Jan-21** | **08-Feb-21** |
| A2190 | Sitework & Landscaping Punchlist | 24 | 06-Jan-21 | 08-Feb-21 |
| A2090 | Rooftop Punchlist | 24 | 06-Jan-21 | 08-Feb-21 |
| A1760 | Parking Levels B1 through Level 4 Punchlist | 24 | 06-Jan-21 | 08-Feb-21 |
| A1770 | Facade Punchlist | 24 | 06-Jan-21 | 08-Feb-21 |
| A1780 | Apartments Levels 5-10 Punchlist | 24 | 06-Jan-21 | 08-Feb-21 |

 Remaining Level of Effort
 Actual Level of Effort
 Actual Work
Remaining Work
Critical Remaining Work
◆ ◆ Milestone

Data Date = 26-Sep-19
Schedule Printed on 26-Sep-19, at 09:08
Page 8 of 8

Commerce Center - Schedule - w/o B2 Level and w/ Owner Delay -
10/10/19

 WILHELM CONSTRUCTION

# Exhibit B

THAT PART OF LOT 1A IN COMMERCE CENTER REPLAT, BEING A SUBDIVISION OF LOTS 13, 19, 20, 21, 22, 23, 24 AND PARTS OF LOTS 14 AND 15 OF THE ORIGINAL PLAT OF THE TOWN OF LOWELL AND VACATED ALLEYS AND STREETS OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 37 NORTH, RANGE 2 EAST, ACCORDING TO THE PLAT THEREOF RECORDED APRIL 26, 2018 AS DOCUMENT NUMBER 1809857, IN THE CITY OF SOUTH BEND, PORTAGE TOWNSHIP, ST. JOSEPH COUNTY, INDIANA, MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWEST CORNER OF SAID LOT 1A; THENCE NORTH 89°52'51" EAST ALONG THE NORTH LINE OF SAID LOT 1A A DISTANCE OF 212.15 FEET; THENCE SOUTH 00°14'04" EAST A DISTANCE OF199.80 FEET; THENCE SOUTH 89°52'51" WEST PARALLEL WITH SAID NORTH LINE A DISTANCE OF 113.30 FEET TO THE WESTERLY LINE OF SAID LOT 1A; THENCE ALONG SAID WESTERLY LINE ON THE FOLLOWING THREE COURSES:
1. THENCE NORTH 00°11'34" WEST A DISTANCE OF 81.80 FEET;
2. THENCE SOUTH 89°52'51" WEST A DISTANCE OF 99.00 FEET;
3. THENCE NORTH 00°11'34" WEST A DISTANCE OF 118.00 FEET TO THE POINT OF BEGINNING.

CONTAINING 0.788 ACRES, MORE OR LESS.

# Exhibit C

## COMMENCEMENT DATE AGREEMENT

This COMMENCEMENT DATE AGREEMENT (this **"Agreement"**), dated as of _____, 2019 (the **"Effective Date"**), is entered into by and between **COMMERCE CENTER DEVELOPMENT, LLC** an Indiana limited liability company, having an address at 401 E. Colfax Ave., Ste. 277, South Bend, IN 46617 ("**Landlord**"), and **MATTHEWS 350 E LASALLE LLC**, an Indiana limited liability company, having an address at 401 E. Colfax Ave., Ste. 277, South Bend, IN 46617 ("**Tenant**") (Landlord and Tenant shall collectively be referred to herein as the **"Parties"** or, individually, as a **"Party"**).

## WITNESSETH

**WHEREAS**, by Ground Lease dated October 30, 2019 (the "**Lease**"), Landlord leased to Tenant certain premises located at 350 E. LaSalle Avenue, South Bend, IN 46617, as more particularly described in the Lease; and

**WHEREAS**, Section 2.03 of the Lease contemplates that Landlord and Tenant will execute an agreement affirming the Commencement Date, the Rent Commencement, and the Expiration Date of the Lease;

**NOW THEREFORE**, in consideration of Ten Dollars ($10.00) and other good and valuable consideration exchanged by the Parties, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      Defined Terms. All capitalized terms not otherwise defined in this Agreement shall have the definitions given to them in the Lease.

2.      Commencement Date. The Commencement Date of the Lease is hereby fixed at October 30, 2019, all preconditions thereto having been satisfied or waived.

3.      Rent Commencement Date. The Rent Commencement Date of the Lease is hereby fixed as the Commencement Date.

4.      Expiration Date. The Expiration Date of the term of the Lease is hereby fixed as ninety-nine (99) years from the Completion Date, or such earlier date on which the Term shall sooner end pursuant to any of the terms, covenants or conditions of this Lease or pursuant to Law. The Term, as described in the Lease, shall begin on the Commencement Date and end on the Expiration Date.

5.      Except as herein expressly modified, all terms, covenants, conditions, and provisions of the Lease remain in full force and effect and binding upon all the Parties.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the Effective Date.

**LANDLORD:**

Commerce Center Development, LLC

By:_____

Name:  David Matthews

Title: Sole Member

**TENANT:**

Matthews 350 E LaSalle LLC

By:_____

Name: David Matthews

Title: Managing Member